UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

|  |  |
|---|---|
| Philip Calderon, on his own behalf and on behalf of all others similarly situated, | : : : |
| *Plaintiff*, | : : : |
| - against - | : : : |
| Public Partnerships, LLC, | : : : : |
| *Defendant*. | : : |

**25-cv-____ ( )**

**Class and Collective Action COMPLAINT**

**JURY TRIAL DEMANDED**

_____

Plaintiff Philip Calderon, individually and on behalf of all others similarly situated, by his undersigned attorneys The Legal Aid Society and Katz Banks Kumin LLP, as and for his Complaint, allege as follows:

**Preliminary Statement**

1.      Plaintiff Philip Calderon is a personal care assistant ("Personal Assistant") employed by Public Partnerships, LLC ("PPL"). He provides home care services through the New York State Medicaid Consumer Directed Personal Assistance Program ("CDPAP"), a New York State Medicaid program that allows Medicaid members who are eligible for home care services ("Consumers") to choose and hire their own personal caregiver. This program sustains consumers' lives in their communities and pays critical wages to the Personal Assistants whose work is essential to the Consumers' well-being.

2.      On April 1, 2025, New York State transitioned from using hundreds of fiscal intermediaries to administer CDPAP to PPL as the single intermediary for thousands of Personal Assistants. This haphazard transition has jeopardized the ongoing care of thousands of program Consumers and threatened the livelihoods of thousands more Personal Assistants.

3.      PPL has failed to pay Mr. Calderon and tens of thousands of other Personal Assistants across New York on time, for all their time worked, or at the correct rate in violation of federal and state wage laws. At the time of this filing, PPL has failed to pay Mr. Calderon any wages for his full-time work since April 1, 2025. Although Mr. Calderon has reported all his work hours to PPL, the company has not paid him because of what multiple company representatives have described to him as an "IT problem."

4.      Likewise, other Personal Assistants in the Class and Collective that Mr. Calderon seeks to represent have faced a dizzying array of technical problems reporting their hours and receiving their pay, including: the inability to access PPL's timekeeping app, Time4Care; the inability to clock-in for their shifts when starting work outside their Consumer's homes; time entries not properly storing in Time4Care or disappearing after entry; automatically being clocked out of shifts when working overnight; and the rejection of time entries or timesheets based on PPL's mistaken identification of a problem with a Consumer's enrollment or authorization status. The different challenges faced by Personal Assistants are all expressions of a single problem: PPL's wholly inadequate infrastructure for onboarding, scheduling, paying, and communicating with employees.

5.      PPL has put Mr. Calderon and tens of thousands of other Personal Assistants and their families in dire financial straits. This action seeks to put an end to PPL's ongoing wage violations.

**PARTIES**

6.      Plaintiff Philip Calderon is a twenty-five-year-old individual residing in Richmond County, New York. He works full-time for PPL caring for his father in Richmond County.

7.      Defendant Public Partnerships, LLC ("PPL") is a limited liability company

2

organized under the laws of Delaware with its principal place of business in Georgia.

8.    Pursuant to a contract entered into with the State of New York, PPL operates as the payroll administrator and the joint employer of the Personal Assistants working under CDPAP throughout New York State under the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL").

9.    Under that contract, PPL determines the terms and conditions of employment for Personal Assistants providing home care services for Consumers under CDPAP,  As such, PPL is an enterprise as defined in Section 3(r)(1) of the FLSA, 29 U.S.C. § 203 (r)(1), and as an enterprise engaged in commerce or in the production of goods for commerce within the meaning of Section 3(s)(1)(A), 29 U.S.C. § 203(s)(1)(A), in that the Defendant's employees are engaged in interstate commerce and Defendant's annual gross volume of business done exceeds $500,000.00.

10.    Upon information and belief, PPL promulgates employment policies, including compensation policies, for all Personal Assistants working under CDPAP in New York State.

11.    PPL employs Plaintiff and similarly situated Personal Assistants within the meaning of the FLSA and the NYLL.

**JURISDICTION AND VENUE**

12.    This Court has jurisdiction over Plaintiff's claims under the FLSA pursuant to 28 U.S.C. §§ 1331 and 1337 and 29 U.S.C. § 216(b).

13.    Pursuant to 29 U.S.C. § 216(b), Plaintiff has consented in writing to become a party to this lawsuit. Plaintiff's written consent form is attached hereto as Exhibit A.

14.    This Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, because these claims are so closely related to Plaintiff's claims under the FLSA that they

form part of the same case or controversy under Article III of the United States Constitution.

15. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

16. Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because it is the judicial district in which a substantial part of the events giving rise to the claims occurred, as it is where the Plaintiff works for PPL.

## BACKGROUND

17. New York created the New York State Medicaid CDPAP program to allow Consumers to select and train their caregivers to assist them with navigating the challenges of daily life created by age, disability, or illness while remaining in their communities.

18. Consumers in the program can receive care from family members, members of their communities, and others with whom they have personal relationships or with whom they feel most comfortable having in their homes. The ability to hire family, friends, neighbors, or community members who speak the same language is especially beneficial for Consumers in light of the highly personal nature of the care they receive and which they require to remain at home and retain their independence.

19. Under New York's regulations, Personal Assistants may provide "personal care services," including "(1) bathing of the patient in the bed, the tub or in the shower; (2) dressing; (3) grooming, including care of hair, shaving and ordinary care of nails, teeth and mouth; (4) toileting; this may include assisting the patient on and off the bedpan, commode or toilet; (5) walking, beyond that provided by durable medical equipment, within the home and outside the home; (6) transferring from bed to chair or wheelchair; (7) turning and positioning; (8) preparing of meals . . . ; (9) feeding; (10) administration of medication by the patient, including prompting

4

the patient as to time, identifying the medication for the patient, bringing the medication and any necessary supplies or equipment to the patient, opening the container for the patient, positioning the patient for medication and administration, disposing of used supplies and materials and storing the medication properly; (11) providing routine skin care; (12) using medical supplies such as walkers and wheelchairs; and (13) changing of simple dressings." 18 N.Y.C.R.R. § 505.14(a)(5)(ii)(a).

20.     Personal Assistants may also assist with "home health aide services," defined as "simple health care tasks, personal hygiene services, housekeeping tasks essential to the Consumer's health and other related supportive services." 18 N.Y.C.R.R. § 505.28(b)(10).

21.     Such tasks include, for example, "performance of simple measurements and tests to routinely monitor the Consumer's medical condition; performance of a maintenance exercise program; and care of an ostomy after the ostomy has achieved its normal function." *Id.*

22.     For Consumers who require assistance with both "personal care services" and "home health aide services," participation in CDPAP means that they can get all of their care at home from one type of aide.

23.     Personal Assistants in the traditional personal care program may not assist with home health aide services, forcing certain individuals in that program to coordinate additional assistance through Certified Home Health Agencies or Private Duty Nursing. In practice, this restriction means that CDPAP represents the only opportunity for certain Consumers to continue to receive care in the community.

24.     Significantly more than 25% of Personal Assistants' work requires them to perform manual labor, such as physically lifting or moving Consumers with limited mobility, helping Consumers use the restroom and bathe, performing physical tasks such as cooking and cleaning,

and driving Consumers or helping them navigate public transportation.

25.    The popularity of CDPAP has meant that as of January 1, 2025, the program supported 280,000 New York State residents and employed over 300,000 Personal Assistants.

26.    From 2015 until April 1, 2025, CDPAP Personal Assistants were paid by one of hundreds of fiscal intermediaries across New York State that provided payroll administrative services. In April 2024, this arrangement changed significantly when New York State mandated that as of April 1, 2025, there could only be one fiscal intermediary for the entire state.

27.    The New York State Department of Health ("DOH") awarded the contract to PPL.

28.    The transition of CDPAP from hundreds of fiscal intermediaries to PPL has been highly chaotic, primarily due to PPL's incompetence and mismanagement.

29.    On January 17, 2025, DOH announced that the deadline for all CDPAP Consumers to complete the enrollment process was March 28, 2025. This gave hundreds of thousands of CDPAP Consumers and Personal Assistants a little over two months to enroll or register.

30.    The January announcement, however, did not explain what would happen to any CDPAP Consumer or Personal Assistant who had not begun or completed the enrollment or registration process by the deadline: that Personal Assistants would not be paid and that Consumers would lose their caregivers.

31.    It was not made clear to Consumers or Personal Assistants that failure to register with PPL by March 28, 2025, could have catastrophic consequences for continuing care and employment.

32.    Many Consumers and Personal Assistants received no notice of the requirement to enroll or register with PPL at all.

33.    In the period immediately prior to PPL's assumption of its contractual

responsibility, it rapidly became clear that a very rocky onboarding process for hundreds of thousands of Consumers and Personal Assistants would mean that sizeable portions of both groups would not be fully registered and transitioned to PPL by April 1, 2025.

