UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

PHILIP CALDERON, FARSHAD PINCHASI,
ALLISON FIELDS, and DANA FOLGAR,
*on their own behalf and on behalf of all others*
*similarly situated,*

*Plaintiffs*,

– *against* –

PUBLIC PARTNERSHIPS, LLC,

*Defendant*.

-------------------------------------------------------------x

Civ. Action No.:
**25-cv-02320 (ARR)(MMH)**

**FIRST AMENDED CLASS &
COLLECTIVE ACTION
COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Philip Calderon, Farshad Pinchasi, Allison Fields, and Dana Folgar, individually and on behalf of all others similarly situated, by their undersigned attorneys, The Legal Aid Society and Katz Banks Kumin LLP, for their First Amended Complaint, allege as follows:

### PRELIMINARY STATEMENT

1.      Plaintiffs Philip Calderon, Farshad Pinchasi, Allison Fields, and Dana Folgar ("Plaintiffs") are personal assistants employed by Public Partnerships, LLC ("PPL"). They provide home care services through the New York State Medicaid Consumer Directed Personal Assistance Program ("CDPAP"), a New York State Medicaid program that allows Medicaid recipients who are eligible for home care services ("Consumers") to choose their own caregivers. CDPAP was designed to allow Consumers to receive care at home and remain in their communities, while also paying critical wages to Plaintiffs and tens of thousands of other personal assistants throughout the state who are providing these essential services.

2.      On April 1, 2025, New York State transitioned from using hundreds of fiscal intermediaries to administer CDPAP to one sole fiscal intermediary: PPL. PPL was contracted to

jointly employ more than 300,000 personal assistants statewide—managing onboarding, overseeing timekeeping, setting wage rates and benefits, and handling payroll operations.

3.     PPL has grossly mismanaged the transition, jeopardizing both the ongoing care of tens of thousands of CDPAP Consumers and the livelihoods of hundreds of thousands of personal assistants.

4.     Plaintiffs seek to represent a class and collective of tens of thousands of other personal assistants employed by PPL in New York City, Nassau County, Suffolk County, and Westchester County (hereafter, "downstate") who have not been paid at all or for all hours worked, were paid late, or were not paid the legally-required rate, including due to unlawful deductions or charges (hereafter, "downstate personal assistants" or the "Class" or "Collective").

5.     PPL has failed to pay Mr. Calderon, Mr. Pinchasi, Ms. Fields, Ms. Folgar, and tens of thousands of other downstate personal assistants for all their time worked and at the correct rate, in violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq*. ("FLSA"), Articles 6 and 19 of the New York Labor Law ("NYLL"), and the New York Home Care Worker Wage Parity Act, Public Health Law § 3914-C ("Wage Parity Act").

6.     Plaintiffs all began working for PPL on or about April 1, 2025. Since their onboarding, PPL has failed to fulfill its basic responsibilities as Plaintiffs' employer, including failing to pay Plaintiffs for weeks of work; paying them late or missing pay; failing to pay two of the Plaintiffs for all hours worked over forty at the overtime premium rate; failing to pay spread of hours at the correct rates; failing to maintain a functional timekeeping online/mobile application (Time4Care), telephonic timekeeping system (Telephony), and online timekeeping portal (PPL@Home); failing to process emailed and faxed paper timesheets correctly; and failing to promptly correct these issues in response to Plaintiffs' complaints.

7.      Plaintiffs, as well as members of the Class and Collective whom they seek to represent, have reported a dizzying array of technical problems preventing their timely and complete payment, including: the inability to clock-in for their shifts when they start work outside their Consumer's homes; disappearing time entries due to defective PPL software; and automatically being clocked out of shifts when working overnight. As a result of PPL's systems, policies and practices, personal assistants are unpaid and underpaid. All of the challenges faced by personal assistants are the result of one single problem: PPL's deeply flawed infrastructure for onboarding, scheduling, recording time, paying, and communicating with its employees.

8.      PPL's compensation scheme also violates the Wage Parity Act, which New York State enacted to ensure that home care workers, such as personal assistants, receive a living wage. The Wage Parity Act covers home care workers in the downstate region and requires employers to pay both a cash minimum wage and additional supplemental benefit pay. The supplemental benefit may be paid in cash or its equivalent value in benefits, at a rate of $2.64 per hour in New York City and $1.67 per hour in Nassau, Suffolk, and Westchester Counties.

9.      Rather than pay the full Wage Parity Act supplement in cash, PPL has devised a benefits scheme that significantly overcharges downstate personal assistants for paltry benefits, including a bare-bones preventive care plan and a flexible benefits card plan which does not comply with relevant IRS regulations. These benefits cost PPL significantly less to provide than the amounts they charge against the total compensation owed to Plaintiffs and other downstate personal assistants under the Wage Parity Act, realizing a substantial windfall for PPL. Since the preventive care plan is self-insured, PPL keeps the balance of supplemental benefit pay in violation of the Wage Parity Act. Making matters worse, personal assistants still cannot access these benefits offerings, even though PPL has allocated Wage Parity Act supplemental pay to these benefits

3

offerings since April 1, 2025. PPL also makes charges against the total compensation owed to Plaintiffs and other downstate personal assistants under the Wage Parity Act to reimburse itself for statutorily mandated wages for sick time.

10.      PPL has placed Mr. Calderon, Mr. Pinchasi, Ms. Fields, Ms. Folgar, and tens of thousands of other downstate personal assistants employed by PPL—and their families—in dire financial straits. In bringing this class and collective action, Plaintiffs seek to put an end to PPL's ongoing wage violations in the downstate region.

## PARTIES

11.      Plaintiff Philip Calderon is a twenty-five-year-old man residing in Richmond County, New York. He works for PPL as a personal assistant caring for his father, a CDPAP Consumer, in Richmond County.

12.      Plaintiff Farshad Pinchasi is a fifty-five-year-old man residing in Nassau County, New York. He works for PPL as a personal assistant caring for his parents, both of whom are CDPAP Consumers.

13.      Plaintiff Allison Fields is a fifty-seven-year-old woman residing in Suffolk County, New York. She works for PPL as a personal assistant caring for a close friend.

14.      Plaintiff Dana Folgar is a twenty-year-old woman who resides in Westchester County, New York. She works for PPL as a personal assistant caring for a disabled Consumer who has severely limited mobility.

15.      Pursuant to 29 U.S.C. § 216(b), Plaintiffs have consented in writing to become a party to this lawsuit. Plaintiffs' written consent to sue forms are attached hereto as Exhibits A through D.

16.      Defendant Public Partnerships, LLC ("PPL") is a limited liability company

organized under the laws of Delaware with its principal place of business in Georgia.

17.     Pursuant to a contract entered into with the State of New York, PPL operates as the payroll administrator and employer of all personal assistants working under CDPAP throughout New York State.

18.     Throughout Plaintiffs' employment, PPL was an "employer" and a "joint employer" of Plaintiffs within the meaning of the FLSA, NYLL, and Wage Parity Act.

19.     Throughout Plaintiffs' employment, Plaintiffs were non-exempt "employees" of PPL as defined by the FLSA and the NYLL.

20.     Under its state contract, PPL determines the terms and conditions of employment for personal assistants providing home care services for Consumers under CDPAP.

21.     PPL is an enterprise as defined in Section 3(r)(1) of the FLSA, 29 U.S.C. § 203(r)(1), in that the company's annual gross volume of business exceeds $500,000.00, and its employees handle goods or materials (such as bandages, gauze wraps, and topical ointments as well as wheelchairs and walkers) that have been moved through or produced in interstate commerce within the meaning of Section 3(s)(1)(A), 29 U.S.C. § 203(s)(1)(A).

22.     PPL promulgates employment policies, including compensation policies, for all personal assistants working under CDPAP in New York State. These policies are imposed on personal assistants as a condition of providing care to Consumers.

23.     Throughout Plaintiffs' employment, PPL has "employed" Plaintiffs—and tens of thousands of other downstate personal assistants—within the meaning of the FLSA, NYLL, and Wage Parity Act.

**JURISDICTION AND VENUE**

24.     This Court has jurisdiction over Plaintiffs' claims under the FLSA pursuant to 28

U.S.C. §§ 1331 and 1337, and 29 U.S.C. § 216(b).

25.     This Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, because these claims are so closely related to Plaintiffs' claims under the FLSA that they form part of the same case or controversy under Article III of the United States Constitution.

26.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

27.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because it is the judicial district in which a substantial part of the events giving rise to the claims occurred, as it is where Mr. Calderon, Mr. Pinchasi, and Ms. Fields have worked and continue to work for PPL.

## FACTUAL BACKGROUND

**CDPAP Provided Flexible, Community-Based Home Care Services to New Yorkers.**

28.     In 1995, New York created New York State Medicaid's CDPAP to allow Consumers or their designated representative to select and train caregivers to assist them with navigating the challenges of daily life created by age, disability, or illness, while they remain in their communities.

29.     Consumers in the program can receive care from family members, members of their communities, and others with whom they have personal relationships and feel most comfortable having in their homes. The ability to hire family, friends, neighbors, or community members is especially beneficial for Consumers considering the intimate nature of the care they need to remain at home and retain their independence, and the critical shortage of home care workers in New York.

30.     Under New York State regulations, personal assistants may provide "personal care services," including: "(1) bathing of the patient in the bed, the tub, or in the shower; (2) dressing;

6

(3) grooming, including care of hair, shaving, and ordinary care of nails, teeth, and mouth; (4) toileting; this may include assisting the patient on and off the bedpan, commode or toilet; (5) walking, beyond that provided by durable medical equipment, within the home and outside the home; (6) transferring from bed to chair or wheelchair; (7) turning and positioning; (8) preparing of meals . . . ; (9) feeding; (10) [assisting with the] administration of medication by the patient, including prompting the patient as to time, identifying the medication for the patient, bringing the medication and any necessary supplies or equipment to the patient, opening the container for the patient, positioning the patient for medication and administration, disposing of used supplies and materials and storing the medication properly; (11) providing routine skin care; (12) using medical supplies such as walkers and wheelchairs; and (13) changing of simple dressings." 18 N.Y.C.R.R. § 505.14(a)(5)(ii)(a).

31.    Personal assistants may also assist with "home health aide services," defined as "simple health care tasks, personal hygiene services, housekeeping tasks essential to the Consumer's health and other related supportive services." 18 N.Y.C.R.R. § 505.28(b)(10). Such tasks include, for example, "performance of simple measurements and tests to routinely monitor the Consumer's medical condition; performance of a maintenance exercise program; and care of an ostomy after the ostomy has achieved its normal function." *Id*.

32.    For Consumers who require assistance with both "personal care services" and "home health aide services," participation in CDPAP means that they can get all their care at home from one aide.