34.     This meant that  thousands of vulnerable New Yorkers would face an abrupt cessation of care on April 1.

35.     In a failed attempt to rectify the system and avoid disaster, Governor Hochul extended the enrollment period to April 30 (from March 31), offering to have PPL pay Personal Assistants retroactively once the enrollment process was completed—despite laws prohibiting such practices.

36.     Since PPL assumed its role as employer and fiscal intermediary on April 1, Personal Assistants and Consumers have reported catastrophic systemic failures in PPL's enrollment, payroll, timekeeping, and communications infrastructure requiring hours on the phone in efforts to remedy countless errors.

37.     As a result, PPL has subjected tens of thousands of Personal Assistants to wage theft leaving them uncompensated or undercompensated for weeks, in violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*, Articles 6 and 19 of the New York Labor Law, , and the New York Wage Parity Act, Public Health Law § 3914-C ("Wage Parity Act").

38.     PPL's payroll and timekeeping infrastructure is beset by glitches, technical errors, and policy choices that make it difficult or impossible to enroll in the system, report hours worked, and approve time. This has resulted in PPL failing to pay Personal Assistants for their time worked.

39.     Under PPL's system, Personal Assistants are required to report their hours to PPL either through an app ("Time4Care"), through an automated telephone system ("Telephony"), or

by faxing, mailing, or emailing paper timesheets. Consumers (or their designated representatives) must approve their Personal Assistants' hours before PPL releases payment.

40.     The flaws in these systems are so profound that they constitute a feature not a bug. Personal Assistants experience problems with all these reporting methods.

41.     The Time4Care app is unreliable, routinely failing to record time entirely or erasing time that has been entered.

42.     Personal Assistants accurately report their time but later find that entire shifts or parts of shifts have inexplicably disappeared when Consumers are asked to approve their weekly pay.

43.     Similar problems exist with the Telephony system.  The email address Consumers are instructed to use for sending in paper timekeeping records often cannot receive messages because it is full.

44.     The PPL system creates other problems for Personal Assistants, including the routine loss of overnight hours, rounding errors, rejections of overlapping shifts, inflexible location requirements, and deleted bank account numbers for direct deposit.

45.     On information and belief, thousands and likely tens of thousands of Personal Assistants work overnight shifts to care for homebound and vulnerable Consumers who require and are authorized to receive 24-hour care.

46.     But PPL's system automatically clocks out these overnight workers at midnight, resulting in lost pay.

47.     In an attempt to remedy this error, PPL began to instruct Personal Assistants to clock out at 11:59 p.m. and clock back in at midnight.

48.     For "sleep-in" workers who often work shifts of several days and are entitled to

eight hours of sleep time, this workaround forces them to lose precious sleep during arduous shifts to secure the pay they have earned.

49.    For Personal Assistants working "split shifts" and therefore on duty all night, this workaround may interfere with tasks they must perform for Consumers.

50.    Time4Care and Telephony round time entries into 15-minute blocks rather than recording exact working hours. This results in payments that differ from the actual hours Personal Assistants worked and should be paid for.

51.    Time4Care and Telephony will not accommodate overlapping work shifts. When two Personal Assistants are on the clock during the same 15-minute block, either because a Consumer is authorized to receive care from two Personal Assistants simultaneously or because of a shift change, both Personal Assistants have had their entire shifts rejected by PPL.

52.    When a Personal Assistant's shift starts outside of the Consumer's home, such as when they meet their Consumer at a medical appointment, they are often unable to clock in.

53.    Personal Assistants have submitted direct deposit paperwork multiple times only to find the information deleted. This delays the availability of funds and requires Personal Assistants to repeatedly submit the same information to PPL's system.

54.    Other rampant errors in the PPL system affect both Personal Assistants and Consumers.

55.    These issues with the PPL system result in payment mistakes that must be corrected.

56.    Consumers have found that PPL undercounts their Personal Assistant's hours or lists the wrong Personal Assistant in the Consumer's portal (including confidential information such as the individual's complete social security number).

57.     Many Designated Representatives of Consumers, such as guardians or healthcare proxies, have reported that PPL does not allow them to approve pay for Personal Assistants.

58.     Other Consumers have found that they cannot approve time at all because PPL's system has incorrectly marked them as lacking CDPAP care authorization by the Consumer's Managed Long Term Care Plan.

59.     Still others have seen time that was originally approved later designated as "denied" without any warning or notice.

60.     Indeed, for some Personal Assistants, the first time their Consumers learn that their Personal Assistant's time was "denied" is when the Personal Assistant receives a check that is far less than expected and the Consumer goes back online seeking answers.  If Consumers cannot approve their Personal Assistant's time, their Personal Assistants go unpaid.