33.    Personal assistants in the traditional personal care program may not assist with home health aide services, forcing certain individuals in that program to coordinate additional assistance through Certified Home Health Agencies or Private Duty Nursing. In practice, this

restriction means that CDPAP represents the only opportunity for certain Consumers to continue to receive care at home, in their communities.

34.     Significantly more than 25% of personal assistants' work requires them to perform manual labor, such as physically lifting or moving Consumers with limited mobility, helping Consumers use the restroom and bathe, performing physical tasks such as cooking and cleaning, and driving Consumers or helping them navigate public transportation.

35.     The popularity of CDPAP has meant that as of January 1, 2025, the program supported 280,000 New York State residents who are Medicaid Consumers and employed over 300,000 personal assistants.

36.     The CDPAP program contemplates that third-party entities, called fiscal intermediaries, will assist Consumers in handling payroll and other administrative obligations entailed in employing a persona assistant.

37.     Under the Social Services Law and regulations governing CDPAP, the Consumer has the sole authority to recruit and hire their personal assistants. Social Services Law § 365-f(3); 18 N.Y.C.R.R. § 505.28(g)(1).

38.     The fiscal intermediary's responsibility is to process pay and benefits. Social Services Law § 365-f(4-a)(a)(ii); 18 N.Y.C.R.R. § 505.28(i)(1)(i).

39.     From 2015 until April 1, 2025, CDPAP personal assistants were paid by one of hundreds of fiscal intermediaries across New York State that provided payroll administration services. In April 2024, this arrangement changed significantly when New York State mandated that as of April 1, 2025, there could only be one fiscal intermediary for the entire state.

40.     The New York State Department of Health ("DOH") awarded PPL the contract to be the sole statewide fiscal intermediary, despite allegations that PPL had engaged in wage theft

and otherwise not complied with their legal obligations in running CDPAP-like programs in other states. Although the contract is worth approximately $9 billion dollars, the Governor and the State Legislature bypassed contract review by the New York State Comptroller.

**PPL's Incompetence and Mismanagement During the Statewide Fiscal Intermediary Transition Has Caused Chaos Among Consumers and Personal Assistants.**

41.     On January 17, 2025, DOH announced a deadline of March 28, 2025, for all CDPAP Consumers to transition from their prior fiscal intermediaries to PPL. Consumers were required to enroll with PPL before their personal assistants were able to complete their own registration. That gave hundreds of thousands of CDPAP Consumers and personal assistants a little over two months to complete the transition.

42.     The number of people required to transition from hundreds to just one fiscal intermediary in two months was unprecedented. Massachusetts managed a similar transition of just 70,000 people in their CDPAP-like program over a period of 19 months. New York provided an astonishingly short timeframe for disabled and vulnerable people to navigate a broken online process.

43.     Tens of thousands of Consumers and personal assistants encountered significant difficulties in completing PPL's registration and enrollment processes. Personal assistants are only able to register with PPL once their Consumers complete their own sign-up process. Once they were able to proceed, personal assistants needed to sign and return an Offer Letter that described their wage rate and benefits, as well as a Personal Assistant Agreement setting forth rules they must follow. Personal assistants also needed to submit work authorization verification and tax withholding paperwork.

44.     PPL did not accept submission of enrollment or registration documents by mail. Consumers and personal assistants were encouraged to use its web portal, PPL@Home. However,

even tech savvy Consumers and personal assistants encountered frequent crashes and other barriers to completing the process online. The web system failed to save required documents or failed to allow Consumers to identify their personal assistants.

45.    Many Consumers and personal assistants reported that PPL took weeks to review and approve their registration or enrollment submissions. Others reported that their submissions were rejected with little to no explanation.

46.    Consumers and personal assistants were unable to reach PPL for assistance by phone, email, or other means of communication, despite persistent efforts.

47.    In the period immediately prior to PPL's assumption of its contractual responsibility, it rapidly became clear that a very rocky onboarding process for hundreds of thousands of Consumers and personal assistants would mean that sizeable portions of both groups would not be fully registered and enrolled with PPL by April 1, 2025. This meant that thousands of vulnerable New Yorkers faced an abrupt cessation of care on April 1.

48.    In a failed attempt to rectify the system and avoid disaster, Governor Hochul extended the enrollment period for one month to April 30 (from March 31), offering to have PPL pay personal assistants retroactively once the enrollment process was completed—despite laws prohibiting such practices.

**Personal Assistants and Consumers Cannot Rely on PPL to Provide Complete and Timely Wage Payments.**

49.    Since PPL assumed its role as employer and fiscal intermediary on April 1, 2025, personal assistants and consumers have reported catastrophic systemic failures in PPL's enrollment, payroll, timekeeping, and communications infrastructure, requiring hours on the phone in efforts to remedy countless errors. As a result, PPL has subjected tens of thousands of personal assistants to wage theft, leaving them uncompensated or undercompensated for weeks.

50.     Under PPL's system, personal assistants are required to report their hours to PPL either through the Time4Care application, the automated telephone system, Telephony, or through an online portal, PPL@Home. Consumers (or their designated representatives) must approve their personal assistants' hours before PPL releases payment.

51.     The flaws in these systems are so profound that they constitute structural features rather than just small glitches. Personal assistants experience problems with every time reporting method.

52.     The Time4Care application is unreliable: Personal assistants are unable to log into the application despite repeated attempts or find that their time entries have not been saved or recorded accurately.

53.     Similar problems exist with the Telephony system. When personal assistants, such as Ms. Folgar, dial in to enter their time, they receive error messages incorrectly stating either that they are not registered with PPL, or that they need to update information that has already been submitted and remains current. Often, after receiving these messages, their calls are simply disconnected.

54.     A number of personal assistants, like Mr. Pinchasi, have stopped using Telephony altogether because it misstated his hours worked.

55.     PPL@Home also produces incorrect results. For example, Mr. Pinchasi has tried to use this system for manually entering time records online because the unrestricted use of paper timesheets ended on May 17, 2025.  However, even that method has produced erroneous results.

56.     Initially, PPL required electronic time entry as a matter of policy.

57.     Consumers or personal assistants were required to request an exception from this policy to submit paper timesheets.

58.     This policy was suspended for six weeks as a result of a class action brought on behalf of Consumers.

59.     When Plaintiffs have encountered issues with Time4Care, Telephony or PPL@Home, they have submitted paper timesheets but have found on many occasions either that PPL did not promptly pay them for the submitted time or paid them less than they were owed.

60.     Personal assistants or Consumers who emailed timesheets to the email address provided by PPL have received bounce-back messages stating that "Delivery has failed to these recipients or groups" with the explanation that their timesheets cannot be delivered because "[t]he recipient's mailbox is full and can't accept messages now."

61.     The bounce-back email contained no further instructions for how personal assistants could obtain timely pay for their work that week.

62.     Ms. Folgar's Consumer received such an email from PPL in response to a paystub she submitted for Ms. Folgar.

63.     PPL never reached back out to Ms. Folgar's Consumer to follow up on the bounce-back message. Instead, Ms. Folgar and her Consumer resubmitted the timesheet to the same email address hoping it would not be rejected the second time.

64.     If a personal assistant, such as Mr. Pinchasi, works for more than one Consumer, PPL's electronic time recording systems do not accurately allocate the hours between the Consumers, sometimes doubling hours reported for one Consumer and sometimes dividing hours evenly between two Consumers, even if they are authorized for different numbers of hours and the personal assistant has reported hours according to their respective authorizations.

65.     This error not only results in inaccurate wages, often underpayments, but also puts both the Consumers and the personal assistant in jeopardy of being accused later of dishonesty. It

also places the Consumers at risk of being denied services down the road.

66.      PPL requires that personal assistant time and Consumer approval of that time be submitted by the end of its weekly pay period, Saturday at 11:59 P.M., for the personal assistant to be paid by the following Thursday for all hours worked during that pay period, including hours on Saturday night before midnight.

67.      The simultaneous deadline for the timely submission and approval is especially unusual and onerous. If a personal assistant working on the last night of a pay period is to receive their full pay for the week promptly through one of PPL's electronic time recording systems, their Consumer must submit their approval in the last minutes before midnight.

68.      The reason that PPL has structured its timekeeping and approval system with a burdensome middle-of-the-night requirement is unclear since payment is not issued for several days thereafter.

69.      The PPL time entry system creates other problems for personal assistants, including the routine loss of overnight hours, rounding errors, rejections of overlapping shifts, and inflexible location requirements.

70.      Upon information and belief, thousands and likely tens of thousands of personal assistants work overnight shifts to care for homebound and vulnerable Consumers who require and are authorized to receive 24-hour care.

71.      PPL's Telephony and Time4Care systems reject time entries that span the time period from 11:59 P.M. to after midnight, requiring personal assistants to clock-out at 11:59 and clock back in at 12:00.

72.      If a personal assistant does not clock out at 11:59 or does not take subsequent steps to edit their time entries, PPL pays them nothing for the whole shift that includes the time from just

before to just after midnight.

73. Time4Care and Telephony will not accommodate overlapping work shifts. When two personal assistants overlap on the clock even for just a few minutes, either because a Consumer is authorized to receive care from two personal assistants simultaneously or because of a shift change requiring that the assistants communicate information to one another, both personal assistants have had their entire shifts rejected by PPL.

74. Personal assistants have submitted direct bank deposit paperwork multiple times only to find the information deleted. This delays the availability of funds and requires personal assistants to repeatedly submit the same information to PPL's system.

75. Other rampant errors in the PPL system affect both personal assistants and Consumers. These issues with the PPL system result in payment mistakes that must be corrected.

76. Consumers have found that PPL undercounts their personal assistants' hours or lists the wrong personal assistant in the Consumer's portal (including confidential information such as the personal assistant's complete social security number).

77. When Consumers seek to approve time accurately reported by personal assistants on Time4Care or Telephony, some have found that entire shifts or parts of shifts have inexplicably disappeared.

78. A CDPAP Consumer may have a designated representative, either an individual delegated to supervise a personal assistant or, where a Consumer has limited capacity, that person's legal guardian. Designated representatives have reported that PPL does not allow them to approve pay for personal assistants, either through Time4Care or Telephony.

79. Other Consumers have found that they cannot approve time at all because PPL has incorrectly marked them as lacking Medicaid authorization for CDPAP care services or failed to

process authorizations submitted by social services agencies and insurance providers.

80.    For example, Ms. Fields has not been paid for three weeks of work at least in part because PPL failed to provide information about the authorization status of the Consumer she works for and did not respond to inquiries from Ms. Fields or the Consumer.

81.    Even when Consumers approve their personal assistants' time submissions, those submissions are sometimes denied by PPL.

82.    For some personal assistants, the first time their Consumers learn that time was denied is when the personal assistant receives a check that is for far less than expected and the Consumer goes back online seeking answers. If Consumers cannot approve their personal assistant's time, their personal assistants go unpaid.