61.     Even when Personal Assistants are paid, the payments they receive are frequently late or incorrect.

62.     Many Personal Assistants are not paid the requisite time-and-a-half for the overtime hours they worked.

63.     Personal Assistants have also been denied overtime pay when PPL omitted the final day of a pay period from a weekly payment causing Personal Assistants' hours to be reduced to below 40 for the week.

64.     Some Personal Assistants who worked overtime report receiving only their regular hourly pay, without the required overtime premium.

65.     Despite the array of defects in its computer systems, PPL limits the number of times a Personal Assistant can submit a paper timesheet.

66.     Recently, Personal Assistants who have tried to email timesheets to the address

provided by PPL have received bounce-back messages stating that "Delivery has failed to these recipients or groups" with the explanation that their timesheets cannot be delivered because "The recipient's mailbox is full and can't accept messages now."

67.     Personal Assistants then are advised to "Please try resending your message later or contact the recipient directly." They are not told whom to contact directly or how to reach that person.

68.     Personal Assistants and Consumers have made repeated efforts to bring these issues to PPL's attention to no avail.

69.     To fix timekeeping or other payroll problems, Personal Assistants and Consumers are told they can call PPL to open a ticket. Getting through to a PPL representative by phone has proven to be exceedingly difficult.

70.     When able to leave a call back number, Personal Assistants and Consumers wait weeks for the promised return call. Often, no call ever comes.

71.     When Personal Assistants and Consumers can reach a person at PPL, their problems remain unresolved.

72.     The representative frequently gives Personal Assistants and Consumers general assurance that the problem will be solved or that they will submit a ticket. Personal Assistants and Consumers later learn the problem has not been addressed.

73.     Because many of these problems interact, workers employed by PPL are forced to spend an inordinate amount of time struggling with PPL's inadequate systems to receive the pay they have earned.

74.     Personal Assistants and the Consumers they care for report spending countless hours in often fruitless attempts to remedy the many issues created by PPL's deeply flawed

systems. They spend hours searching for workarounds in attempts to navigate an impenetrable process.

75.    For example, many English-speaking Consumers and Personal Assistants now select foreign language options when calling PPL because they have learned that this workaround increases the likelihood of reaching a person before the line disconnects.

76.    The resulting delays and underpayments are not just an inconvenience; they are a serious burden for low-wage workers who provide an essential service to vulnerable New Yorkers.

77.    Many Personal Assistants live paycheck to paycheck and cannot afford to work without a guarantee of timely payment.

78.    These workers are the lynchpin that keeps disabled New Yorkers in their homes. They do a hard job that is difficult to replace. There is a well-documented shortage of home care workers throughout New York State.

79.    Personal Assistants who cannot afford to work for free have begun to leave the program.

80.    Though Personal Assistants want to continue providing care, their financial circumstances do not permit many of them to weather the long delays and uncertainty that PPL has created.

81.    Consumers are increasingly experiencing interruptions in their personal care services as PPL's mismanagement of the program continues.

82.    Despite the requirements of the FLSA, NYLL, and the New York Wage Parity Act, PPL has failed to pay an astounding number of Personal Assistants their wages each week.

83.    Caring Majority Rising, a coalition of people with disabilities, older adults,

caregivers, and home care workers, surveyed over 650 Personal Assistants and Consumers since April 1 when PPL became the state-wide fiscal intermediary.

84.    A majority of those responding to Caring Majority Rising reported underpayments on either the first or second payroll weeks. Many of these workers reported receiving no payment whatsoever since the April 1 transition.

85.    The problems are not limited to Personal Assistants who have been unable to navigate the byzantine transition from their prior fiscal intermediaries to PPL. A majority of workers responding to Caring Majority Rising were either fully registered with PPL or had completed their portion of the registration process and are awaiting final confirmation from PPL, yet they reported that they remain unpaid for their essential work.

**Plaintiff Philip Calderon**

86.    The experience of Plaintiff Philip Calderon illustrates how PPL is violating both federal and state wage laws with respect to him and other Personal Assistants.

87.    Mr. Calderon is a Personal Assistant who provides home care services for his father, a Consumer under CDPAP.

88.    Mr. Calderon and his father were fully registered and enrolled with PPL before the April 1 transition.

89.    Mr. Calderon has continued to work around forty hours per week as a Personal Assistant since that date.

90.    PPL has not paid Mr. Calderon anything for his services, even though he has recorded his time on PPL's timekeeping application, faxed time records to PPL, and contacted PPL by phone many times to remedy the issue.

91.    Mr. Calderon's father requires home care services because of his severe arthritis.

He can walk with the assistance of a cane or walker but requires Mr. Calderon's assistance to complete basic life tasks.