83.    Even when personal assistants are paid, the payments they receive are frequently late or incorrect.

84.    Personal assistants, including Mr. Pinchasi, have also been denied overtime pay when PPL omitted shifts or hours from a weekly payment, causing their hours to be reduced to below 40 for the week.

85.    Personal assistants and Consumers have made repeated efforts to bring these issues to PPL's attention to no avail.

86.    To fix timekeeping or other payroll problems, personal assistants and Consumers are told they can call PPL to open a ticket. Getting through to a PPL representative by phone has proven to be exceedingly difficult.

87.    When they have been able to leave a call back number, personal assistants and Consumers have had to wait weeks for the promised return call. Often, no call ever comes.

88.    When personal assistants and Consumers can reach a person at PPL, their problems

remain unresolved.

89.    The PPL representatives frequently give personal assistants and Consumers general assurance that the problem will be solved or that they will submit a ticket. Personal assistants and Consumers later learn the problem has not been addressed.

90.    Personal assistants and the Consumers they care for report spending countless hours in often fruitless attempts to remedy the many issues created by PPL's deeply flawed systems. They spend hours searching for workarounds in attempts to navigate an impenetrable process. For example, many English-speaking Consumers and personal assistants now select foreign language options when calling PPL because they have learned that this workaround increases the likelihood of reaching a person before the line disconnects.

91.    The experiences of the individual Plaintiffs in this action illustrate how PPL has violated federal and state wage laws with respect to them and other personal assistants.

**PPL Is Engaging in Widespread Wage Theft Affecting Many Thousands of Personal Assistants.**

92.    Despite the requirements of the FLSA, NYLL, and the New York Wage Parity Act, PPL has failed to pay an astounding number of personal assistants in the downstate region (and beyond) their correct wages each week.

93.    Publicly available information indicates that, at least as of mid-April, many thousands of personal assistants who had registered with PPL had not yet received a paycheck.

94.    In an April 14, 2025 press release, DOH announced that 220,000 Consumers had started or completed enrollment with PPL, and that while 245,000 personal assistants had started or completed registration, only 160,000 personal assistants were deemed to be "payroll ready."

95.    A press release from PPL, released four days later on April 18, declared that the company had paid only 130,000 personal assistants in the first two pay periods of April. These

figures indicate PPL had not paid at least 30,000 personal assistants whom DOH had stated were fully registered and payroll ready personal assistants.

96.    By May 9, a PPL press release claimed that 189,000 personal assistants had received at least one paycheck, nearly 60,000 more than in their April 18 report. These 60,000 personal assistants had not been paid at all in the first two payroll periods of the transition, even though large numbers of them continued to care for their Consumers.

97.    Caring Majority Rising, a coalition of people with disabilities, older adults, caregivers, and home care workers, has surveyed hundreds of personal assistants and Consumers on a weekly basis since PPL became the state-wide fiscal intermediary on April 1.

98.    A majority of those responding to Caring Majority Rising's weekly surveys reported receiving underpayments from PPL, even among personal assistants who were fully registered with PPL. Personal assistants and Consumers have continued to report underpayments to Caring Majority Rising even as PPL enters its second month as the state-wide fiscal intermediary.

99.    Delays in pay and underpayments are not just an inconvenience to personal assistants; they are a serious burden for low-wage workers who provide an essential service to vulnerable New Yorkers.

100.    Many personal assistants live paycheck to paycheck and cannot afford to work without a guarantee of timely payment. Personal assistants who cannot afford to work for free have begun to leave the program.

101.    Though personal assistants want to continue providing care, their financial circumstances do not permit many of them to weather the lengthy delays and uncertainty that PPL has created.

102.    Consumers are increasingly experiencing interruptions in their personal care

services as PPL's mismanagement of the program continues.

103.     Despite the many advantages that the CDPAP program historically provided (in particular, the ability to choose a trusted caregiver who can provide critical healthcare services at home), in the wake of PPL's mismanagement of personal assistants' wages, approximately 75,000 Consumers have left the CDPAP program and must find care elsewhere through the agency system, according to a public filing by the state. That has serious consequences for Consumers' health and well-being.

**PPL Is Charging Personal Assistants for Benefits that It Has Not Yet Provided, That Are Not Worth the Value PPL is Charging to Them and That Involve Unlawful Kickbacks to PPL.**

104.     Home care workers are the linchpin that keeps disabled New Yorkers in their homes. They do a hard job that is difficult to fill, as evidenced by the well-documented shortage of home care workers throughout New York State. The Wage Parity Act was enacted in part to address the shortage and high turnover rates by providing a living wage and hopefully in turn improve the quality of care to Consumers by ensuring a more stable and well-compensated workforce. The Wage Parity Act was amended in 2020 to strengthen these protections and ensure that employers do not siphon away funds intended for workers. PPL is flouting the requirements of the Wage Parity Act.

105.     Before beginning work for PPL, Plaintiffs and other personal assistants received offer letters setting forth some of the terms of their employment with PPL. The letters informed them of their hourly cash wages, overtime rate, and that payroll is to be processed on a weekly basis.

106.     The offer letters also informed Plaintiffs and other personal assistants that they would receive certain benefits in accordance with the Wage Parity Act. The offer letters stated that Plaintiffs and downstate personal assistants would be automatically enrolled in an "MEC/Flex Plan"

and that this plan was worth $.87 per hour for New York City personal assistants and $.62 per hour for other downstate personal assistants.

107.    The offer letters did not specify the allocation of Wage Parity Act funds between plans or provide details on the nature of the plans.

108.    The offer letters asserted that PPL offers these benefits to downstate personal assistants "at no cost to you."

109.    That statement is untrue. PPL is using funds that it would otherwise have to pay the personal assistant in cash or other benefits to pay for those plans.

110.    The offer letters also reported that PPL would provide a benefit of one hour of paid time off ("PTO") for every 30 hours worked, up to a maximum of 56 hours each year, at a supposed value of $0.65 an hour.

111.    PPL does not permit downstate personal assistants to receive their Wage Parity Act supplemental in cash.  They are forced to have their Wage Parity supplemental pay allocated to PPL's benefit offerings, even if those benefits are of no value to a personal assistant, or of significantly less value than claimed by PPL. Since PPL has no competition in New York State, personal assistants can only work for their Consumers under PPL's terms.

112.    PPL required Plaintiffs and other downstate personal assistants to sign a form titled "Employee Acknowledgment" as a condition of hire.

113.     Since PPL is the sole statewide fiscal intermediary, the only way for Consumers to access care through the CDPAP program is for them to recruit, hire and train workers who will sign the Employee Acknowledgment on the PPL offer letters.

114.    As contemplated in its offer letters, PPL has in fact utilized portions of Plaintiffs' and downstate personal assistants' Wage Parity Act pay towards benefits offerings.

19

115.    For approximately the first six weeks PPL employed Plaintiffs and other downstate personal assistants, it deducted their Wage Parity Act supplemental benefit pay for these benefits, but provided no way to access them, nor any further details on the nature of the plans.

116.    Starting the week of May 19, 2025, PPL began to send downstate personal assistants, including Plaintiffs Fields and Folgar, messages with more information about their benefits. In these communications, PPL informed downstate personal assistants they were enrolled in a preventive care plan called the PPL Basic Wellness Plan, an accident indemnity plan, and a critical illness plan. PPL also informed downstate personal assistants they were enrolled in the Flexible Benefits Plan, which allowed them to make certain pre-tax purchases with a prepaid debit card.

117.    PPL charges $0.87 an hour from the pay of personal assistants in New York City and $0.62 from the pay of those in Westchester, Nassau, and Suffolk Counties toward the Basic Wellness Plan, accident plan, critical illness plan, and Flexible Benefits Plan combined.

118.    PPL only requires downstate personal assistants entitled to Wage Parity Act supplemental payments to participate in the Basic Health Plan. Upstate personal assistants who perform the same work for the same employer are not forced to participate in the plan.

119.    From statements in messages sent to these Plaintiffs Fields and Folgar, as well as other downstate personal assistants, it is possible to calculate that PPL is charging $0.40 per hour of its Wage Parity Act obligations to the Basic Wellness Plan, accident plan, and critical illness plan.

120.    PPL has provided no information on the breakdown of how the $0.40 per hour is allocated among the three plans. PPL allocates the remaining Wage Parity Act funds ($0.47 per hour in New York City and $0.22 per hour in the other downstate counties) to the Flexible Benefit

Plan card.

121.    The breakdown of these deductions is not spelled out in the PPL hiring notice provided to Plaintiffs and other downstate personal assistants, nor in any of the wage statements provided with their wages.

122.    This breakdown is required under New York Labor Law § 195. *See* N.Y. Lab. L. § 195(1)(a) ("Where such prevailing wage supplements are claimed, or such home care aide benefits are provided, the notice shall identify, for each type of supplement claimed or *each type of home care aide benefits provided*: (i) the hourly rate claimed; (ii) the type of supplement or type of home care aide benefits, including when applicable, but not limited to, pension or healthcare . . . .") (emphasis added), and § 195(3) ("Where such prevailing wage supplements are claimed, or such home care aide benefits are provided, the statement shall either: (i) identify the type of *each supplement* claimed, or the type of each homecare aide benefits provided, and the hourly rate *for each* . . . ").

123.    Such a breakdown is required so that home care aides can determine whether their wages are being improperly diverted.

124.    To date, Plaintiffs and other personal assistants have not received any insurance cards, any claim forms, or a summary plan description for the PPL Basic Wellness Plan or the other insurance plans.

125.    Plaintiff Folgar's recent experience concerning the benefits portion of her Wage Parity Act pay illustrates how opaque the benefit payments are.

126.    On May 23, 2025, Plaintiff Folgar received a text message from an unknown number inviting her to click on a registration link to review her "personal data and elect …benefits" by May 27, 2025 at 6pm.

127.    That link led to an enrollment portal stating "Your current Wage Parity credits entitles you to the PPL Basic Wellness Health Plan, an Accident Indemnity Policy through Manhattan Life, a Critical Illness Policy through Zurich, and additional flexible benefit credits effective for the month of June 2025 in the amount of $23.54."

128.    At the step of the enrollment portal titled "Elections," the first element of "Elections" was "Medical Plan." It stated: "You are enrolled in the Basic Wellness plan by default."

129.    PPL has informed Ms. Folgar that it has credited 107 of her 117 hours of work as time eligible for wage parity. PPL does not explain why 10 hours were not credited for wage parity, nor does it provide enough information for Ms. Folgar to determine whether 177 hours reflects all of the time worked over the period in question. PPL states that a total of $23.54 was allocated to her flex benefits card. Dividing $23.54 by 107 reveals that PPL is crediting $0.22 per hour to her Flexible Benefits Plan. Presumably PPL directs the reminder of her Wage Parity Act supplemental payment of $0.62 per hour—$0.40 per hour—to the three insurance plans. PPL does not provide Ms. Folgar with any indication of the respective value of each.