92.     Mr. Calderon spends significantly more than 25% of his work time on manual tasks. He physically assists his father through their home, including up and down stairs, and when his father sits or stands. He helps his father toilet and bathes him. He cooks for his father, cleans the home, and drives his father to appointments or to go grocery shopping.

93.     Before PPL was Mr. Calderon's fiscal intermediary, he and his father worked with another fiscal intermediary organization called Freedom Care. Mr. Calderon did not experience any problems with wage payments.

94.     Starting on or around April 1, 2025, after completing the mandatory training on Time4Care provided by PPL, Mr. Calderon began tracking his time working for his father using Time4Care.

95.     The Time4Care application allows Personal Assistants such as Mr. Calderon to clock-in and clock-out for their shifts, and to transmit their work hours to PPL.

96.     Although Mr. Calderon was able to clock-in and clock-out of Time4Care, his time entries were accompanied by an error message indicating he would not be paid.

97.     The message read: "Consumer is not enrolled with MCO/State on Time Entry's Date of Service. Consumer is not enrolled during Time Entry's Date of Service."

98.     Mr. Calderon's father enrolled with PPL prior to the April 1 transition date. His father had provided PPL with his authorization for home care services. When his father checked his account on PPL's website, it indicated he was enrolled and authorized to receive care.

99.     Mr. Calderon repeatedly tried to contact PPL. Despite numerous calls, he struggled to reach a representative of the company.

100.    On two occasions when Mr. Calderon was able to reach a PPL representative by phone, the company representatives told him that the error message was itself an error in PPL's IT system, and that he did not need to take any additional action to be paid.

101.    In addition to using Time4Care, Mr. Calderon submitted his weekly timesheet to PPL by fax on or around April 19. The preliminary injunction in a suit brought by CDPAP Consumers, *Engesser et al. v. McDonald, the New York State Department of Health,* directed Personal Assistants that they could submit time records for payment by fax or email.

102.    Mr. Calderon has still not been paid any wages for no less than approximately 169 hours of work caring for his father since April 1, 2025.

103.    PPL's failure to pay Mr. Calderon has caused him and his family financial hardship.

104.    Mr. Calderon lives with his father and mother, both of whom have disabilities and receive disability insurance.

105.    Mr. Calderon's income from his home care work is an important part of how his family meets their basic expenses. Without it, he has had to use credit and savings to cover expenses.

106.    If PPL does not pay him soon, Mr. Calderon worries his family will not be able to meet their basic expenses.

107.    Mr. Calderon is not alone. PPL's conduct with respect to Mr. Calderon is typical of what tens of thousands of other Personal Assistants in New York have experienced since PPL became their employer on April 1, 2025. Like him, they have not been paid or been underpaid because of PPL's dysfunctional systems for timekeeping, payroll, and communications.

108.    By the conduct described in this Complaint, Defendant willfully committed widespread violations of the FLSA, the NYLL, and the Wage Parity Act.

## COLLECTIVE ACTION ALLEGATIONS

109.    Plaintiff brings the First Claim for Relief, the FLSA claim, on behalf of himself and those individuals who may opt into the "FLSA Collective" defined as: "All current and former Personal Assistants for Defendant within Westchester, Nassau, and Suffolk Counties, and the five boroughs of New York City and who have not been paid on time for all hours worked at the required rate as a result of Defendant's illegal and improper pay practices, employed between April 1, 2025 through the date of final judgment in this matter."

110.    The current and former employees described above are situated similarly to Plaintiff Calderon within the meaning of the FLSA, 29 U.S.C. § 216(b) and, therefore, the First Claim for Relief herein may be brought and maintained as an "opt-in" collective action pursuant to Section 16(b) of the FLSA.

111.    At all relevant times, the FLSA Collective has substantially similar job requirements and pay provisions, and have been subjected to Defendant's decisions, policies, practices, procedures, and rules, which include Defendant's willful failure and refusal to pay wages on time for all hours worked at the legally-mandated rate—including but not limited to failure to pay the federal minimum wage and legally-required overtime.

112.    Defendant PPL is liable under the FLSA for, *inter alia*, failing to properly compensate the FLSA Collective.

113.    Common proof applicable to Plaintiff and the other workers will show that Defendant failed to pay minimum and overtime wages as required by the FLSA to Plaintiff and other similarly situated workers.

114.    This cause of action is also maintainable as a collective action pursuant to the FLSA, 29 U.S.C. § 216(b), because the prosecution of separate actions by individual members of

16

the FLSA Collective would create a risk of inconsistent or varying adjudications with respect to individual current and former employees which would establish incompatible standards of conduct for Defendant.