130.    Plaintiffs Calderon and Pinchasi and other downstate personal assistants have not yet received messages with descriptions of the plans. They have not had the opportunity to choose among the Flexible Benefits Plan options.

131.    None of the Plaintiffs or, upon information and belief, any downstate personal assistants have been provided with actual flexible benefit cards or means of filing claims or using Flexible Benefits Plan benefits. PPL has stated that the Basic Wellness Plan, accident plan, critical illness plan, and Flexible Benefits Plan benefits will become available in June.

132.    Though Plaintiffs and other downstate personal assistants still cannot access any benefits, PPL has credited the value of their plans against the Wage Parity Act supplemental benefit

pay since the April 1 transition.

133.    Even if Plaintiffs and other downstate personal assistants are later able to access the Basic Wellness Plan, the benefits of that Plan are so limited that they will receive substantially less value than if PPL simply paid them the Wage Parity Act supplement in cash.

134.    The Basic Wellness Plan is of no value at all to downstate personal assistants who already have health insurance, because it covers preventive services and medications that personal assistants' existing health insurance policies already provide. Yet these downstate personal assistants are forced to make payments towards the plan from their Wage Parity Act monies.

135.    Astonishingly, the limited information provided indicates that the Basic Wellness Plan provides no coverage at all for sick visits, hospitalization, surgery, chemotherapy, or many other basic services. The Basic Wellness Plan covers only a list of ten preventive services (*see* Figure 1 below). An enrollee who gets cancer, has diabetes, or breaks a bone will receive no coverage at all from this Plan.

*Figure 1*

| Preventive Medical Services | | |
|---|---|---|
| **Benefit** | **In-Network** | **Out-Of-Network** |
| Primary Care Physician: Adult Routine Physical - 1 visit per year. | No Charge | Not Covered |
| Gynecological - Adult Routine Physical - 1 visit per year. | No Charge | Not Covered |
| Maternity (Routine Prenatal /Postnatal Services only) | No Charge | Not Covered |
| Routine Immunizations (Child & Adult) | No Charge | Not Covered |
| Flu Shot (Routine) | No Charge | Not Covered |
| X-Rays and Lab tests (Routine) | No Charge | Not Covered |
| Mammography (Routine) – 1 per year; Age 40 and more | No Charge | Not Covered |
| Pap-smear (Routine) – 1 per year | No Charge | Not Covered |
| Prostate Cancer Screening PSA (Routine) - 1 per year | No Charge | Not Covered |
| Colon Cancer Screening (Routine) - age 45-75 Colonoscopy – 1 in 10 years Sigmoidoscopy – 1 in 3 years | No Charge | Not Covered |

| Non-Preventive Medical Services | | |
|---|---|---|
| **Benefit** | **In-Network** | **Out-Of-Network** |
| Primary Care Physician Visits | Not Covered | Not Covered |
| Specialist Visits | Not Covered | Not Covered |
| Retail Health Clinics/Convenience Clinics | Not Covered | Not Covered |
| Maternity Care – PPACA mandated maternity care is covered at 100% | Not Covered | Not Covered |
| Chiropractic Care | Not Covered | Not Covered |



**LEADING EDGE** ADMINISTRATORS

**Public Partnership, LLC**
**Employee Benefit Summary – Anthem Essential Coverage Plan**
**Network: National PPO (Blue Card PPO) Network**
**Effective Date: 05/01/2025**

| Non-Preventive Lab and Radiology | | |
|---|---|---|
| **Benefit** | **In-Network** | **Out-Of-Network** |
| Lab and Pathology | Not Covered | Not Covered |
| X-Rays / Radiology | Not Covered | Not Covered |
| MRI / MRA; CT / CTA / PET Scan | Not Covered | Not Covered |

| Inpatient Services | | |
|---|---|---|
| **Benefit** | **In-Network** | **Out-Of-Network** |
| Pre-Surgical / Pre-Admission Testing | Not Covered | Not Covered |
| Hospital Stay; Includes Room and Board: Drugs and Medication; Anesthesia and ICU; Maternity Stay, Inpatient Lab | Not Covered | Not Covered |
| Inpatient Physician Services | Not Covered | Not Covered |
| Inpatient Mental Health / Substance Abuse Services | Not Covered | Not Covered |
| Inpatient Physical Medical Rehab | Not Covered | Not Covered |
| Skilled Nursing Facility | Not Covered | Not Covered |

| Outpatient Services | | |
|---|---|---|
| **Benefit** | **In-Network** | **Out-Of-Network** |
| Second Opinion - Surgical | Not Covered | Not Covered |
| Outpatient Surgery | Not Covered | Not Covered |
| Home Health Care | Not Covered | Not Covered |
| Hospice – Home or Facility | Not Covered | Not Covered |
| Mental Health / Substance Abuse - PPACA mandated mental health/substance abuse care is covered at 100% all other services are excluded. | Not Covered | Not Covered |

136.    The Basic Wellness Plan is a self-insured plan, meaning PPL retains any funds not

spent on providing care. If PPL spends less on care than it charges Plaintiffs and other downstate

personal assistants for that care, it keeps Wage Parity Act funds it otherwise would have paid them

in benefits or cash.

137.    Available evidence shows that PPL is overcharging downstate personal assistants for the combination of the Basic Wellness Plan, the critical illness plan, and the accident plan. According to relevant data from the Health Care Cost Institute (an organization that advises employers), data from a Medicaid Managed Care Operating Report (that originated with managed care companies), and publicly-available information on the price of the critical illness and accident plans, these plans are likely worth substantially less than the $.40 per hour credited by PPL toward its Wage Parity Act obligations. Indeed, PPL may be charging downstate personal assistants tens of millions annually in excess of the actual cost of these plans.

138.    The precise amount PPL is overcharging depends on how many downstate personal assistants already have health insurance coverage under Medicaid, New York's Essential Plan, or private insurance because the Basic Wellness Plan is worthless to those personal assistants. The Basic Wellness Plan is useless for those downstate personal assistants because Medicaid, the Essential Plan and any plan that satisfies the Affordable Care Act must at least include the coverage in the Basic Wellness Plan.

139.    In its recent email messages to some Plaintiffs and other downstate personal assistants, PPL has given downstate personal assistants only a few days, until May 27, 2025, to allocate the amounts they have accrued and will accrue towards a menu of funds under the Flexible Benefits Plan. These funds include ones for dental and vision care, transit, parking, cell phones for work-related expenses, and dependent care.

140.    PPL refers to the default fund as an Excepted Benefit Health Reimbursement Arrangement ("EBHRA"), which covers some medical expenses not covered by the Basic Wellness plan.

141.    But the Flexible Benefits Plan does not meet the legal requirements of an EBHRA.

142.    Under federal regulations, an EBHRA, must be funded by the employer, not the employee. *See* IRS Notice 2002-45, 2002-02 CB 93, https://www.irs.gov/pub/irs-drop/n-02-45.pdf.

143.    PPL is not funding the EBHRA with its own money. Instead, it is funding it with Wage Parity Act funds—monies the downstate personal assistants are entitled to under the law.

144.    Therefore, PPL's "EBHRA" is inconsistent with the requirements of the IRS.

145.    It is PPL's policy that unused Flex Benefits Plan funds revert to PPL if not used by the end of the calendar year. Such a reversion would violate the Wage Parity Act's prohibition on returning wage parity benefits to the fiscal intermediary. N.Y. Pub. Health L. § 3614-c(5-a).

146.    PPL also allocates Wage Parity Act supplemental benefit pay to paid time off, accrued at a rate of one hour for every 30 hours worked up to a maximum of 56 hours.

147.    To the extent PPL is applying those allocations out of the mandated Wage Parity Act benefits amount to cover paid safe and sick time, it is reimbursing itself for payments that it is legally obligated to make under the New York State Sick Leave Law, N.Y. Lab. L. § 196-b.

### PLAINTIFFS' EMPLOYMENT WITH PPL

**Plaintiff Philip Calderon**

148.    Mr. Calderon worked for an entire month without pay—from April 1, 2025 through May 1—and was not paid at all until after the commencement of this action. Although Mr. Calderon reported his work hours to PPL on time and through a proper mechanism, the company failed to pay him due to what company representatives described to him as an "IT problem." While PPL has now paid him for the first five weeks of his employment, persistent glitches in PPL's timekeeping have resulted in him receiving his wages late on at least two other occasions.

149.    Mr. Calderon was fully registered and his father—who is the Consumer he cares for—was fully enrolled with PPL before the April 1 transition.

150. Mr. Calderon has continued to work approximately 40 hours per week as a personal assistant since that date.

151. Mr. Calderon worked approximately 40 hours during the workweek ending April 5, 2025. Under NYLL Section 191(a), Mr. Calderon should have been paid weekly, on a regular pay day, and his pay for that period should have been paid not later than seven days after the end of the workweek, *i.e.*, on or before April 12, 2025.

152. PPL's scheduled regular pay day was and remains on Thursdays.

153. Mr. Calderon worked approximately 40 hours during the workweek ending April 12, 2025. Under NYLL Section 191(a), his pay was required to be paid not later than seven days after the end of the workweek, i.e., on April 19, 2025.

154. Mr. Calderon worked approximately 40 hours during the workweek ending April 19, 2025. Under NYLL 191(a), his pay was required to be paid not later than 7 days after the end of the workweek, i.e., on April 26, 2025.

155. But Mr. Calderon was not paid until May 1, 2025, for the workweeks ending April 5, April 12, and April 19, 2025.

156. At the time of the commencement of this action, on April 25, 2025, Mr. Calderon had not received any payment from PPL for over 160 hours of work.

157. Mr. Calderon did not receive any paycheck at all from PPL until May 1, 2025, even though he had recorded his time on PPL's timekeeping application, faxed time records to PPL, and contacted PPL by phone many times to remedy the issue.

158. Mr. Calderon's father requires home care services because of his severe arthritis. He can walk with the assistance of a cane or walker but requires Mr. Calderon's assistance to complete basic life tasks.

159.    Mr. Calderon spends significantly more than 25% of his work time on manual tasks. He physically assists his father with walking throughout their home, including up and down stairs, and helps his father with sitting and standing. He helps his father with toileting and bathing, cleans the home, and cooks for his father. He also drives his father to appointments and grocery shopping.

160.    Before PPL was Mr. Calderon's fiscal intermediary, he and his father worked with another fiscal intermediary organization called Freedom Care. Mr. Calderon did not experience anything akin to the problems with wage payments he has experienced with PPL.

161.    Mr. Calderon has not received a Flex Card from PPL, nor has he received information about how to access Wellness Plan benefits.

162.    PPL sent Mr. Calderon an offer letter indicating it was deducting $0.87 per hour from Mr. Calderon's hourly wage compensation to cover the cost of his mandatory participation in the Wellness Plan and Flex Card benefits, and $0.67 per hour to cover the costs associated with his accrual of PTO and sick time. These allocations appear on his paystubs.