115.    The names, last known addresses, and cell phone numbers of the proposed FLSA Collective members are available to Defendant. Defendant should be required to provide Plaintiff a list—including names, last known addresses, cell phone numbers, and email addresses if known—of all current and former employees who could be members of the proposed FLSA Collective.

116.    Notice of and an opportunity to join this lawsuit should be provided to all potential opt-in Plaintiffs both by First Class Mail to their last known address and by online posting, as well as by other practicable means including but not limited to text messaging, as soon as possible.

## CLASS ACTION ALLEGATIONS

117.    Plaintiff brings the NYLL and Wage Parity Act claims under Second and Third Causes of Action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class of persons defined as:

> All persons who have worked as Personal Assistants for Defendant in Westchester, Nassau, and Suffolk Counties, and the five boroughs of New York City, and suffer or have suffered the denial of wages on time for all hours worked at the legally required rate of pay during the period between April 1, 2025 and the date of final judgment in this action (the "Rule 23 Class").

118.    Plaintiff reserves the right to amend and refine the class definition above or add classes and/or subclasses as litigation progresses.

119.    Numerosity: The Rule 23 Class identified is so numerous that joinder of all members is impracticable.

120.    The exact number of Rule 23 Class members is unknown to Plaintiff at this time,

but it is believed to be in the tens of thousands. These members can be identified based on Defendant's and CDPAP's records.

121.    Commonality: Common questions of law and fact exist as to all members of the Rule 23 Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Rule 23 Class are:

a.    whether Defendant failed to keep true and accurate time and pay records for all hours worked by Plaintiff and members of the Rule 23 Class;

b.    whether Defendant failed to compensate Plaintiff and members of the Rule 23 Class for all of the work they were required to perform;

c.    whether Defendant failed to compensate Plaintiff and members of the Rule 23 Class on time for all of the work they were required to perform;

d.    whether Defendant failed to compensate Plaintiff and members of the Rule 23 Class at the legally-required rate;

e.    whether Defendant's policy of failing to pay workers was instituted willfully or with reckless disregard of the law; and

f.    the nature and extent of class-wide injury and the measure of damages for those injuries.

122.    These common questions arise, in part, because of the uniform circumstances under which the CDPAP program was transitioned to the single intermediary PPL.

123.    Typicality: Plaintiff's claims are typical of the claims of the other members of the Rule 23 Class. Plaintiff and all other members of the Rule 23 Class sustained damages arising out of Defendant's conduct in violation of the NYLL. The Rule 23 Class members are employed by Defendant as Personal Assistants under CDPAP, enjoy the same statutory rights and protections,

and have sustained similar types of damages as a result of Defendant's failure to comply with the NYLL.

124.    Adequacy: Plaintiff will fairly and adequately protect the interests of the members of the Rule 23 Class and has retained counsel competent and experienced in complex class action litigation, including suits involving unpaid overtime and misclassification of workers.

125.    Plaintiff has no interests that are contrary to or in conflict with those of the other members of the Rule 23 Class.

126.    Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

127.    A class action is superior to other available methods for the fair and efficient adjudication of this action. The Rule 23 Class has been damaged and is entitled to recovery as a result of the Defendant's violation of the NYLL as well as its common and uniform policies, practices, and procedures. A class action is a particularly superior method of adjudication in the context of wage and hour litigation where, as here, class members lack the financial resources to conduct a thorough analysis of Defendant's payroll and compensation practices and to vigorously prosecute a lawsuit in federal court against a corporate defendant. Although the relative damages suffered by individual Rule 23 Class members are not de minimis, such damages are small compared to the expense and burden of individual prosecution of this litigation. In addition, class certification is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about Defendant's practices.

128.    This action is properly maintainable under Rule 23(b)(3) of the Federal Rules of Civil Procedure.

129.    Plaintiff intends to send notice to all members of the Class to the extent required

by Fed. R. Civ. P. 23(c)(2). The names and addresses of the class members are available from Defendant's records.

130.    At all times during his employment, Plaintiff and members of the Rule 23 Class were Defendant's "employees" as defined in Section 3(e)(1) of the FLSA, 29 U.S.C. § 203(e)(1), and in NYLL §§ 2, 651(5) and 190(2).

131.    At all relevant times during Plaintiff's employment, Defendant was an "employer" within the meaning of Section 3(d) of the FLSA, 29 U.S.C. § 203(d), and NYLL §§ 2, 651(6) and 190(3).