163.    Beginning on or around April 1, 2025, after completing the mandatory training on Time4Care provided by PPL, Mr. Calderon began tracking his time working for his father using Time4Care.

164.    Although Mr. Calderon clocked in and out of Time4Care, his time entries were accompanied by an error message indicating he would not be paid. The message read: "Consumer is not enrolled with MCO/State on Time Entry's Date of Service. Consumer is not enrolled during Time Entry's Date of Service." However, Mr. Calderon's father enrolled with PPL prior to the April 1, 2025 transition date, and when his father checked his account on PPL's website, it indicated he was enrolled and authorized to receive care.

165.    Mr. Calderon repeatedly tried to contact PPL. Despite numerous calls, he struggled

to reach a representative of the company.

166.    On occasions when Mr. Calderon was able to reach a PPL representative by phone, the company representatives told him that the error message was itself an error in PPL's IT system, and that he did not need to take any additional action to be paid.

167.    In addition to using Time4Care, Mr. Calderon submitted his weekly timesheet to PPL by fax on or around April 19. The preliminary injunction in a suit brought by CDPAP Consumers, against the New York State Department of Health (*Engesser et al. v. McDonald*) directed that personal assistants be permitted to submit time records for payment by fax or email.

168.    To Mr. Calderon's knowledge, the only reason for the delay in payment of his wages was an IT error on PPL's part.

169.    The delay in payment of Mr. Calderon's wages caused him and his family financial hardship and stress. Mr. Calderon lives with his father and mother, both of whom have disabilities and receive disability insurance.

170.    Mr. Calderon's income from his home care work is an important part of how his family meets their basic expenses. Without it, he has had to use credit and savings to cover expenses.

171.    PPL's flawed timekeeping and payroll systems continue to affect Mr. Calderon.

172.    On or around May 8 and continuing at least through May 13, the Time4Care app began rejecting his time entries upon clocking out, again displaying an error message claiming his Consumer is not enrolled. Because of this error in PPL's timekeeping and payroll systems, Mr. Calderon received his pay for the payroll week ending May 10 a week late.

173.    This error recurred during the payroll period ending May 24, 2025. As a result, Mr. Calderon will not be paid for his work in that workweek.

174.    The uncertainty regarding when and whether he will be paid has caused Mr.

Calderon significant stress.

175.    Mr. Calderon is not alone. PPL's conduct with respect to Mr. Calderon is typical of what tens of thousands of other personal assistants in New York have experienced since PPL became their employer on April 1, 2025. Like him, they have not been paid or have been underpaid because of PPL's dysfunctional systems for timekeeping, payroll, and communications.

**Plaintiff Farshad Pinchasi**

176.    Mr. Pinchasi is a personal assistant who provides home care services for both his father and his mother, who are elderly, ill Consumers. He lives and works in Nassau County.

177.    Because of errors with both the Time4Care and Telephony timekeeping mechanisms, Mr. Pinchasi had to submit paper timesheets to PPL for four weeks beginning on April 1, 2025. More recently, Mr. Pinchasi has had to manually enter his time through PPL's portal. Disturbingly, all of the payments he has received since then have been riddled with errors, and he has yet to be fully compensated for all of the hours he worked and diligently reported, including the overtime hour he works every week.

178.    Mr. Pinchasi was fully registered, and both his parents were fully enrolled with PPL before the April 1 transition.

179.    Mr. Pinchasi has continued to work forty-one hours per week as a personal assistant since that date (although a small portion of his first week was paid for by his prior fiscal intermediary).

180.    For each of the six weeks that PPL has paid him, Mr. Pinchasi received a payment that did not cover all of the hours he had worked for the applicable pay period. Even the retroactive payments he later received for some of his weeks have mostly left him underpaid for the weeks in question. He has never been paid at all, let alone at an overtime rate, for his 41st hour of work in

the last five weeks.

181.   Mr. Pinchasi's parents have serious orthopedic and other chronic health conditions and require assistance with an array of activities of daily living. He assists them with grooming and helps his father bathe. Mr. Pinchasi performs a variety of chores for his parents, including food shopping and preparing meals, clothes shopping, laundry, banking, and administering medications. He also regularly takes his parents to doctors' appointments and physical therapy. Mr. Pinchasi spends significantly more than 25% of his work time on manual tasks.

182.   Before PPL was Mr. Pinchasi's fiscal intermediary, he and his parents worked with another fiscal intermediary organization called International Home Care Services of New York. Mr. Pinchasi did not experience the range of problems with wage payments he has experienced with PPL.

183.   Starting around April 1, 2025, Mr. Pinchasi began to attempt to report his hours worked for PPL. First, he attempted to use PPL's Time4Care application. He repeatedly received an error message telling him that he could not enter time records until the consumer had a "valid service authorization" even though the authorization had already been sent to PPL. Each time he contacted PPL for assistance, no one responded.

184.   He then attempted to use PPL's Telephony system. However, when he entered hours for one parent, the entries indicated that he had worked those hours for each of his parents. The system rejected the entries.

185.   Mr. Pinchasi continued to email PPL to request assistance, but no one responded. He also tried repeatedly to reach PPL by phone. He would be left on hold for about 15 minutes at a time and then would then receive a message that someone would call him. No one did.

186.   Mr. Pinchasi then found paper PPL timesheets online on the DOH website. He

31

faxed paper timesheets to PPL for his first week of work for PPL, ending on April 5, 2025. The preliminary injunction in a suit brought by CDPAP Consumers, *Engesser et al. v. McDonald, the New York State Department of Health* directed personal assistants that they could submit time records for payment by fax or email.

187.    In the subsequent three weeks, Mr. Pinchasi also submitted paper timesheets to PPL, but while he was paid something for each of those weeks, his paystubs reveal that he was paid for fewer hours than he had worked in each of those weeks.

188.    For example, for the week ending April 12, 2025, his second week, Mr. Pinchasi reported 41 hours of work (15 hours assisting his father and 26 hours assisting his mother) but was paid for a total of only 26 hours (13 hours for each) on his pay date for that week. The following week, he received two paystubs: one purporting to cover hours he was owed for the first week and one purporting cover some but not all of the hours he was owed for the second week. Even adding those late additional hours to the ones he had previously been paid for the second week, he has only been paid for 35.5 out of the 41 hours he worked that week. The paystub for the third week allocated no hours of pay to the third week. The paystub for the sixth week allocated wages for 35.5 hours for the third week, whereas he had worked and reported 41 hours for that week.

189.    For the fifth and sixth weeks of work—the weeks ending May 3 and May 10—Mr. Pinchasi manually entered his hours in the PPL portal. Once again, his hours were listed incorrectly on his paystub, and he was paid for fewer hours than he had worked. For the week ending May 10, 2025, the paystub allocated 35.5 hours of pay to that week, but he worked his full 41 hours that week. In addition, he was paid a straight rate for all of his hours even though he had worked 41 hours in each of those weeks, entitling him to overtime pay for the hour he worked over 40. Mr. Pinchasi has also been paid less than he was owed in spread of hours pay for the weeks ending April

26, 2025, and May 3, 2025.

190.    PPL@Home allocates roughly half of Mr. Pinchasi's manually entered hours to each parent, instead of paying him as he reported and properly attributing the hours worked to the hours authorized for each parent. Mr. Pinchasi is now able to access the Time4Care application, but it too divides up his hours inaccurately. These inaccurate allocations put him and his parents at risk of being accused of dishonesty.

191.    All of Mr. Pinchasi's paystubs show an inaccurate number of hours worked for each pay period and sometimes for retroactive periods. The inaccuracies in the paystubs make it difficult to decipher which hours Mr. Pinchasi has actually been paid for.

192.    Mr. Pinchasi has still not been paid at all for the 41 hours he worked in the week ending May 17, 2025. For that week, under NYLL Section 191(a), Mr. Pinchasi should have been paid weekly, on a regular pay day, and not later than seven days after the end of the workweek, *i.e.*, by May 24, 2025. But Mr. Pinchasi still has not, to date, been paid for that week.

193.    Mr. Pinchasi has never been paid on time or for all of the hours he worked and reported, and he has never been paid for the hours he has worked over 40 in a workweek at the legally required overtime rate, as required by the FLSA and the NYLL.

194.    The uncertainty regarding these chronic underpayments has caused Mr. Pinchasi and his parents significant stress.

195.    On or about March 7, 2025, Mr. Pinchasi received two Offer Letters from PPL, one for each parent, stating his total compensation under the Wage Parity Act.

196.    As per the terms of the Offer Letter, PPL pays Mr. Pinchasi an hourly cash wage of $19.50 and deducts and allocates $0.62 cents per hour for the Wellness Plan and Flex Card programs, and $0.65 per hour to PPL's PTO plan. These allocations are reported on his paystubs.

197.    To date, Mr. Pinchasi has not received any information about how to access any benefits under the Wellness Plan, and he has never received a Flex Card from PPL.

**Plaintiff Allison Fields**

198.    Ms. Fields is a personal assistant for a friend who requires home care services because of his mental health disability. Ms. Fields has been her Consumer's personal assistant for over six years.

199.    Ms. Fields was registered and her Consumer was enrolled before the April 1 transition date to PPL.

200.    Ms. Fields has worked for PPL around 21 hours per week since April 1 and reported her hours to PPL on a timely basis.

201.    For each week Ms. Fields worked, under NYLL Section 191(a), she should have been paid weekly, on a regular pay day, and not later than seven days after the end of that workweek.

202.    However, PPL still has not paid at all Ms. Fields for the work weeks ending April 19, and April 26, and May 3.

203.    Ms. Fields was able to enter her time on the Time4Care app during the payroll weeks ending April 5 and 12, and she received pay for those weeks.

204.    When Ms. Fields tried to clock-in on her next workday, on or around April 13, she found that she could not clock in on Time4Care. The app displayed a message claiming that Ms. Fields' Consumer lacked authorization for CDPAP services.

205.    Neither Ms. Fields nor the Consumer she works for had received any notice that his authorization had expired or would expire soon, or that either of them had to take any steps to renew the notice.

206.    Consumers can view information about their authorization status on PPL@Home.

When Ms. Fields and her Consumer checked his account, there was no information present about any authorizations.

207.    Ms. Fields called PPL many times but was unable to reach a company representative to resolve the error message or obtain any explanation as to what she or the Consumer should do.

208.    Because she could not enter time on Time4Care, Ms. Fields emailed scans of paper timesheets to PPL for the weeks ending April 19, April 26, and May 3.

209.    PPL has not paid Ms. Fields anything for her hours worked in those weeks.

210.    In the weeks after she began receiving the Time4Care error message, Ms. Fields read on social media that other CDPAP Consumers and personal assistants experiencing similar issues had reached out to the provider of the Consumer's CDPAP coverage for assistance. She and the Consumer contacted the insurance company which covers his CDPAP participation. The insurance company directed the Consumer to take new authorization paperwork to his doctor and return it to them.