132.    Class Members were and are manual laborers who are paid hourly rates, and PPL maintains control over their employment and payroll.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
### VIOLATION OF THE FAIR LABOR STANDARDS ACT
(Brought on behalf of Plaintiff and the FLSA Collective)

133.    Plaintiff realleges all allegations in the preceding paragraphs as if fully set forth here.

134.    Section 6(a) of the FLSA, 29 U.S.C. §206(a), provides that no employer engaged in commerce shall pay its employees less than the applicable minimum wage rate for all hours worked.

135.    Section 7(a) of the FLSA, 29 U.S.C § 207(a), provides that no employer engaged in commerce shall employ an employee for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of 40 hours at a rate not less than one and one-half times the regular rate at which she is employed.

136.    Section 16 of the FLSA, 29 U.S.C. § 216(b), provides that any employer who violates the provisions of 29 U.S.C. § 207 shall be liable to the employee or employees affected

in the amount of their unpaid compensation and an additional equal amount as liquidated damages.

137.    Defendant is an enterprise engaged in commerce. 29 U.S.C. § 203.

138.    At all times since April 1, 2025, Defendant has employed or jointly employed all members of the FLSA Collective.

139.    Defendant has willfully failed to timely pay the FLSA Collective the legally required minimum wage and overtime rates, in violation of the FLSA.

140.    Plaintiff and the FLSA Collective are entitled to the full amount of their unpaid minimum wages, unpaid overtime, in an amount to be determined at trial, and an equal amount of liquidated damages, in addition to costs, and reasonable attorney's fees.

**SECOND CLAIM FOR RELIEF:**
**VIOLATIONS OF NEW YORK LABOR LAW**
(Brought on behalf of Plaintiff and Members of the Rule 23 Class)

141.    Plaintiff realleges all allegations in the preceding paragraphs as if fully set forth here.

142.    Under Article 19 of the NYLL, NYLL § 652, employers must pay each employee it suffers or permits to work no less than the minimum wage for all hours worked.

143.    Under Article 36 of the New York Public Health Law, NYLL § 3614-C, an employer of home care workers must pay each home care worker no less than a prescribed living wage rate.

144.    Under Article 6 of the NYLL, NYLL § 193, an employer may not make deductions from the wages of an employee unless such deductions are authorized by law or are for the benefit of an employee and consented to, including—as codified in the No Wage Theft Loophole Act—by failing to pay workers at all.

145.    Under Article 6 of the NYLL, an employer must pay manual workers on a weekly basis, not later than seven calendar days after the end of the week in which the wages are earned, and failing to timely pay such manual workers entitles employees to liquidated damages for late payment.

146.    Pursuant to regulations issued by the State Commissioner of Labor, an employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate in the manner and methods provided by the FLSA. 12 N.Y.C.R.R. § 142-2.2.

147.    Pursuant to regulations issued by the State Commissioner of Labor, an employer shall pay a spread of hours premium of an extra hour's pay for every day worked in excess of ten hours. 12 N.Y.C.R.R. §§ 137-1.7, 142-2.4.

148.    Defendant, through the conduct described above, has violated multiple of the above provisions of the NYLL and its accompanying regulations.

149.    Defendant has employed Plaintiff and members of the Rule 23 Class within the meaning of the NYLL since April 1, 2025.

150.    Plaintiff and members of the Rule 23 Class are manual workers within the meaning of the NYLL.

151.    Defendant has willfully failed to timely pay Plaintiff and members of the Rule 23 Class at the legally required rate for all hours worked as required by the NYLL, including but not limited to by failing to pay the minimum wage as set by Public Health Law § 3614-C, overtime pay, and spread of hours premiums, and by paying Plaintiff late.

152.    Plaintiff and members of the Rule 23 Class are entitled to their unpaid minimum wages and unpaid overtime, in an amount to be determined at trial, and an equal amount of liquidated damages in addition to fees and costs, as well as liquidated damages for late payment

of wages.

### THIRD CLAIM FOR RELIEF:
### VIOLATION OF THE NEW YORK HOME CARE WORKER WAGE PARITY ACT:
### BREACH OF CONTRACT AND UNJUST ENRICHMENT
(Brought on behalf of Plaintiff and Members of the Rule 23 Class)

151.    Plaintiff realleges all allegations in the preceding paragraphs as if fully set forth here.

152.    The New York Home Care Workers Wage Parity Act, N.Y. Pub. Health Law § 3614–c, requires Licensed Home Care Services Agencies and other employers in New York City and the surrounding counties to pay all home care aides providing Medicaid-covered care, including CDPAP Personal Assistants, an "applicable minimum rate of home care aide total compensation" in order to receive Medicaid reimbursements for that care. *Id*. § 3614–c(2); *see also id.* § 3614–c(1)(d) (defining "[h]ome care aide" to include "home health aide[s]" and "personal care aide[s]").