211.    Ms. Fields accompanied her Consumer to visit his primary care practice and have the paperwork completed on or around April 29. Upon information and belief, the Consumer's doctor submitted the paperwork to his insurer, which submitted it to PPL.

212.    Around a week later, on or around May 7, Ms. Fields found she could once again clock-in and clock-out on Time4Care without an error message. PPL did not communicate this to Ms. Fields or her Consumer, but Ms. Fields habitually checked Time4Care to see if she was able to clock-in.

213.    While PPL paid Ms. Fields for work the week ending May 10, she remains unpaid for the preceding three weeks she worked while seeking PPL's assistance to resolve the error messages she received when attempting to use Time4Care.

214.    Ms. Fields has also experienced subsequent problems receiving timely payment from PPL. During the workweek ending May 24, 2025, Ms. Fields again received error messages next to her time entries claiming that her consumer lacked authorization, even though he has been authorized for services through the end of October 2025. Because of these errors, PPL has not paid Ms. Fields for all her hours worked in that week.

215.    When they have paid her, PPL has allocated money otherwise payable in cash to offer Ms. Fields benefits which are of no value to her.

216.    On or around March 13, 2025, Ms. Fields received an Offer Letter from PPL stating her total compensation under the Wage Parity Act.

217.    As per the terms of the offer letter, PPL pays her an hourly cash wage of $19.50, while allocating $0.62 of her total hourly compensation to the Wellness Plan and Flex Card programs, and $0.65 of her total hourly compensation to PPL's PTO plan.

218.    Ms. Fields has not received any information about how to access benefits offered under the Wellness Plan or Flex Card programs.

219.    Ms. Fields has health insurance through the New York State of Health Marketplace.

220.    Ms. Field's existing insurance covers preventive care, and she does not derive any benefit from the Wellness Plan.

221.    PPL's failure to pay Ms. Fields has caused her substantial stress and financial difficulty.

222.    Ms. Fields does not want to stop caring for her friend, who trusts her and does not

want to find a new personal assistant.

223.    However, without the income from her work as a personal assistant, Ms. Fields has had to pay bills and living expenses using credit cards, totaling over $1,000 to cover gas, groceries, car insurance, and health insurance premiums for Ms. Fields's daughter.

224.    Ms. Fields expects to be charged interest on her credit card balance, which she cannot afford to pay off without payment from PPL.

**Plaintiff Dana Folgar**

225.    Ms. Folgar met the Consumer she works for as a young adult when she accompanied her mother—who was then a personal assistant—to work. Ms. Folgar got along well with her mother's Consumer and thought she would like to provide that type of home-based personal care, and so when she turned eighteen, she submitted the paperwork to become a personal assistant herself. Ms. Folgar left school and became a personal assistant at 18. She has worked for the same Consumer ever since.

226.    Ms. Folgar has continued to provide care for her Consumer despite the difficulties entailed in using Time4Care and Telephony, not being paid for days of work, and receiving her pay late.

227.    Ms. Folgar has been unable to enter her time in Time4Care application and has been disconnected multiple times by the Telephony system.

228.    Because of these technical problems, Ms. Folgar has relied on email timesheets to submit her hours to PPL. Despite her persistent efforts to document her work properly with the company, Ms. Folgar has not been paid for all of the hours she has worked, nor has she been paid at the proper rates for the spread of hours or received all her overtime hours.

229.    Ms. Folgar was fully registered and enrolled with PPL before the April 1 transition.

Ms. Folgar has not received the $100 incentive payment promised to encourage people to sign up before April 1.

230.    Ms. Folgar's regular weekly schedule is Friday from 7:30am – 5:45pm, Saturday from 7:30pm – Sunday 7:30am, and Monday from 7:30am – 7:30pm.

231.    Ms. Folgar occasionally fills in or swaps shifts with the other personal assistants who work for the same Consumer. The personal assistants all work together to ensure their Consumer's needs are met.

232.    Each of Ms. Folgar's shifts are over ten hours long and therefore Ms. Folgar is entitled to spread of hours pay for each shift that exceeds ten hours in a day.

233.    PPL has not paid Ms. Folgar in full for her services, even though she has recorded her time on PPL's timekeeping application, emailed timekeeping records to PPL, and contacted PPL by phone many times to correct the issues with her pay.

234.    Ms. Folgar cares for a Consumer who requires assistance to get out of bed, toilet, bathe, and perform many of life's basic tasks.

235.    Ms. Folgar spends significantly more than 25% of her work time on manual tasks. She physically assists her consumer to dress, eat, bathe, toilet, and navigate her home.

236.    Before PPL became the fiscal intermediary, Ms. Folgar worked with another fiscal intermediary organization called Concepts of Independence. Ms. Folgar routinely submitted her time by phone without the issues she has experienced with PPL.

237.    Beginning on or around April 1, 2025, after completing the mandatory training on Time4Care provided by PPL, Ms. Folgar attempted to use the application to track her time working for her consumer using Time4Care. Time4Care repeatedly froze when she attempted to use the application and would not record her time.

238.     The Time4Care application is supposed to allow personal assistants such as Ms. Folgar to clock in and clock out for their shifts, and to transmit their work hours to PPL.

239.     Ms. Folgar tried to report her time using PPL's Telephony system. That system would tell her to check her date of birth and social security number and would not permit her to enter her time. Her time-reporting calls using that system were repeatedly disconnected. After countless hours spent trying to resolve this problem, a representative from PPL told Ms. Folgar that the company had the wrong date of birth in its system and that this error prevented her from using Telephony. Ms. Folgar had accurately reported her date of birth to the company and submitted photographs of her passport and driver's license while registering.

240.     Because neither Time4Care nor the Telephony system worked, Ms. Folgar submitted her weekly timesheet to PPL by email.

241.     The preliminary injunction in a suit brought by CDPAP Consumers, *Engesser et al. v. McDonald, the New York State Department of Health,* allowed personal assistants to submit their time records for payment by fax or email.

242.     Ms. Folgar's pay has been neither regular nor timely. Instead, she has been forced to wait for her pay for nearly two weeks on more than one occasion even though her time records were submitted to PPL on time.

243.     Ms. Folgar worked approximately 32.75 hours during the workweek ending April 12, 2025. Under NYLL Section 191(a), Ms. Folgar should be paid weekly, on a regular pay day, and not later than 7 days after the end of the workweek, *i.e.*, on April 19, 2025. Ms. Folgar still has not been paid for her work on April 11, and was not paid for her work on April 6 until May 29, 2025. A PPL representative told Ms. Folgar that she has not been paid for her work on April 11 because that pay was mistakenly provided to another personal assistant.

244.    PPL's scheduled regular pay day was and remains on Thursdays.

245.    Ms. Folgar worked approximately 52.25 hours during the workweek ending April 26, 2025. Under NYLL Section 191(a), Ms. Folgar should have been paid not later than 7 days after the end of the workweek, *i.e.*, on May 3, 2025. However, she was not paid until May 7 for some of her work during that week.

246.    PPL also did not pay Ms. Folgar overtime premiums for all of the hours she worked over 40. Though Ms. Folgar's Consumer submitted an accurate timesheet, PPL failed to pay Ms. Folgar for two and half hours, which should have been paid at her overtime rate. In other words, PPL paid Ms. Folgar for only 10 hours of overtime rather than the full number of overtime hours she worked.

247.    Ms. Folgar worked approximately 22.5 hours during the work week ending May 10, 2025. Under NYLL Section 191(a), PPL should have paid her on a weekly basis, on a regular pay day, and not later than 7 days after the end of the workweek, *i.e.*, on May 1, 2025. However, PPL paid her for only some of her work during the week and failed to pay her entirely for her work on Sunday May 4, 2025.

248.    PPL routinely rounds Ms. Folgar's time. Ms. Folgar works a regular shift from 7:30pm on Saturday to 7:30am on Sunday. Because PPL's payroll week ends at midnight on Saturday, Ms. Folgar's shift is broken into two parts (7:30pm-midnight and 12:01am – 7:30am) on Ms. Folgar's paycheck.

249.    PPL rounds her time so that Ms. Folgar's checks always show a full four or five hours of work – never the 4.5 hours she actually works from 7:30 pm to midnight on Saturdays.

250.    PPL has not paid Ms. Folgar spread of hours premiums for any of the shifts she has worked that are longer than 10 hours.

251.    PPL's decision to round Ms. Folgar's time makes it more difficult for her to confirm she is being paid correctly for the hours she works.

252.    Ms. Folgar received an offer letter from PPL stating her total compensation under the Wage Parity Act. As per the terms of the offer letter, PPL agreed to pay Ms. Folgar an hourly cash wage and allocate $0.62 cents to the MEC Plan and Flex Card programs, and $0.65 to PPL's PTO plan. Those allocations are reported on her paystubs. PPL subsequently emailed Ms. Folgar to inform her of a change to the hourly rate. The allocations were unchanged and have been reflected in all of her paystubs.

253.    To date, Ms. Folgar has not received a flexible benefits card or any information about how to access any other benefits.

254.    PPL's failure to pay Ms. Folgar for the work she has done in a timely fashion has caused her financial hardship, making it difficult to make ends meet and cover the costs of food, rent, and utilities. She has struggled to make her car insurance payment and has delayed setting up a payment plan to address a medical debt that is outstanding. Because she has not been paid on time and in full for her work, Ms. Folgar has only been able to make the minimum payment due on her credit cards and so the debt is accruing interest and growing each month.

255.    By the conduct described in this Complaint, Defendant willfully committed widespread violations of the FLSA, the NYLL, and the Wage Parity Act.

## COLLECTIVE ACTION ALLEGATIONS

256.    Plaintiffs bring their First Claim for Relief alleging violations of the FLSA, on behalf of themselves and those individuals who may opt into the "FLSA Collective" defined as:

> All current and former personal assistants employed by Public Partnerships, LLC within the five boroughs of New York City and Nassau, Suffolk, and Westchester Counties who have not been paid on time or for all hours worked or at the required rate under the FLSA by Defendant, at any time from April 1, 2025 through the date

of final judgment in this action ("FLSA Collective" or the "Collective").

257.    The current and former employees described above are situated similarly to the Plaintiffs within the meaning of the FLSA, 29 U.S.C. § 216(b), and therefore the First Claim for Relief may be brought and maintained as an "opt-in" collective action pursuant to Section 16(b) of the FLSA.

258.    At all relevant times, the FLSA Collective has substantially similar job requirements and pay provisions, and has been subjected to Defendant's decisions, policies, practices, procedures, and rules, which include Defendant's willful failure and refusal to pay wages on time for all hours worked at the legally-mandated rates—including but not limited to failure to pay the federal minimum wage and legally-required overtime.