153.    Upon information and belief, Defendant entered into a contract with the New York State DOH that required Defendant to pay Plaintiffs and Rule 23 Class Members wages as required by New York State Public Health Law § 3614-c ("New York State Contract"), in as much as Plaintiff and Rule 23 Class Members are home care aides hired by Defendant to perform Medicaid-reimbursable services under CDPAP in Westchester, Nassau, and Suffolk Counties and the five boroughs of New York City.

154.    Pursuant to the New York State Contract, Defendant subsequently entered into agreements with the Plaintiff and members of the Rule 23 Class that require Defendant to pay Plaintiff and Class Members' wages as required under N.Y. Public Health Law § 3614-c ("Individual Agreements").

155.    Upon information and belief, the schedule of prevailing rates of wages and benefits

23

to be paid all workers furnishing labor pursuant to the New York State Contract and Individual Agreements was included in and formed a part of those contracts and agreements.

156.    Beginning on April 1, 2025, Plaintiff and Rule 23 Class Members furnished labor to Defendant in furtherance of Defendant's performance of the New York State Contract.

157.    Defendant willfully paid Plaintiff and Rule 23 Class Members less than the prevailing rates of wages and benefits to which they were entitled, and breached its obligation to pay all wages due as required by N.Y. Public Health Law § 3614-c.

158.    Defendant, by its policies, practices, patterns, and procedures, was unjustly enriched at the expense of Plaintiff and Rule 23 Class Members by failing to pay Plaintiff and Rule 23 Class Members all minimum wages due under the New York Home Care Worker Parity Act, N.Y. Public Health Law § 3614-c.

159.    Plaintiff and Rule 23 Class Members, as third-party beneficiaries of Defendant's contract with the New York State Department of Health to pay wages as required by the New York Home Care Worker Wage Parity Act, are entitled to relief for the breach of this contractual obligation, plus interest.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff, on behalf of themselves, the FLSA Collective, and the Rule 23 Class, demand a trial by jury as to all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of himself, the FLSA Collective, and the Rule 23 Class, respectfully requests that this Court enter a judgment providing the following relief:

(a) Certifying this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure with respect to the Second and Third Claims for Relief;

(b) Declaring this action to be maintainable as a collective action pursuant to the FLSA with respect to the First Claim for Relief;

(c) Designating Plaintiff Calderon as representative of the Rule 23 Class, and counsel of record as Class Counsel;

(d) Issuing proper notice to the Class at Defendant's expense;

(e) Declaring that the practices complained of in this action are unlawful under New York Labor Law, Articles 6 and 19, the supporting New York State Department of Labor regulations, and the New York Home Care Worker Wage Parity Act;

(f) Permanently enjoining Defendant from further violations of the FLSA, the NYLL, and the New York Home Care Worker Wage Parity Act;

(g) Ordering Defendant to pay all unpaid wages and liquidated damages pursuant to the FLSA, NYLL Articles 6 and 19, §§ 650 *et seq.,* the supporting New York State Department of Labor regulations and New York common law, and the Wage Parity Act;

(h) Ordering the payment of attorneys' fees pursuant to 29 U.S.C. § 216(b) and New York Labor Law §§ 198 and 663;

(i)  Ordering the payment of the costs and disbursements of this action; and

(j)  Ordering such other relief, in law or equity, as this Court deems just and proper,

including all relief authorized by the FLSA, the NYLL, and the Wage Parity Act.


Dated:  April 25, 2025
        New York, New York

                         Respectfully submitted,

                            /s/ B. Franco Olshanksy
                         B. Franco Olshansky

**THE LEGAL AID SOCIETY**

Richard Blum
Rebekah Cook-Mack
Belkys Garcia
Rebecca Antar Novick
49 Thomas Street, Fl 5
New York, NY 10013
(332) 227-7291
bfrancoolshansky@legal-aid.org
rblum@legal-aid.org
rcook-mack@legal-aid.org
bgarcia@legal-aid.org
rantar@legal-aid.org

**KATZ BANKS KUMIN LLP**

Hugh Baran (he/him)
Emma Walters (she/her)
Katz Banks Kumin LLP
111 Broadway, Suite 1702
New York, NY 10006
(646) 759-4501
Baran@katzbanks.com
Walters@katzbanks.com

*Counsel for Plaintiff*