259.    Defendant PPL is liable under the FLSA for, *inter alia*, failing to properly compensate the FLSA Collective.

260.    Common proof applicable to Plaintiffs and the other workers will show that Defendant has failed and continues to fail to pay minimum and overtime wages as required by the FLSA to Plaintiffs and other similarly situated personal assistants.

261.    This cause of action is maintainable as a collective action pursuant to the FLSA, 29 U.S.C. § 216(b), because the prosecution of separate actions by individual members of the FLSA Collective would create a risk of inconsistent or varying adjudications with respect to individual current and former employees which would establish incompatible standards of conduct for Defendant.

262.    The names, last known addresses, and cell phone numbers of the proposed FLSA Collective members are available to Defendant. Defendant should be required to provide Plaintiffs a list—including names, last known addresses, cell phone numbers, and email addresses if known—

of all current and former employees who could be members of the proposed FLSA Collective.

263.    Notice of and an opportunity to join this lawsuit should be provided to all potential opt-in Plaintiffs by both First-Class Mail to their last known address and by online posting, as well as by other practicable means, including but not limited to text messaging, as soon as possible.

## CLASS ACTION ALLEGATIONS

264.    Plaintiffs bring the NYLL and Wage Parity Act claims pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class of persons defined as:

> All current and former personal assistants employed by Public Partnerships, LLC in the five boroughs of New York City and Nassau, Suffolk, and Westchester Counties, who have not been paid on time or for all hours worked or at the legally-required rate of pay, including due to unlawful deductions or charges, under Articles 6 or 19 of the New York Labor Law or the Wage Parity Act by Defendant at any time between April 1, 2025 and the date of final judgment in this action (the "Rule 23 Class" or "Class").

265.    Plaintiffs reserve the right to amend and refine the class definition above or add classes and/or subclasses as litigation progresses.

266.    Numerosity: The Rule 23 Class identified is so numerous that joinder of all members is impracticable. The exact number of Rule 23 Class members is unknown to Plaintiffs at this time, but it is believed to be in the tens of thousands. These members can be identified based on Defendant's records.

267.    According to a request for proposals issued by DOH before PPL was selected to be the single intermediary and employer of Plaintiffs and other members of the Rule 23 Class, there were over 200,000 Consumers in the CDPAP program in the New York City area alone, who were each served by at least one personal assistant. And as noted above, recent surveys of personal assistants found that the majority of those responding had experienced underpayment of wages.

268.    Commonality: Common questions of law and fact exist as to all members of the

Rule 23 Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Rule 23 Class are:

a.  whether Defendant has failed to keep true and accurate time and pay records for all hours worked by Plaintiffs and members of the Rule 23 Class;

b.  whether Defendant has established and maintained systems, practices, and policies that have failed to compensate Plaintiffs and members of the Rule 23 Class for all of the work they were required to perform;

c.  whether Defendant has established and maintained systems, practices, and policies that have failed to compensate Plaintiffs and members of the Rule 23 Class at the legally required rate;

d.  whether Defendant is deducting and allocating mandated Wage Parity Act payments to cover benefits that it has not provided to Plaintiffs and/or to reimburse itself without the voluntary consent of Plaintiffs;

e.  whether Defendant is overcharging Plaintiffs and members of the Rule 23 Class for the benefits it is charging toward its Wage Parity Act obligations and whether Defendant has a policy and practice of returning money from those benefits to itself;

f.  whether Defendant's systems, policies, and practices of failing to pay workers for all hours worked were instituted willfully or with reckless disregard of the law;

g.  whether Defendant's persistent inaccuracies in paystubs make it difficult for personal assistants to figure out what they have been paid for and what they have not been paid for;

h.  whether the lack of information provided to personal assistants concerning the allocation of Wage Parity Act dollars to the different plans they have been

automatically enrolled in makes it impossible for them to know whether money owed to them is being correctly charged; and

i. the nature and extent of class-wide injury and the measure of total damages for those injuries.

269. These common questions arise, in part, because of the uniform circumstances under which the CDPAP program was transitioned to the single intermediary PPL.

270. Typicality: Plaintiffs' claims are typical of the claims of the other members of the Rule 23 Class. Plaintiffs and all other members of the Rule 23 Class sustained damages arising out of Defendant's conduct in violation of the NYLL. The Rule 23 Class members are employed by Defendant as personal assistants under CDPAP, enjoy the same statutory rights and protections, and have sustained similar types of damages because of Defendant's failure to comply with the NYLL and its use of unlawful policies and practices.

271. Adequacy: Plaintiffs will fairly and adequately protect the interests of the members of the Rule 23 Class and have retained counsel competent and experienced in complex class action litigation, including suits involving unpaid overtime and misclassification of workers.

272. Plaintiffs have no interests that are contrary to or in conflict with those of the other members of the Rule 23 Class.

273. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

274. A class action is superior to other available methods for the fair and efficient adjudication of this action. The Rule 23 Class has been damaged and is entitled to recovery as a result of the Defendant's violation of the NYLL and Wage Parity Act as well as its common and uniform systems, policies, and practices. A class action is a particularly superior method of

adjudication in the context of wage and hour litigation where, as here, class members lack the financial resources to conduct a thorough analysis of Defendant's payroll and compensation practices and to vigorously prosecute a lawsuit in federal court against a corporate defendant. Although the relative damages suffered by individual Rule 23 Class members are not de minimis, such damages are small compared to the expense and burden of individual prosecution of this litigation. In addition, class certification is appropriate in this matter because the class procedure will obviate the need for unduly duplicative litigation that might result in inconsistent judgments regarding Defendant's practices.

275.    This action is properly maintainable under Rule 23(b)(3) of the Federal Rules of Civil Procedure.

276.    Plaintiffs intend to send notice to all members of the Class to the extent required by Fed. R. Civ. P. 23(c)(2). The names and addresses of the class members are available from Defendant's records.

277.    At all times during their employment, Plaintiffs and members of the Rule 23 Class were Defendant's "employees" as defined in NYLL §§ 2, 651(5), and 190(2). At all relevant times during Plaintiffs' employment, Defendant was an "employer" within the meaning of NYLL §§ 2, 651(6) and 190(3).

278.    Class Members were and are manual laborers who are paid hourly rates, and PPL maintains control over their employment and payroll.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
### VIOLATIONS OF THE FAIR LABOR STANDARDS ACT
(Brought on behalf of Plaintiffs and the FLSA Collective)
(Failure to Timely Pay Minimum and Overtime Wages for All Hours Worked)

279.    Plaintiffs reallege all allegations in the preceding paragraphs as if fully set forth here.

280.    Section 6(a) of the FLSA, 29 U.S.C. § 206(a), provides that no employer engaged in commerce shall pay its employees less than the applicable minimum wage rate for all hours worked.

281.    Under the FLSA and its implementing regulations, minimum and overtime wages earned in a particular workweek must be paid in a timely, prompt manner, on the regular payday for the period in which such workweek ends. For manual workers in New York such as Plaintiffs and the FLSA Collective, all wages must be paid on a weekly basis, not later than seven calendar days after the end of the week in which the wages are earned. NYLL § 191(a). PPL has established a weekly pay day of Thursday.

282.    Failing to pay minimum wages to manual laborers in the time required under NYLL § 191(a) violates the FLSA's prompt payment requirement.

283.    Section 7(a) of the FLSA, 29 U.S.C § 207(a), provides that no employer engaged in commerce shall employ an employee for a workweek longer than forty hours unless such employee receives compensation for their employment in excess of 40 hours at a rate not less than one and one-half times the regular rate at which they are employed.

284.    Section 16 of the FLSA, 29 U.S.C. § 216(b), provides that any employer who violates the provisions of 29 U.S.C. §§ 206 or 207 shall be liable to the employee or employees

affected in the amount of their unpaid compensation and an additional equal amount as liquidated damages.

285.    Defendant is an enterprise engaged in commerce. 29 U.S.C. § 203.

286.    At all times since April 1, 2025, Defendant has employed all members of the FLSA Collective.

287.    Defendant has willfully failed to timely and promptly pay Plaintiffs and the FLSA Collective the legally required federal minimum wage for all hours worked, in violation of the FLSA. Under the FLSA, late wages are considered a form of unpaid wages.

288.    Defendant has willfully failed to pay Mr. Pinchasi and Ms. Folgar, and other members of the FLSA Collective, for all hours worked over 40 in a workweek, at the legally required overtime rate, in violation of the FLSA.

289.    Plaintiffs and the FLSA Collective are entitled to the full amount of their unpaid minimum wages, unpaid overtime, in an amount to be determined at trial, and liquidated damages equal to all unpaid wages (including late-paid wages), in addition to costs and reasonable attorneys' fees, under 29 U.S.C. § 216(b).

**SECOND CLAIM FOR RELIEF:**
**VIOLATIONS OF NEW YORK LABOR LAW**
**AND NEW YORK HOME CARE WORKER WAGE PARITY ACT**
(Brought on behalf of Plaintiffs and Members of the Rule 23 Class)
(Failure to Timely Pay All Hours Worked at the Correct Rate)

290.    Plaintiffs reallege all allegations in the preceding paragraphs as if fully set forth here.

291.    Under Article 19 of the NYLL, and its implementing regulations or wage orders, employers must pay each employee it suffers or permits to work no less than the minimum wage for all hours worked.

292.    Pursuant to regulations issued by the State Commissioner of Labor, an employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate in the manner and methods provided by the FLSA. 12 N.Y.C.R.R. § 142-2.2.

293.    Pursuant to regulations issued by the State Commissioner of Labor, an employer must pay a spread of hours premium of an extra hour's pay for every day worked in excess of ten hours. 12 N.Y.C.R.R. §§ 137-1.7, 142-2.4.

294.    Under Article 6 of the NYLL, NYLL § 191, an employer must pay manual workers their agreed-upon wage on a weekly basis, not later than seven calendar days after the end of the week in which the wages are earned. The failure to timely pay such manual workers on a regular timely basis entitles employees to liquidated damages for late payment.

295.    Defendant, through the conduct described above, has violated multiple provisions of Articles 6 and 19 of the NYLL and its accompanying regulations and the Wage Parity Act.

296.    Under Article 36 of the New York Public Health Law, NYLL § 3614-F, "Where any home care aide is paid less than required by subdivision two of this section, the home care aide, or the commissioner of labor acting on behalf of the home care aide, may bring a civil action under article six or nineteen of the labor law[.]"

297.    Defendant has employed Plaintiffs and members of the Rule 23 Class within the meaning of the NYLL since April 1, 2025.

298.    Plaintiffs and members of the Rule 23 Class are manual workers within the meaning of the NYLL.

299.    Defendant has willfully failed to timely pay Plaintiffs and members of the Rule 23 Class at the legally required rate for all hours worked as required by the NYLL, including but not limited to by failing to pay the minimum wage as set by Public Health Law §§ 3614-C and

3614-F, overtime pay, and spread of hours premiums, and by paying Plaintiffs' wages late in violation of NYLL § 191(a).

300.    Defendant has failed to provide accurate wage statements required under NYLL § 195 causing personal assistants to be unable to determine whether they have been paid in full for all hours worked.

301.    Plaintiffs and the other members of the Rule 23 Class are entitled to their unpaid or late wages, including illegal deductions, in an amount to be determined at trial, liquidated damages equal to unpaid wages (including late-paid wages), and statutory damages for violations of NYLL § 195, in addition to attorneys' fees and costs, under NYLL §§ 198 and 663.

### THIRD CLAIM FOR RELIEF:
### VIOLATIONS OF NEW YORK LABOR LAW
### AND NEW YORK HOME CARE WORKER WAGE PARITY ACT
(Brought on behalf of Plaintiffs and Members of the Rule 23 Class)
(Allocation of Home Care Wage Parity Act Supplement Pay to Benefits Not Provided)

302.    Plaintiffs reallege all allegations in the preceding paragraphs as if fully set forth here.

303.    Under Article 36 of the New York Public Health Law, NYLL §§ 3614-C and 3614-F, an employer of home care workers must pay each home care worker no less than a prescribed living wage rate in cash and the remainder of the prescribed amount in some combination of cash and/or benefits.

304.    The Public Health Law's Wage Parity Act also provides that "No portion of the dollars spent or to be spent to satisfy the wage or benefit portion under this section shall be returned to the … fiscal intermediary, related persons or entities, other than to a home care aide as defined in this section to whom the wage or benefits are due, as a refund, dividend, profit, or in any other manner." N.Y. Pub. Health Law § 3614-C(5-a).

305.    Under Article 6 of the NYLL, § 191, employers must timely pay all agreed-upon wages, including benefits and wage supplements.

306.    Under Article 6 of the NYLL, NYLL § 193, an employer may not make deductions from the wages of an employee unless such deductions are authorized by law or are for the benefit of an employee and voluntarily consented to, including—as codified in the No Wage Theft Loophole Act—by failing to pay workers at all. Under NYLL § 190(1), "wages" includes benefits or wage supplements as defined in NYLL § 198-c, and thus includes "health, welfare and retirement benefits," NYLL § 198-c(2), such as the Wellness Plan, accident plan, critical illness plan, and the Flexible Benefits Plan promised to Plaintiffs and members of the Rule 23 Class.

307.    Under NYLL § 193, no employer shall make any charge against wages or require an employee to make any payment by separate transaction unless such charge is permitted as a deduction from wages.

308.    By allocating portions of the required total hourly compensation owed to Plaintiffs and members of the Rule 23 Class under the Wage Parity Act to health care benefits that it has not actually provided to them, Defendant has made unlawful charges against the wages of Plaintiffs and members of the Rule 23 Class, in violation of NYLL § 193 and the Wage Parity Act.

309.    By failing to provide the promised benefits, Defendant has also failed to pay Plaintiffs and members of the Rule 23 Class their promised wages by failing to provide them with promised benefits or wage supplements, in violation of NYLL §§ 191 and 193 and the Wage Parity Act.

310.    Defendants' charges to Plaintiffs and members of the Rule 23 Class's wages for benefits are unlawful even if or when Defendant provides the promised Basic Wellness Plan and Flex Card.

311.    At a minimum, for personal assistants with insurance, the deductions or charges for the Basic Wellness Plan offer no benefit. For others, the available evidence indicates the amount PPL is charging for these supposed benefits will be significantly higher than both any actual benefit personal assistants will receive under the plan, and the actual cost to Defendant of providing any benefits.

312.    Deductions that PPL is making that are allegedly for the Wellness Plan and Flex Card constitute unlawful deductions or charges from the required total hourly compensation of Plaintiffs and members of the Rule 23 Class, in violation of NYLL § 193 and the Wage Parity Act.

313.    PPL fails to satisfy the requirements of NYLL § 193(1)(a) because it is allocating a portion of the total compensation owed to Plaintiffs and members of the Rule 23 Class under the Wage Parity Act to benefits that PPL did not and has not actually provided.

314.    In addition, by allocating a portion of the total compensation owed to Plaintiffs and members of the Rule 23 Class under the Wage Parity Act to a combination of plans that includes one labeled "EBHRA" that does not conform to the requirements of federal regulations, PPL fails to satisfy the requirements of NYLL § 193(1)(a) & 193(2), that the deductions be for an authorized plan, including a pre-tax plan approved by the IRS or local taxing authority.

315.    The allocations for the combination of the insurance plans and the Flex Card also fail to meet the requirements of NYLL § 193(1)(b), because some of the allocations are not for the benefit of the employee; the employees have not been given truthful or complete written notice of the terms and conditions of the deductions or charges; the employees have not given written consent to all of these deductions and charges; and any alleged consent they may have given has not been fully voluntary, including for the reasons described above.

316.    By allocating funds to a Flex Card that if not used by December 2025, will revert

to PPL, PPL is violating both NYLL § 193 and the Wage Parity Act.

317.    By allocating portions of the required total hourly compensation owed to Plaintiffs and members of the Rule 23 Class under the Wage Parity Act to cover paid safe and sick time, Defendant is causing Plaintiffs to pay for time off that employers are legally obligated to pay for under the New York State Sick Leave Law, NYLL § 196-b.

318.    All of the above-described deductions are unlawful charges against the wages of Plaintiffs and members of the Rule 23 Class, in violation of NYLL § 193 and the Wage Parity Act.

319.    Defendant's failure to provide downstate personal assistants with sufficient information—in both their hiring wage notices and in their wage statements with each payment of wages—to determine if the funds owed to them under the Wage Parity Act have been properly charged violates NYLL § 195.

320.    Plaintiffs and the other members of the Rule 23 Class are entitled to recover the full value of these illegal charges against their wages and deductions from their promised wages in an amount to be determined at trial, an equal amount of liquidated damages, and statutory damages for violations of NYLL § 195, in addition to attorneys' fees and costs, under NYLL § 198.

### FOURTH CLAIM FOR RELIEF:
### VIOLATIONS OF THE NEW YORK HOME CARE WORKER WAGE PARITY ACT:
### BREACH OF CONTRACT
(Brought on behalf of Plaintiffs and Members of the Rule 23 Class)

321.    Plaintiffs reallege all allegations in the preceding paragraphs as if fully set forth here.

322.    The New York Home Care Workers Wage Parity Act, N.Y. Pub. Health Law § 3614–C, requires Licensed Home Care Services Agencies and other employers in New York City and the surrounding counties to pay all home care aides providing Medicaid-covered care, including CDPAP personal assistants, an "applicable minimum rate of home care aide total compensation" in

order to receive Medicaid reimbursements for that care. *Id.* § 3614–c(2); *see also id.* § 3614–c(1)(d) (defining "[h]ome care aide" to include "home health aide[s]" and "personal care aide[s]").

323.    Defendant entered into a contract with the New York State DOH that required Defendant to pay Plaintiffs and other members of the Rule 23 Class wages as required by New York State Public Health Law § 3614-C ("New York State Contract"), in as much as Plaintiffs and the other Rule 23 Class members are home care aides hired by Defendant to perform Medicaid-reimbursable services under CDPAP in Westchester, Nassau, and Suffolk Counties and the five boroughs of New York City.

324.    Pursuant to the New York State Contract, Defendant subsequently agreed to pay Plaintiffs and the other members of the Rule 23 Class's wages, including benefits, as required under N.Y. Public Health Law § 3614-C ("Individual Agreements").

325.    The schedule of prevailing rates of wages and benefits to be paid to all workers furnishing labor pursuant to the New York State Contract and Individual Agreements was included in and formed a part of those contracts and agreements.

326.    Beginning on April 1, 2025, Plaintiffs and the other members of the Rule 23 Class furnished labor to Defendant in furtherance of Defendant's performance of the New York State Contract.

327.    Defendant willfully paid Plaintiffs and Members of the Rule 23 Class less than the prevailing rates of wages and benefits to which they were entitled, and breached its obligation to pay all wages due as required by N.Y. Public Health Law § 3614-C.

328.    Plaintiffs and the other members of the Rule 23 Class, as third-party beneficiaries of Defendant's contract with DOH to pay wages as required by the New York Home Care Worker Wage Parity Act, are entitled to relief for the breach of this contractual obligation and its contractual

obligation with Plaintiffs and members of the Rule 23 Class, plus interest.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs, on behalf of themselves, the FLSA Collective, and the Rule 23 Class, demand a trial by jury as to all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves, the FLSA Collective, and the Rule 23 Class, respectfully request that this Court enter a judgment providing the following relief:

(a) Declaring this action to be maintainable as a collective action pursuant to the FLSA with respect to the First Claim for Relief;

(b) Certifying this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure with respect to the Second, Third, and Fourth Claims for Relief;

(c) Designating Plaintiffs Calderon, Folgar, Pinchasi, and Fields as representatives of the FLSA Collective and the Rule 23 Class, and counsel of record as Class Counsel;

(d) Issuing proper notice to the FLSA Collective at Defendant's expense;

(e) Declaring that the practices complained of in this action are unlawful under the Fair Labor Standards Act and the New York Labor Law, Articles 6 and 19, the supporting New York State Department of Labor regulations, and the New York Home Care Worker Wage Parity Act;

(f) Ordering Defendant to pay all unpaid wages and liquidated damages pursuant to the FLSA, NYLL Articles 6 and 19, the supporting New York State Department of Labor regulations, and the Home Care Worker Wage Parity Act;

(g) Ordering the payment of attorneys' fees pursuant to 29 U.S.C. § 216(b) and New York

Labor Law §§ 198 and 663;

(h) Ordering the payment of the costs and disbursements of this action; and

(i) Ordering such other relief, in law or equity, as this Court deems just and proper, including all relief authorized by the FLSA, the NYLL, and the Wage Parity Act.

Dated: May 28, 2025
      New York, New York

                    Respectfully submitted,

                    **THE LEGAL AID SOCIETY**

                    B. Franco Olshansky
                    Richard Blum
                    Rebekah Cook-Mack
                    Belkys Garcia
                    Rebecca Antar Novick
                    Michael Diller
                    49 Thomas Street, Fl 5
                    New York, NY 10013
                    (332) 227-7291
                    rblum@legal-aid.org
                    rcook-mack@legal-aid.org
                    bgarcia@legal-aid.org
                    rantar@legal-aid.org
                    mdiller@legal-aid.org

                    **KATZ BANKS KUMIN LLP**

                    /s/ Hugh Baran
                    Hugh Baran (he/him)
                    Emma Walters (she/her)
                    Katz Banks Kumin LLP
                    111 Broadway, Suite 1403
                    New York, NY 10006
                    (646) 759-4501
                    Baran@katzbanks.com
                    Walters@katzbanks.com

                    *Counsel for Plaintiffs*