**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

PHILIP CALDERON, FARSHAD PINCHASI, ALLISON FIELDS, and DANA FOLGAR, *on their own behalf and on behalf of all others similarly situated,*

*Plaintiffs,*

- against -

PUBLIC PARTNERSHIPS, LLC,

*Defendant.*

Civ. Action No.:
1:25-cv-02320 (FB)(LKE)

PRELIMINARY APPROVAL HEARING:
July 1, 2026 at 11:00 a.m.
Courtroom 13B South

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL, PRELIMINARY CLASS CERTIFICATION, APPOINTMENT OF CLASS COUNSEL, AND OTHER RELIEF

Dated: New York, NY
June 23, 2026

**KATZ BANKS KUMIN LLP**
Hugh Baran (he/him)
Emma Walters (she/her)
Avi Kumin (he/him)[†]
111 Broadway, Suite 1403
New York, NY 10006
(646) 759-4501
baran@katzbanks.com
walters@katzbanks.com
kumin@katzbanks.com

[†] *Pro hac vice motion to be filed*

**THE LEGAL AID SOCIETY**
Elizabeth Saylor (she/her)
B. Franco Olshansky (she/her)
Richard Blum (he/him)
Rebekah Cook-Mack (she/her)
Michael Diller (he/him)
Rebecca Antar (she/her)
Belkys Garcia (she/her)
49 Thomas Street, Fl 5
New York, NY 10013
(212) 577-3300
esaylor@legal-aid.org
bfrancoolshansky@legal-aid.org
rblum@legal-aid.org
rcook-mack@legal-aid.org
mdiller@legal-aid.org
rantar@legal-aid.org
brgarcia@legal-aid.org

*Counsel for Plaintiffs and the Proposed Settlement Class*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

I.    SUMMARY OF PLAINTIFFS' ALLEGATIONS ................................................. 2

    A.    PPL Becomes the Sole Fiscal Intermediary for CDPAP, a Life-Saving Program that Allows Vulnerable New Yorkers to Receive Home-Based Care. .......................................... 2

    B.    PPL Allegedly Fails to Pay PAs on Time and at the Correct Rate for All Hours Worked, in Violation of the FLSA and NYLL. ................................................................. 4

    C.    PPL Allocates Certain Wage Parity Compensation to Paid Time Off and Minimum Essential Coverage Under the Wage Parity Act, in a Manner Plaintiffs Allege Violated the Law. ................................................................................................................. 4

II.    PROCEDURAL HISTORY AND SETTLEMENT NEGOTIATIONS ........................... 7

III.    THE SETTLEMENT AGREEMENT ............................................................................. 8

    A.    Settlement Class ......................................................................................... 8

    B.    Monetary Relief and Settlement Allocations .............................................. 9

    C.    Non-Monetary Relief ................................................................................ 10

    D.    Releases ..................................................................................................... 12

    E.    Form and Method of Notice ..................................................................... 12

    F.    Opt-Out, Objection, and Exclusion .......................................................... 13

    G.    Notice Period, Final Approval, and Payments .......................................... 13

STANDARD OF REVIEW ................................................................................................. 15

ARGUMENT ....................................................................................................................... 16

I.    THE COURT SHOULD CERTIFY THE RULE 23 SETTLEMENT CLASS. ............... 16

    A.    The Rule 23 Class Meets the Standards for Certification. ......................... 16

        1.    The Proposed Class is Sufficiently Numerous. .................................. 16

        2.    The Proposed Class Shares Common Questions of Law and Fact. ............ 16

        3.    The Proposed Class Representatives are Typical of the Proposed Class. ............ 18

        4.    The Proposed Class Representatives and Proposed Class Counsel are Adequate. .... 19

        5.    Common Issues Predominate Over Any Individual Issues and the Class Action Mechanism is Superior. ................................................................................ 20

II.    THE SETTLEMENT IS A FAIR, REASONABLE, AND ADEQUATE RESOLUTION FOR THE CLASS. ................................................................................................. 22

    A.    Plaintiffs and Proposed Class Counsel Have Adequately Represented the Class and Support the Proposal – Rule 23(e)(2)(A). ..................................................................... 22

B. The Proposal Was Negotiated at Arm's Length Without Fraud or Collusion - Rule 23(e)(2)(B) and Grinnell Factor 3. ...................................................................... 23

C. The Proposal Provides Adequate Relief to the Settlement Class – Rule 23(e)(2)(C) and Grinnell Factors 1, 4-9. ...................................................................... 24

    1. The Settlement Represents a Fair Compromise that Provides Significant Monetary and Non-Monetary Benefits to the Settlement Class. ...................................................................... 24

        a. Settlement Class Members Will Receive Significant Monetary Benefits. ........... 24

            i. The General Damages Payment Adequately Compensates Settlement Class Members for Unpaid and Late Wages. ...................................................................... 25

            ii. Reserve Fund Structure Ensures that Settlement Class Members will Receive, at Minimum, an Additional $4.5 million. ...................................................................... 25

            iii. The Guaranteed MEC Payment and the Additional MEC Fund Allow Settlement Class Members to Recover Compensation. ...................................................................... 26

            iv. The PTO Payment & Reconciliation are Fair and Reasonable. ........................ 27

        b. Settlement Class Members Will Receive Significant Non-Monetary Relief. ........ 30

        c. The Release of FLSA Claims by Class Members is Permissible. ........................ 31

    2. Costs, Risks, & Likely Duration of Litigation Support Approval. ................................ 35

    3. The Proposed Method of Distributing Relief is Effective and Equitable – Rule 23(e)(2)(C)(ii), (D). ...................................................................... 37

    4. The Settlement is Within the Range of Reasonableness in Light of the Best Possible Recovery & All Attendant Litigation Risks. ...................................................................... 39

    5. The Terms of Any Proposed Award of Litigation Costs and Attorneys' Fees, Including Timing of Payment, Are Fair and Reasonable - Rule 23(e)(2)(C)(iii). ................................ 41

    6. There Are No Agreements Required to Be Identified Under Rule 23(e)(3) – Rule 23(e)(2)(C)(iv). ...................................................................... 44

    7. The Reaction of the Absent Class Members Will Be Known After Notice and the Public Interest Supports Settlement. ...................................................................... 44

III. THE COURT SHOULD APPROVE THE PROPOSED NOTICE PLAN AND THE CLASS NOTICES. ...................................................................... 44

IV. THE COURT SHOULD APPOINT THE SETTLEMENT ADMINISTRATOR AND SCHEDULE A FINAL FAIRNESS HEARING. ...................................................................... 47

CONCLUSION ...................................................................... 48

**TABLE OF AUTHORITIES**

**Cases**

*Abarza v. Spirit Pharms. LLC*, 2025 WL 1519147 (E.D.N.Y. May 28, 2025) .......... 22, 23, 39, 44

*Allegra v. Luxottica Retail N. Am.*, 341 F.R.D. 373 (E.D.N.Y. 2022).......................................... 19

*Amador v. Morgan Stanley & Co., LLC*, No. 11-cv-4326 (S.D.N.Y. 2014) ............................... 42

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) .............................................................. 21

*Beh v. Community Care Companions, Inc.*, 2026 WL 1289873 (W.D.N.Y. Mar. 11, 2026), *report and recommendation adopted sub nom. Beh v. Cmty. Care Companions Inc.*, 2026 WL 1286570 (W.D.N.Y. May 8, 2026) ...................................................................................... 36

*Brown v. Kelly*, 609 F.3d 467 (2d Cir. 2010)............................................................................... 18

*Caccavale*, 2025 WL 882220 ...................................................................................... 20, 21, 35, 39

*Cagan v. Anchor Sav. Bank FSB*, 1990 WL 73423 (E.D.N.Y. May 22, 1990) ........................... 24

*Campbell v. Bukhari Grp. LLC*, 2025 WL 1874485 (E.D.N.Y. July 8, 2025) ........... 15, 19, 33, 47

*Carbone v. Ltd. Run Games, Inc.*, 2026 WL 686144 (E.D.N.Y. Mar. 11, 2026) ........................ 42

*Cheeks v. Freeport Pancake House*, 796 F.3d 199 (2d Cir. 2015) .............................................. 33

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974).............................................. 15, 41

*City Select Auto Sales Inc. v. BMW Bank of N.A. Inc.*, 867 F.3d 434, (3rd Cir. 2017) ............... 46

*Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473 (2d Cir. 1995) ...................................... 16

*D'Angelo v. Hunter Bus. Sch., Inc.*, 2023 WL 4838156 (E.D.N.Y. July 28, 2023) ..................... 41

*Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 2d 172 (W.D.N.Y. 2011) ................... 24, 33, 39

*Dial Corp. v. News Corp.*, 314 F.R.D. 108 (S.D.N.Y. 2015) ...................................................... 21

*Duggan v Buckley Cable Constr. Co.*, No. 24-3296 (E.D. Pa. Apr. 10, 2026)............................ 33

*Espinal v. Sephora USA, Inc.*, 2024 WL 4241537 (S.D.N.Y. Sept. 19, 2024), *reconsideration denied,* 2024 WL 4751279 (S.D.N.Y. Nov. 12, 2024)............................................................ 18

*Espinoza v. 953 Assocs. LLC*, 280 F.R.D. 113 (S.D.N.Y. 2011)................................................. 17

*Flores v. Mamma Lombardi's of Holbrook, Inc.*, 104 F. Supp. 3d 290 (E.D.N.Y. 2015)............ 32

*Fowler v. Union Pac. R.R. Co.*, 2019 WL 13038410 (C.D. Cal. Jan. 7, 2019) ........................... 26

*Fusion Elite All Stars v. Varsity Brands, LLC*, 2023 WL 6466398 (W.D. Tenn. Oct. 4, 2023) .. 37

*Gamero v. Koodo Sushi Corp.*, 272 F. Supp. 3d 481 (S.D.N.Y. 2017) ....................................... 34

*Gonzales v. 27 W.H. Bake, LLC*, 2018 WL 1918623 (S.D.N.Y. Apr. 20, 2018)......................... 37

*Guthrie v. Rainbow Fencing Inc.*, 113 F.4th 300 (2d Cir. 2024)................................................. 18

*Hall v. ProSource Techs.*, 2016 WL 1555128 (E.D.N.Y. Apr. 11, 2016) .................................. 42

*Hunter v. Blue Ridge Bankshares, Inc.*, 2025 WL 1649323 (E.D.N.Y. June 11, 2025)........ passim

*In re Deloitte & Touche, LLP Overtime Litig.*, 2012 WL 340114 (S.D.N.Y. 2012) ................... 46

*In re Nano-X Sec. Litig.*, 2023 WL 12071594 (E.D.N.Y. Oct. 31, 2023).................................. 47

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11 (E.D.N.Y. 2019)............................................................................................................................... 41

*In re Traffic Executive Ass'n*, 627 F.2d 631 (2d Cir. 1980) ...................................................... 15

*In re Valeant Pharmas. Int'l, Inc. Sec. Litig.*, 2020 WL 3166456 (D.N.J. June 15, 2020) ......... 43

*Knepper v. Rite Aid Corp.*, 675 F.3d 249 (3d Cir. 2012)............................................................ 32

*Knight v. Concentrix Corp.*, 2019 WL 3503052 (N.D. Cal. Aug. 1, 2019)................................. 45

*Lawson v. Grubhub, Inc.*, 2026 WL 710228 (N.D. Cal. Mar. 13, 2026)..................................... 33

*Lundeen v. 10 West Ferry Street Operations LLC*, 156 F.4th 332 (3d Cir. 2025) ..... 31, 32, 33, 35

*Lunemann v. Kooma III LLC*, 2024 WL 2133803 (E.D. Pa. May 13, 2024)............................... 33

*Martin v. Weiner*, 2007 WL 4232791, (W.D.N.Y. 2007)........................................................... 46

*Mautner v. Hirsch,* 1992 WL 106318 (S.D.N.Y. May 4, 1992) .................................................. 24

*Mikhlin v. Oasmia Pharm. AB*, 2021 WL 1259559 (E.D.N.Y. Jan. 6, 2021)............. 35, 37, 40, 45

*Millin v. Brooklyn Born Chocolate, LLC*, 2020 WL 2198125 (E.D.N.Y. May 6, 2020) ............. 44

*Moore v. Rubin*, 766 F. Supp. 3d. 423 (E.D.N.Y. 2025) ............................................................ 42

*Moses v. New York Times Co.,* 79 F.4th 235 (2d Cir. 2023)....................................................... 22

*O'Quinn v. TransCanada USA Servs., Inc.*, 469 F. Supp. 3d 591 (S.D.W. Va. 2020)................. 46

*Ortega v. Uber Tech., Inc.*, 2018 WL 4190799 (E.D.N.Y. May 4, 2018) ................................... 45

*Patti's Pitas, LLC v. Wells Fargo Merch. Servs., LLC,* 2021 WL 5879167 (E.D.N.Y. July 22, 2021).............................................................................................................................. 31

*Peterson v. Flixbus, Inc.*, No. 23STCV06069 (Cal. Super. Ct. 2024).................................... 33, 45

*Pliego v. Los Arcos Mexican Restaurants, Inc.*, 313 F.R.D. 117 (D. Colo. 2016) ...................... 32

*Polar Int'l Brokerage Corp. v. Reeve*, 187 F.R.D. 108 (S.D.N.Y. 1999)................................... 30

*Ramirez v. Merrill Gardens, LLC*, 2024 WL 3011142 (E.D. Cal. June 11, 2024)....................... 26

*Ramirez v. Riverbay Corp.*, 39 F. Supp. 3d 354, 364 (S.D.N.Y. 2014)....................................... 18

*Rana v. Islam*, 887 F.3d 118 (2d Cir. 2018) ............................................................................. 34

*Rangel v. PLS Check Cashers of California, Inc.*, 899 F.3d 1106 (9th Cir. 2018)................. 32, 33

*Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d 513 (6th Cir. 1993) ............................... 42

*Richardson v. Wells Fargo Bank, N.A.*, 839 F.3d 442 (5th Cir. 2016) ........................................ 31

*Roach v. T.L. Cannon Corp.*, 778 F.3d 401 (2d Cir. 2015) .............................................. 21

*Robidoux v. Celani*, 987 F.2d 931 (2d Cir. 1993) ........................................................... 19

*Rosenfeld v. Lenich*, 2021 WL 508339 (E.D.N.Y. Feb. 11, 2021) ................................................ 42

*Sand v. Greenberg*, 2011 WL 7842602 (S.D.N.Y. Oct. 6, 2011) ............................................... 39

*Seijas v. Repub. of Argentina*, 606 F.3d 53 (2d Cir. 2010) ...................................................... 21

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234 (2d Cir. 2011) ............................. 18

*Steahle v. Cargroup Holdings, LLC*, 2025 WL 3284466 (E.D. Pa. Nov. 25, 2025) .................... 33

*Stephens v. Farmers Rest. Grp.*, 329 F.R.D. 476 (D.D.C. 2019) .............................................. 33

*Talarico v. Public Partnerships, LLC*, Case No. 25-1369 (3d Cir. May 19, 2026) ...................... 36

*Then v. Great Arrow Builders, LLC*, 2022 WL 562807 (W.D. Pa. Feb. 23, 2022) ................. 33, 35

*United States v. Public Partnerships LLC et al.*, No. 26-cv-3601 (E.D.N.Y.) .............................. 8

*Walencik v. Kostal Kontakt Systeme, Inc.*, 809 F. Supp. 3d 731 (E.D. Mich. 2025) .................... 33

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ........................................................ 16, 17

*Williams v. Equitable Acceptance Corp.*, No. 18-CV-07537 (NRB), (S.D.N.Y. 2021) .............. 45

*Ying v. All-Ways Forwarding of N.Y. Inc.*, 2025 WL 968586 (E.D.N.Y. Mar. 31, 2025) ...... 23, 37

*Zhu v. Wanrong Trading Corp.*, 2024 WL 4351357 (E.D.N.Y. Sept. 30, 2024) ......................... 38

**Statutes**

18 N.Y.C.R.R. § 505.28(g)(1) ...................................................................................... 3

18 N.Y.C.R.R. § 505.28(i)(1)(i) ................................................................................... 3

18 N.Y.C.R.R. § 505.28(J)(1) ...................................................................................... 3

Fed. R. Civ. P. 23(a)(1) ............................................................................................. 16

Fed. R. Civ. P. 23(a)(2) ............................................................................................. 16

Fed. R. Civ. P. 23(a)(3) ............................................................................................. 18

Fed. R. Civ. P. 23(a)(4) ............................................................................................. 19

Fed. R. Civ. P. 23(b)(3) ............................................................................................. 20

Fed. R. Civ. P. 23(c)(2)(B) ................................................................................... 44, 47

Fed. R. Civ. P. 23(e) ................................................................................................. 15

Fed. R. Civ. P. 23(e)(2) ............................................................................................. 22

Fed. R. Civ. P. 23(g) ................................................................................................. 19

N.Y. Pub. Health § 3614-c .......................................................................................... 4

N.Y. Pub. Health L. § 3614-C(1)(b) ................................................................................ 36

N.Y. Soc. Serv. Law § 365-f(4-a)(a)(ii)............................................................................ 3

N.Y. Soc. Serv. Law § 365-f(4-a)(a)(ii)(A-J) .................................................................. 3

N.Y. Soc. Serv. Law § 365-f(4-a)(iii) .............................................................................. 3

NYLL § 198(1-a) (as amended)........................................................................................ 36

Soc. Serv. L. § 365-f(3) ................................................................................................... 3

Soc. Serv. L. § 365-f(4-a)(a)(ii) ...................................................................................... 3

**Other Authorities**

Craig Becker & Paul Strauss, *Representing Low-Wage Workers in the Absence of a Class: The Peculiar Case of Section 16 of the Fair Labor Standards Act and the Underenforcement of Minimum Labor Standards*, 92 MINN. L. REV. 1317 (2008)...................................................... 34

NAT'L EMP'T L. PROJECT (June 2019), https://s27147.pcdn.co/wp-content/uploads/Retal-Report-6-26-19.pdf............................................................................................................... 34

Newberg and Rubenstein on Class Actions, § 13.13, *et seq*. (4th ed. 2002) ................................ 15

Rachel K. Alexander, *Federal Tails and State Puppy Dogs: Preempting Parallel State Wage Claims to Preserve the Integrity of Federal Group Wage Actions*, 58 AM. U. L. REV. 515 (Feb. 2009)............................................................................................................................... 32

*Rules for Protected Time Off Policies,* NYC Consumer and Worker Protection (April 20, 2026), https://www.nyc.gov/assets/dca/downloads/pdf/businesses/Paid-Safe-And-Sick-Leave-Policies.pdf. ............................................................................................................. 29

**<u>INTRODUCTION</u>**

Plaintiffs Philip Calderon, Farshad Pinchasi, Allison Fields, and Dana Folgar ("Plaintiffs"), current and former personal assistants ("PAs") who were paid through fiscal intermediary Defendant Public Partnerships, LLC ("PPL") as part of the New York State Medicaid Consumer Directed Personal Assistance Program ("CDPAP" or the "Program") between March 1, 2025 and April 30, 2026, respectfully move for the Court's preliminary approval of a class action settlement.

Plaintiffs have provided essential home care services to elderly and disabled New Yorkers as part of CDPAP. Since PPL assumed its role as the sole statewide fiscal intermediary on April 1, 2025, Plaintiffs and many other PAs reported payment issues that they allege left them without accurate, timely, and complete pay for their work. Plaintiffs brought this case on behalf of themselves and a class—which numbers approximately 200,000 PAs in New York City, Westchester, Nassau, and Suffolk Counties ("downstate PAs")—alleging that PPL violated state and federal law by, among other things, failing to pay them accurately and on time. Specifically, Plaintiffs alleged that PPL: (1) violated the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL") by failing to pay PAs in a timely manner at the correct rate for all hours worked; (2) provided benefits that did not comply with the New York Home Care Worker Wage Parity Act ("WPA"), Public Health Law § 3914-C, the NYLL, and the New York State Paid Sick and Safe Leave Law ("NYSSL"); (3) provided pay statements and notices that did not comply with New York Labor Law Section 195 ("NYLL § 195"); and (4) breach of contract.

After significant exchanges of data, three all-day, in-person mediation sessions, and further months of mediated negotiations, the parties reached a class settlement (the "Settlement") of the claims in this case and executed a detailed settlement agreement. *See* Baran Decl., Ex. A (hereafter, the "Agreement," "Settlement Agreement," or "Agmt."). The proposed Settlement will provide approximately 200,000 downstate PAs with significant monetary and non-monetary relief, with a

1

total monetary value of at least $162 million. To Plaintiffs' knowledge, this represents a historically large wage-and-hour class action settlement reached in New York, and among the largest wage-and-hour class action settlements reached nationwide.

Plaintiffs now bring this motion asking that the Court (1) grant preliminary approval of the proposed Settlement; (2) certify the proposed Rule 23 Settlement Class; (3) appoint Plaintiffs' Counsel Katz Banks Kumin LLP and The Legal Aid Society as Class Counsel and the Plaintiffs as Class Representatives; (4) authorize notice to similarly situated employees; (5) appoint Atticus Administration as Settlement Administrator and authorize the Settlement Administrator to distribute the proposed notices in the manner described below; and (6) set a Final Fairness Hearing to consider final class approval of the Settlement.[1]

## BACKGROUND

### I. SUMMARY OF PLAINTIFFS' ALLEGATIONS

#### A. PPL Becomes the Sole Fiscal Intermediary for CDPAP, a Life-Saving Program that Allows Vulnerable New Yorkers to Receive Home-Based Care.

Created by New York State in 1995, CDPAP allows Medicaid recipients who are eligible for home care services ("Consumers") to choose their own caregivers while remaining in their own communities. First Amended Compl. ("FAC") ¶ 28. CDPAP provides invaluable benefits for Consumers by allowing them to hire friends, family, neighbors, or community members to help them navigate the challenges of daily life created by age, disability, or illness. FAC ¶¶ 28-29. As of January 1, 2025, the program supported 280,000 Consumers who employed over 300,000 PAs statewide. FAC ¶ 35.

Since the inception of CDPAP, New York State has engaged third-party entities known as

---

[1] All capitalized terms have the meaning defined in the parties' Settlement Agreement, which is attached to the accompanying Declaration of Hugh Baran ("Baran Decl.") as Exhibit A, unless otherwise stated herein.

fiscal intermediaries to administer the program. Soc. Serv. L. § 365-f(3); 18 N.Y.C.R.R. § 505.28(g)(1). These fiscal intermediaries are responsible for processing pay and benefits for PAs. Soc. Serv. L. § 365-f(4-a)(a)(ii); 18 N.Y.C.R.R. § 505.28(i)(1)(i). Under the statutory framework, Consumers and fiscal intermediaries maintain distinct responsibilities for the administration of CDPAP.[2]

From 2015 to April 1, 2025, hundreds of fiscal intermediaries paid PAs in CDPAP. FAC ¶ 39. That changed in April 2024, after New York State passed a law mandating that a sole fiscal intermediary administer the program. The State announced PPL as the selected statewide fiscal intermediary for the hundreds of thousands of PAs in September 2024. FAC ¶¶ 39-40. Accordingly, as of April 1, 2025, and pursuant to a contract entered into with the New York Department of Health ("DOH"), PPL has operated as the sole fiscal intermediary for nearly all CDPAP PAs in New York.[3] FAC ¶ 17.

Plaintiffs are all current or former downstate personal care assistants who were paid through PPL as the statewide discal intermediary for services performed as part of CDPAP since the transition. FAC ¶¶ 148-254. Mr. Calderon works as a PA caring for his father who suffers from severe arthritis and other medical conditions, and has limited mobility. FAC ¶¶ 149, 158. Mr. Pinchasi works as a PA caring for his two elderly parents who have serious orthopedic and other chronic health conditions. FAC ¶¶ 176, 181. Ms. Fields works as a PA caring for a friend with a

---

[2] Consumers are responsible for recruiting, hiring, scheduling and supervising PAs on Consumers. *See* N.Y. Soc. Serv. Law § 365-f(3). CDPAP identifies fiscal intermediaries to perform additional services "to facilitate the [C]onsumer's role as the employer." *Id.* at § 365-f(4-a)(a)(ii). These services include processing wages, benefits, and income tax for PAs. *Id.* at § 365-f(4-a)(a)(ii)(A-J); *see also* 18 N.Y.C.R.R. § 505.28(J)(1). The statutory framework further indicates that fiscal intermediaries are "not responsible for, and [its] services shall not include, fulfillment of the responsibilities of the [C]onsumer." N.Y. Soc. Serv. Law. at § 365-f(4-a)(iii). Further, fiscal intermediaries are expressly prohibited from recruiting, hiring, firing, training or supervising PAs, or setting their work schedules. *Id.; see* FAC ¶¶ 36-38.

[3] The only exception is that pursuant to the Court's injunction in *Engesser v. McDonald,* No. 25-cv-01689, certain PAs were allowed to continue being paid through their prior fiscal intermediaries during the Court-ordered extension period. Since that extension period ended, PPL has been the sole statewide fiscal intermediary for all PAs providing care in CDPAP.

mental health disability. FAC ¶ 198. Ms. Folgar worked as a PA for a disabled bedbound Consumer. FAC ¶¶ 225, 234.

### B. PPL Allegedly Fails to Pay PAs on Time and at the Correct Rate for All Hours Worked, in Violation of the FLSA and NYLL.

Plaintiffs allege that, despite their compliance with the requirements to register for PPL's fiscal intermediary services during the transition, they were consistently paid late as a result of PPL's faulty timekeeping and payroll systems. FAC ¶¶ 41-103. Thus, Plaintiffs allege that they were not timely paid and did not receive the federal minimum wage for all hours worked under the NYLL and FLSA. FAC ¶¶ 279-301.

In addition to late payment of wages, Plaintiffs allege that a variety of other PPL policies also have resulted in underpayments in violation of the FLSA and/or the NYLL. FAC ¶¶ 279-328.

### C. PPL Allocates Certain Wage Parity Compensation to Paid Time Off and Minimum Essential Coverage Under the Wage Parity Act, in a Manner Plaintiffs Allege Violated the Law.

Under the WPA, PAs working within the five boroughs of New York City or in Westchester, Nassau and/or Suffolk Counties are entitled to receive supplemental compensation in cash or its equivalent value in benefits, at a rate of $2.54/hour in New York City and $1.67/hour in Nassau, Suffolk, and Westchester. *See* N.Y. Pub. Health § 3614-c; *see also* FAC ¶ 8. The following chart sets out these obligations:[4]

---

[4] The chart reflects the WPA requirements until December 31, 2025. Under the WPA, employees must receive a base wage of $19.65 starting January 1, 2026, through December 31, 2026.



**New York City**
Total: $21.64

**Long Island & Westchester**
Total: $20.77

During the period relevant to this dispute, PPL paid the supplemental compensation required under the WPA through a combination of additional hourly wages plus benefits. FAC ¶¶ 9, 104-47. The following chart sets out how Plaintiffs allege PPL satisfied these obligations:

| Region | Home care base wage | Total supplemental (wage parity act) | PPL supplement allocation | | Total purported compensation |
|---|---|---|---|---|---|
| New York City | $19.10 | $2.54 | $0.87 → MEC/Flex | $0.40 Basic Wellness / Accident / Critical Illness | $21.64 |
| | | | | $0.47 Flex Plan | |
| | | | $0.67 → PTO accrual   paid time off | | |
| | | | $1.00 → Cash   direct payment | | |
| Long Island & Westchester | $19.10 | $1.67 | $0.62 → MEC/Flex | $0.40 Basic Wellness / Accident / Critical Illness | $20.77 |
| | | | | $0.22 Flex Plan | |
| | | | $0.65 → PTO accrual   paid time off | | |
| | | | $0.40 → Cash   direct payment | | |

Plaintiffs alleged that PPL's mandated benefits violated the WPA in several ways. First, Plaintiffs alleged that PPL allocated WPA compensation to mandatory benefits programs—described as the four-part MEC/Flex Plan[5]—that were allegedly inaccessible for months and failed to provide PAs with benefits substantially equal in value to the WPA compensation allocated to pay for them. FAC ¶¶ 104-47. Although PPL allegedly began charging PAs for all four programs under the MEC/Flex Plan beginning on April 1, 2025, Plaintiffs alleged that PAs could not immediately access these benefits. FAC ¶¶ 115, 124, 131-33. For example, Plaintiffs alleged that although PAs' WPA compensation was allocated to the Flexible Benefit ("Flex") Plan on an hourly basis beginning with their first hour of work, Plaintiffs alleged that they could not access those funds for approximately two months. FAC ¶¶ 131-32. Further, Plaintiffs alleged that the health benefits provided by the Basic Wellness Plan had little to no value to PAs because, *inter alia*, it only provided the minimum essential coverage for preventive care required by the Affordable Care Act. FAC ¶¶ 133–38. It did not provide coverage for any healthcare services beyond routine preventive care, failing to cover hospitalization, medical treatment, and almost all prescription drugs. FAC ¶ 135.

Plaintiffs further alleged that PPL allocated WPA funds ($0.67 per hour for New York City-based PAs and $0.65 per hour for other downstate PAs) to a Paid Time Off ("PTO") program. FAC ¶¶ 162, 196. Plaintiffs alleged that PPL's PTO program accrued at the same rate and up to the same maximum as the minimum earned safe and sick time required by New York State and New York City law. FAC ¶¶ 146-47. Under those laws, sick time accrues at a rate of one hour for every 30 hours of work and must be paid by the employer. NYLL §196-B; NYC Admin. Code

---

[5] That plan, which is no longer offered by PPL, was composed of four parts: (1) a Basic Wellness Plan; (2) an indemnity-style Accident Plan; (3) an indemnity-style Critical Illness Plan; and (4) a Flexible Benefits Plan ("Flex Plan"). FAC ¶ 127.

§ 20-9111 *et seq*. Thus, Plaintiffs alleged that PPL required PAs to pay for sick time that employers are required to provide by state law, in violation of the WPA and NYSSL. FAC ¶¶ 290-320.

PPL's position is that these practices are consistent with applicable law. *See infra,* ARGUMENT Part II.C.2 (discussing risks & PPL's position).

## II. PROCEDURAL HISTORY AND SETTLEMENT NEGOTIATIONS

On April 25, 2025, Plaintiff Mr. Calderon sued PPL on behalf of himself and all similarly situated individuals in New York City, and Westchester, Nassau, and Suffolk Counties in the U.S. District Court for the Eastern District of New York. ECF No. 1. The action was initially assigned to U.S. District Judge Allyne Ross and U.S. Magistrate Judge Marcia M. Henry. On May 28, 2025, Plaintiffs filed their First Amended Complaint, with Plaintiffs Ms. Folgar, Mr. Pinchasi, and Ms. Fields joining Mr. Calderon as Lead Plaintiffs and proposed Class representatives. ECF No. 10. On July 7, the case was reassigned to Judge Block and Magistrate Judge Eshkenazi. *See* Text Order Dated July 7, 2025.

On July 18, 2025, Plaintiffs filed a letter motion for a pre-motion conference seeking leave to move for conditional certification under the FLSA. ECF No. 21. On July 23, 2025, PPL filed a letter in opposition. ECF No. 22. On July 28, 2025, PPL filed a pre-motion letter seeking leave to move to dismiss Plaintiffs' action. ECF No. 23. On July 29, 2025, Judge Block scheduled a conference on both proposed motions without setting a briefing schedule. ECF No. 24.

On September 12, 2025, Davis Wright Tremaine became PPL's counsel of record. ECF No. 26; Text Order Dated Sept. 22, 2025. The parties then agreed to engage in mediation and scheduled a mediation for December 15, 2025. On September 22, 2025, the Court granted the parties' joint motion to adjourn the pre-motion conference originally scheduled for September 30, 2025, and stayed all deadlines until one day after the scheduled mediation, in order to allow the parties to discuss settlement. ECF No. 29; Text Order Dated Sept. 22, 2025. To assist in settlement

negotiations, the parties moved to compel non-party DOH to authorize disclosure by PPL of employment data to Plaintiffs' data expert. ECF No. 30. The Court granted that motion on September 25, 2025, and PPL subsequently produced required data. ECF No. 32.

On December 15, 2025, the Parties held a full-day mediation with mediator Stephen Sonnenberg. ECF No. 35. The Parties agreed to continue mediation before a new mediator. *Id*. On January 20, 2026, and February 11, 2026, the Parties held subsequent full-day mediations with mediator Marc Isserles. ECF Nos. 36, 37. Between February 12, 2026, and April 13, 2026, the Parties engaged in further settlement conversations facilitated by Mr. Isserles. ECF Nos. 38-46.

On April 13, 2026, the Parties reached an agreement-in-principle that, among other things, PPL would pay the Total Guaranteed Recovery (as defined in the Settlement Agreement, Baran Decl. Ex A), and provide certain non-monetary relief, to all members of the Settlement Class who do not opt out (hereafter, "Settlement Class Members"), and informed the court of the same on April 13, 2026. Agmt. at pp. 2-3 (Recitals); ECF No. 47.

On May 1, 2026, the Parties signed a binding Term Sheet ("Term Sheet") detailing the material terms of the Settlement. Baran Decl. ¶ 17; ECF No. 52. On June 23, 2026, the Parties signed a full Settlement Agreement, as described below, which superseded the Term Sheet.[6] *See* Agmt.

## III. THE SETTLEMENT AGREEMENT

### A. Settlement Class

The proposed Settlement would provide monetary and non-monetary relief to a proposed Settlement Class defined as:

---

[6] On June 16, 2026, the Department of Justice filed a civil lawsuit against PPL and state officials related to the transition to a single statewide fiscal intermediary. *See United States v. Public Partnerships LLC et al.*, No. 26-cv-3601 (E.D.N.Y.). DOJ's lawsuit does not seek recovery of wages or cite any wage violations, apart from a single factual allegation. Accordingly, the instant settlement should not be affected by that lawsuit.

All current and former personal assistants who were paid through PPL as the statewide fiscal intermediary for services performed as part of CDPAP in New York City, Nassau County, Suffolk County, and/or Westchester County (collectively, "downstate personal assistants") at any time between March 1, 2025 and April 30, 2026.

### B. Monetary Relief and Settlement Allocations

In exchange for the release of the Settlement Class Members' claims through the Settlement Execution Date, PPL will pay a Total Guaranteed Recovery of $162,000,000 to cover a global settlement. Agmt. ¶ 66. The Total Guaranteed Recovery will consist of two payments: a Total Initial Monetary Payment of $157.5 million, and a Reserve Fund payment of at least $4.5 million. *Id.* at ¶¶ 61, 64. All settlement administration expenses, service awards for the proposed Class Representatives, and proposed Class Counsel's attorneys' fees and costs, if approved by the Court, will be paid from the Total Guaranteed Recovery, not inclusive of employer-share taxes. *Id.* at ¶ 69.

The Total Guaranteed Recovery shall consistent of the following payments:

- **Total Initial Monetary Payment to Class:** <u>$157,500,000</u>, equal to:

  o **_General Damages Payment_**: <u>$40,500,000,</u> representing settlement of, *inter alia*, all wage-and-hour claims, *id.* at ¶ 65(a);

  o **_Guaranteed MEC Payment:_** <u>$25,000,000</u>, representing settlement of all claims related to the MEC and Flex Plan, *id.* at ¶ 65(b); *and*

  o **_PTO Payment:_** <u>$92,000,000</u>, representing settlement of all claims related to PTO.[7] PPL shall reduce the PTO balances of members of the Settlement Class commensurately (the "PTO Reconciliation"), *id.* at ¶ 65(c)-(d).

---

[7] This amount is guaranteed *unless* it is determined, prior to the submission of final approval papers, that less than $92,000,000 of PTO balance is available to be paid out to the Settlement Class. Agmt. ¶ 63(d). If that happens, PPL will only pay out 90% of the available PTO balance as the PTO Payment. This determination will be based on the pre-final approval forensic accounting. *Id.* & ¶ 79. Based on the forensic accounting on the PTO Account following the signing of the Term Sheet and prior to the signing of the Agreement, there is approximately $123 million in PTO funds available to the Class. Accordingly, proposed Class Counsel believe this to be a remote possibility—but in any event, it is one that will be definitively known to the Court prior to Final Approval.

- **Second Settlement Payment:** At least $4,500,000, to be drawn from two funds as follows:

  o **Reserve Fund:** $4,500,000. PPL shall deposit $4,500,000 into a separate account held by the Settlement Administrator in escrow, until the amount of Additional MEC Funds have been determined through the final forensic accounting under Section V of the Agreement. *See id*. at ¶ 80.

  o **Additional MEC Fund:** Monetary Value to Be Determined through forensic accounting. PPL shall permit a mutually acceptable independent accounting/advisory firm, Stout Risius Ross, LLC ("Stout") and PPL's independent accounting firm ("Aprio") to calculate the total amount of remaining MEC funds in PPL's Health Plan Account as of April 30, 2027, with Aprio first refreshing its analysis that will then be provided to counsel and Stout for review. *See id.* at ¶ 80; *see also infra*, Part V (Non-Monetary Relief). The Additional MEC Fund shall be deposited into the Common Fund. The Common Fund shall not receive less than $4.5 million from the combined Reserve and Additional MEC Funds and PPL shall not receive more than $4.5 million from the Reserve Fund. *Id*. at ¶ 66. This distribution is represented in table below.

| Potential Amount determined by Forensic Accounting to be Additional MEC Fund | Amount of Reserve Fund returned to PPL | Amount of Reserve Fund retained by class | Total Amount to be Paid to Common Fund | Total Recovery |
|---|---|---|---|---|
| $ 0 | $ 0 | $ 4,500,000 | $ 4,500,000 | $ 162,000,000 |
| $ 1,000,000 | $ 500,000 | $ 4,000,000 | $ 5,000,000 | $ 162,500,000 |
| $4,500,000 | $ 2,250,000 | $2,250,000 | $ 6,750,000 | $ 164,250,000 |
| $ 6,000,000 | $ 3,000,000 | $ 1,500,000 | $ 7,500,000 | $ 165,000,000 |
| $ 9,000,000 | $ 4,500,000 | $ 0 | $ 9,000,000 | $ 166,500,000 |
| $ 10,000,000 | $ 4,500,000 | $ 0 | $ 10,000,000 | $ 167,500,000 |
| $ 12,000,000 | $ 4,500,000 | $ 0 | $ 12,000,000 | $ 169,500,000 |

### C. Non-Monetary Relief

The Parties agreed that Stout would conduct a forensic accounting of PPL's MEC and PTO funds in its Health Plan Account and PTO Account, respectively. As part of the settlement, PPL has agreed to return to the Settlement Class certain amounts allocated from their statutory WPA

compensation towards the MEC Plan and PPL's PTO program. The accounting provides a rigorous analytic process to ensure that the amounts returned to downstate PAs correspond to the money allocated by PPL to fund the plans. The initial accounting reviews the status of the MEC Allocation in the Health Plan Account and PTO funds in the PTO Account as of May 1, 2026 (the date of the executed term sheet). *Id.* at ¶ 78. PPL has also agreed to subsequent forensic accountings on (1) the PTO Account, as well as the Safe and Sick Leave ("SSL") Account, 30 days prior to the deadline to submit a motion for final approval, and (2) the status of the MEC Allocation in the Health Plan Account and the PTO funds in the PTO Account as of April 30, 2027 (the deadline for PAs to file health claims under the MEC plan). *Id.* at ¶¶ 79-80.

Finally, as a condition of entering into the Term Sheet and the Settlement Agreement, PPL ended the PAs' mandatory enrollment in the MEC plan as of April 30, 2026. *Id.* at ¶ 82. Ending mandatory enrollment in the MEC benefits PAs by, among other things, allowing them to avoid coordination of benefits issues the MEC created for PAs who had alternative health insurance plans. *See* FAC ¶¶ 133–38.

The following diagram represents the total relief under the Agreement:



**SETTLEMENT AGREEMENT OVERVIEW**

*Calderon et al. v. Public Partnerships, LLC*

**TOTAL INITIAL MONETARY PAYMENT | $157.5 MILLION**

**1 $40.5 Million**
General Damages Payment
- From this fund, $50 paid per class member with alleged unpaid sign-on bonus claim
- Remainder distributed proportionally based on hours worked

**2 $25 Million**
Guaranteed MEC Payment
- Distributed proportionally based on amounts allocated for MEC premiums

**3 $92 Million**
PTO Payment
- Distributed proportionally based on PTO balance when PPL pays settlement funds
- At the time paid to common fund by PPL, Class Members' PTO balances will be reduced commensurately

**SECOND SETTLEMENT PAYMENT | $4.5 MILLION +**

**A $4.5 Million Reserve Fund**
- Held in escrow by Administrator until Additional MEC Fund determined
- Administrator returns 50 cents per dollar of Additional MEC Fund paid by PPL, up to a maximum of $4.5 million
- If zero Additional MEC Fund paid, $4.5 million will be distributed to class

**B Additional MEC Fund**
Further Health Premiums Returned to Class
- All remaining MEC allocations as of April 30, 2027 to be paid, as determined by Accounting Firm

**NON-MONETARY RELIEF** ✓ End of MEC Health Plan ✓ Forensic Accounting of MEC and PTO

## D. Releases

For the consideration discussed above, the Settlement Class Members who do not opt out of this Settlement will release PPL and PPL Releasees from all Released Class Claims (as defined in the Settlement Agreement) through the Settlement Execution Date, which includes: (1) any and all claims raised on behalf of the Settlement Class that could have been raised on behalf of the Settlement Class based on the facts alleged in the First Amended Complaint, and (2) any and all wage-and-hour claims, including FLSA claims. Agmt. ¶¶ 84-85.

## E. Form and Method of Notice

In addition to seeking Preliminary Approval of the Settlement, Plaintiffs also seek preliminary certification of a class, and preliminary Court approval of the form and method of notice to the Settlement Class. In the Settlement Agreement, the Parties have agreed to the content of the Notices attached to the Agreement as Exhibits 2-6. Given the unusually large size of the Settlement Class, and the fact that PPL routinely communicates with Settlement Class Members

by email and text message, the notices will be sent only by email and text, with a postcard notice sent to undeliverable emails and phone numbers. *Id.* at ¶¶ 106-09, 113. The Settlement Administrator shall verify and/or update electronic and mailing addresses and resend returned notices where possible. *Id.* at ¶ 108. PPL shall post the notice on its website and shall seek approval from DOH to post it to its mobile application and its online timekeeping portal, PPL@Home. *Id.* at ¶ 111. A settlement website ([www.PublicPartnershipsSettlement.com](www.PublicPartnershipsSettlement.com)) will also be created. *Id.* at ¶ 112.

### F. Opt-Out, Objection, and Exclusion

The Settlement Agreement provides that Settlement Class Members may request exclusion from the Settlement Class ("opt out") by submitting a signed written request to the Settlement Administrator for exclusion from the Settlement. *Id.* at ¶ 115. To be effective, Settlement Class Members' exclusion requests must be sent by the Objection/Exclusion Deadline, which shall be 60 days after the date of sending of the notice. *Id.* at ¶ 114. If more than 10% of the Settlement Class opts out of the Settlement, PPL may cancel the Settlement Agreement, and the Parties will resume litigation. *Id.* at ¶ 120. Settlement Class Members who do not opt out can file objections to the Settlement Agreement. *Id.* at ¶ 119.

### G. Notice Period, Final Approval, and Payments

The notice sought to be approved here, as set forth in the Settlement Agreement, provides for a notice period—during which proposed Settlement Class Members may opt out of or object to the Settlement—of 60 days. *Id.* at ¶¶ 32, 114. Plaintiffs will move for Final Approval within 7 days of the notice period closing. *Id.* at ¶ 134. Plaintiffs will move for Court approval of attorneys' fees and costs in advance of the Objection/Opt-Out Deadline. *Id.* at ¶ 135.

Under the Agreement, PPL shall pay the Total Guaranteed Recovery to the Qualified Settlement Fund ("QSF") account established by the Settlement Administrator within 30 days of

the Settlement Effective Date, as defined in the Settlement Agreement. *Id.* at ¶¶ 51, 64. The Settlement Administrator will then distribute the funds to Settlement Class Members who have not opted out as soon as practicable, but no later than 45 days following the Settlement Effective Date. *Id*. at ¶¶ 97, 136. If the Settlement Effective Date occurs more than 45 days prior to April 30, 2027, there shall be two distributions (of the Net Initial Settlement Payment and the Second Settlement Payment, respectively). *Id.* at ¶ 74. If the Settlement Effective Date occurs later than 45 days prior to April 30, 2027, the Net Initial Settlement Payment and the Second Settlement Payment shall be combined for a single distribution so as to reduce the costs of administration, unless Plaintiffs' Counsel otherwise determine that delays in the forensic accounting of the MEC Allocation would require Settlement Class Members to wait too long to receive their payments. *Id.*

The default payment method shall be direct deposit to the last banking information available to PPL if such information is on file. *Id.* at ¶ 74. If PPL has no such information, the default payment method shall be by check. *Id.* Settlement Class Members will also be able to provide alternative banking information and update their contact information on a secure portal. *Id.*

If the 90-day check deadline for the first distribution has passed, any unclaimed amounts from that distribution shall be reallocated to the Settlement Class in the second distribution. In the event that any unclaimed amounts remain in the Common Fund within 90 days of the second distribution (or of the single distribution, if there is only one distribution), whether as a result of bounced-back direct deposits or uncashed checks, those remaining unclaimed amounts shall, if another distribution to the Settlement Class is impractical, be paid to Disability Rights New York as the designated *cy pres* beneficiary. *Id.* at ¶ 98; *see* Baran Decl. ¶¶ 125–26 (discussing *cy pres* beneficiary).

## STANDARD OF REVIEW

"Public policy and the courts strongly favor settlement of class actions and complex litigation." *Hunter v. Blue Ridge Bankshares, Inc.*, 2025 WL 1649323, at *13 (E.D.N.Y. June 11, 2025). Still, courts must carefully review class action settlements under Rule 23 and applicable law. *Id.*; Fed. R. Civ. P. 23(e). Typically, that means a two-stage review: (1) preliminary approval to determine whether approval is likely, a class can be certified for settlement purposes, and notice should issue to the class; and (2) final approval to evaluate the class members' response and whether the settlement is fair, reasonable, and adequate. *Campbell v. Bukhari Grp. LLC*, 2025 WL 1874485, at *3–4 (E.D.N.Y. July 8, 2025). This Settlement comes before the Court at the first stage—preliminary approval.

Courts in this district have analyzed preliminary approval against the requirements of Rule 23(e), as well as the factors under *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974). *Id.* If the court determines that preliminary approval is justified, it must direct notice to the class. *Hunter*, 2025 WL 1649323, at *13.

Preliminary approval requires only an "initial evaluation" of the fairness of the proposed settlement on the basis of written submissions and an informal presentation by the settling parties. Newberg and Rubenstein on Class Actions, § 13.13, *et seq*. (4th ed. 2002) ("Newberg"). To grant preliminary approval, the court need only find that there is "'probable cause' to submit the [settlement] to class members and hold a full-scale hearing as to its fairness." *In re Traffic Executive Ass'n*, 627 F.2d 631, 634 (2d Cir. 1980); Newberg § 13.10 ("[A] court's preliminary evaluation of the proposed settlement" applies this test for approval: "if the proposed settlement appears to be the product of serious, informed, non-collusive negotiation, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible judicial approval") (cleaned up).

## ARGUMENT

## I.   THE COURT SHOULD CERTIFY THE RULE 23 SETTLEMENT CLASS.

Plaintiffs and proposed Class Counsel have negotiated a large settlement in this wage-and-hour action. It is one of the largest settlements known to Plaintiffs and proposed Class Counsel in a wage-and-hour case in this Circuit and beyond. It guarantees the Settlement Class a recovery of at least $162 million and includes important non-monetary changes. This is an excellent result that easily meets the requirements for approval under Rule 23.

As explained below, because the proposed Settlement Class satisfies all the standards for certification, because the proposed Settlement was negotiated through extensive arms-length negotiations between experienced counsel, and because it represents an agreement that meets all of the substantive and procedural requirements of Rule 23, the Court should preliminarily certify the Settlement Class and grant preliminary approval.

### A.   The Rule 23 Class Meets the Standards for Certification.[8]

#### 1.   The Proposed Class is Sufficiently Numerous.

Rule 23 requires a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[N]umerosity is presumed at a level of 40 members." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). Here, as there are approximately 200,000 putative Settlement Class Members, Baran Decl. ¶ 77, numerosity is satisfied.

#### 2.   The Proposed Class Shares Common Questions of Law and Fact.

Rule 23 requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). All questions need not be common and "even a single common question will do." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (cleaned up). What matters is "the capacity of a classwide

---

[8] PPL does not oppose this motion solely for purposes of settlement and it expressly reserves all rights and defenses in the event the Settlement is not preliminarily or finally approved. Agmt. ¶ 59.

proceeding to generate common answers apt to drive the resolution of the litigation." *Id*. at 350.

Here, Plaintiffs allege numerous questions common to the Settlement Class, including but not limited to the following:

- whether PPL's timekeeping and payroll system was faulty, and if so, in what way(s);

- whether PPL failed to pay promised sign-on bonuses to Class members who registered before the deadline but were not, according to PPL, marked "paperwork complete";

- whether PPL improperly calculated the regular rate of pay, and thus paid the incorrect overtime premiums for all hours worked over 40 in a workweek;

- whether PPL allocated mandated WPA compensation to cover benefits that it did not timely provide to Plaintiffs;

- whether PPL's policies related to PTO were unlawful under the WPA and NYSSL;

- whether PPL's requirement that Plaintiffs and all downstate PAs participate in the MEC was unlawful under the WPA;

- whether PPL's paystubs made it difficult for downstate PAs to figure out what they have been paid for and what they have not been paid for; and

- whether the information provided to PAs concerning the allocation of WPA dollars to the different mandatory benefits plans was sufficient for them to know whether WPA money was being correctly allocated.

*See* FAC ¶ 268.

Plaintiffs allege that PPL's wage payment violations make up a common issue across the class because they are alleged to stem from a common payroll system, and because "claims by workers that their employers have unlawfully denied them wages to which they were legally entitled have repeatedly been held to meet the commonality prerequisite for class certification." *Espinoza v. 953 Assocs. LLC*, 280 F.R.D. 113, 127 (S.D.N.Y. 2011). Further, it is well-established in this Circuit that in the NYLL context, "class claims all derive[d] from the same compensation policies" and "the same New York State statutes and regulations" satisfy commonality. *Shahriar*

*v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 252 (2d Cir. 2011). Finally, the WPA and NYLL § 195 claims affect the entire Class, since PPL allegedly used a single benefits model and set of wage notices/statements with PAs, which the Plaintiffs alleged harmed them and the Settlement Class in an identical manner.[9] FAC ¶ 270. In short, the questions above are capable of generating common answers. Commonality is satisfied.

### 3. The Proposed Class Representatives are Typical of the Proposed Class.

Rule 23 requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This requirement will generally be "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010) (internal quotation marks omitted).

Here, Plaintiffs' claims are typical because their claims all arise from PPL's timekeeping and payroll systems, and because they all alleged PPL paid them late and did not pay them for at least some work. *See Ramirez v. Riverbay Corp.*, 39 F. Supp. 3d 354, 364 (S.D.N.Y. 2014) (finding commonality and typicality satisfied where a "payroll policy…was the reason for the Subclass members' alleged injuries under the NYLL[.]"). Further, all the Plaintiffs were allegedly subject to the same benefits offerings and alleged deductions and allege that they received identically noncompliant wage notices/statements. Thus, the proposed class representatives are typical of the

---

[9] While some courts in this Circuit have held workers lack standing to pursue NYLL § 195 claims in certain circumstances where they allege no concrete harm, Plaintiffs here argue that they have plausibly alleged concrete downstream harms to the Settlement Class flowing from the noncompliant wage notices and statements. *See Guthrie v. Rainbow Fencing Inc.*, 113 F.4th 300, 310 (2d Cir. 2024) ("A plaintiff-employee who has plausibly shown that defective notices led him or her to lose wages has such a concrete interest and is not simply policing legal infractions in the abstract."). Plaintiffs alleged that PPL's statements and notices did not detail the exact nature of the allocations of WPA compensation. FAC ¶¶ 300, 319. As a result, Plaintiffs have plausibly alleged that they and other Settlement Class Members were concretely harmed because they could not determine the value of their benefits, nor the full allocation of their pay. *See also Espinal v. Sephora USA, Inc.*, 2024 WL 4241537, at *3 n.2 (S.D.N.Y. Sept. 19, 2024), *reconsideration denied,* 2024 WL 4751279 (S.D.N.Y. Nov. 12, 2024). Accordingly, Plaintiffs have plausibly alleged Article III standing to pursue these claims for the Settlement Class here.

Settlement Class. *See Robidoux v. Celani*, 987 F.2d 931, 936–37 (2d Cir. 1993) (noting that "[w]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims.").

### 4. The Proposed Class Representatives and Proposed Class Counsel are Adequate.

Rule 23 requires that "the representative parties [ ] fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This inquiry asks whether "1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Allegra v. Luxottica Retail N. Am*., 341 F.R.D. 373, 399 (E.D.N.Y. 2022) (quotation marks omitted); *see* Fed. R. Civ. P. 23(g) (considering the work counsel has done identifying and investigating the claims, counsel's experience with class actions, knowledge of the applicable areas of law, and resources committed to representation).

Plaintiffs Calderon, Fields, Pinchasi, and Folgar are adequate class representatives. They have been actively engaged in advocating for the Settlement Class throughout these negotiations—participating in three all-day mediations and additional months of negotiations—and have remained in contact with proposed Class Counsel throughout the action, asking questions and ensuring they have a fulsome understanding of the negotiations. Baran Decl. ¶¶ 79-83. They have seen this action through, without trying to strike a deal for themselves over the proposed Settlement Class. *Id.* ¶ 79. Each fits within the class definition, and their interests are aligned with those of the class they represent—and, as a result, have achieved an excellent nine-figure result for the Settlement Class. *See Campbell,* 2025 WL 1874485, at *5 ("An adequate class representative is one who has an interest in vigorously pursuing the claims of the class and no interests antagonistic to the interests of other class members.") (internal quotation marks omitted).

Proposed Class Counsel from Katz Banks Kumin LLP and The Legal Aid Society are adequate class counsel. Collectively, they have negotiated and reached this class-wide Settlement. Baran Decl. ¶¶ 84–87; 120–21. They are knowledgeable about applicable law and class actions. *Id.* ¶¶ 88–119. They have secured the *pro bono* assistance of Stout, and several other experts, to benefit the Settlement Class without reducing the monetary relief to be distributed. *Id.* ¶ 20 & n.1. They have analyzed large amounts of data, conducted extensive legal research, and written multiple mediation briefs, along with other case-related and settlement-related communications. *Id.* ¶ 121. They have devoted significant hours to the litigation, and advanced significant litigation costs (including mediation costs and expert fees), none of which have been paid. *Id.* ¶ 120. They are committed to seeing this Settlement through and litigating this Action absent Final Approval. Finally, they are all well qualified and experienced. *See id.* at ¶¶ 84–119 (detailing counsel's qualifications).

### 5. Common Issues Predominate Over Any Individual Issues and the Class Action Mechanism is Superior.

Rule 23(b)(3) requires that common questions of law or fact "predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). "However, in the settlement context, some inquiries essential to litigation of class certification, including the issue of manageability—how the case will or can be tried, and whether there are questions of fact or law that are capable of common proof, are no longer relevant." *Caccavale v. Hewlett-Packard Co.*, 2025 WL 882220, at *17 (E.D.N.Y. Mar. 14 2025) (internal quotation marks omitted).

As to predominance, there are numerous common questions, as discussed above, that are allegedly common to all Settlement Class Members—for example whether PPL's policies for

20

allocating WPA compensation for various benefits, including the initial alleged delay in providing benefits, violate the WPA and NYLL, and whether PPL's PTO policies violate the WPA and NYSSL. These questions are common to almost all downstate PAs, who were allegedly subject to similar allocations of their total compensation for these purposes, making these analyses unlikely to require individualized inquiries. Rather, "generalized proof" will suffice. *Id*. at \*18.

To the extent that variation among the reasons for wage payment denials could potentially raise individualized issues, those differences allegedly relate only to damages, not liability—and it is well established in the Second Circuit that individualized damages issues do not alone defeat certification. *See Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 408 (2d Cir. 2015) (reversing district court refusal to certify wage and hour claims based on individualized damages determinations because it is "the law of this Circuit . . . that individualized damages determinations alone cannot preclude certification under Rule 23(b)(3)[.]") (citing *Seijas v. Repub. of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010)). Accordingly, the proposed Settlement Class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

The class action mechanism is superior here because "[w]here the courts—absent class certification—would have to litigate numerous lawsuits by hundreds . . . of individual class members, the efficiencies of a class are self-evident[.]" *Caccavale*, 2025 WL 882220, at \*18 (cleaned up). Here, as there are over 200,000 Settlement Class Members, "the prospect of individual actions would certainly prove less efficient than a class-wide proceeding." *Id*. The alternative to a class action in this case would be for tens of thousands of class members to file individual lawsuits, even though their individual damages may be relatively low in comparison to the costs of litigation. Such an approach would needlessly consume judicial resources when PPL's alleged common policy makes it possible to adjudicate all of their claims together here. *See Dial Corp. v. News Corp.*, 314 F.R.D. 108, 121 (S.D.N.Y. 2015) ("Class relief is superior where, as

here, class-wide litigation of common issues will reduce litigation costs and promote judicial efficiency.")

## II. THE SETTLEMENT IS A FAIR, REASONABLE, AND ADEQUATE RESOLUTION FOR THE CLASS.

Courts must consider the following factors when considering a class action settlement:

(A) whether the class representatives and class counsel have adequately represented the class;
(B) whether the proposal was negotiated at arm's length;
(C) whether the relief provided for the class is adequate, taking into account:
   (i) the costs, risks, and delay of trial and appeal;
   (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
   (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
   (iv) any agreement required to be identified under Rule 23(e)(3); and
(D) whether the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). The provisions of Rule 23(e)(2)(C) and (D) listed above "are supplemented and often overlapped by the [*Grinnell* factors], which courts in this Circuit have traditionally considered when evaluating the fairness, reasonableness, and adequacy of the proposed settlement." *Hunter*, 2025 WL 1649323, at *14 (internal quotation marks omitted).[10] Here, these factors weigh in favor of approving the Settlement, for the reasons explained below.

### A. Plaintiffs and Proposed Class Counsel Have Adequately Represented the Class and Support the Proposal – Rule 23(e)(2)(A).

The adequacy of representation inquiry in the context of settlement approval generally follows that for determining adequacy in certifying a class. *See supra*, ARGUMENT Part I.A.4;

---

[10] The *Grinnell* factors are: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *Hunter*, 2025 WL 1649323, at *14 (quoting *Moses v. New York Times Co.,* 79 F.4th 235, 244, n.4 (2d Cir. 2023)). The reaction of the class to a proposed settlement is to be evaluated after notice has been distributed and when the court is determining whether to finally approve a settlement. *Abarza v. Spirit Pharms. LLC*, 2025 WL 1519147, at *12 (E.D.N.Y. May 28, 2025).

*see, e.g., Ying v. All-Ways Forwarding of N.Y. Inc.*, 2025 WL 968586, at *6 (E.D.N.Y. Mar. 31, 2025). Where a class representative's interest is aligned with class members and class counsel are sufficiently experienced and qualified, that weighs in favor of preliminary approval. *See Abarza*, 2025 WL 1519147, at *8. Given the proposed Class Representatives' adequacy and typicality, as well as the adequacy, experience, and qualification of proposed Class Counsel, this factor weighs in support of preliminary approval. *See supra*, ARGUMENT Part I.A.4.

### B. The Proposal Was Negotiated at Arm's Length Without Fraud or Collusion - Rule 23(e)(2)(B) and Grinnell Factor 3.

"Courts reviewing proposed settlements must also scrutinize the negotiating process, to ensure they resulted from arm's-length negotiations and that plaintiffs' counsel have possessed the experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests." *Hunter*, 2025 WL 1649323, at *14 (internal quotation marks omitted).

Here, proposed Class Counsel and PPL's counsel negotiated for approximately five months with the assistance of a mediator after receipt of data from PPL in October 2025, after analysis of that data by Plaintiffs' Counsel in consultation with a retained data expert who conducted extensive analysis of that data, and after investigating the claims of the Plaintiffs and Class members. *See supra*, BACKGROUND Part II & Baran Decl. ¶¶ 6-10. The parties attended three full-day mediation sessions and participated in months of ongoing negotiations with two private mediators with extensive experience in negotiating class action settlements. *Id*. All of this supports approval. *See e.g., Hunter*, 2025 WL 1649323, at *15 ("Involvement of a mediator during the settlement negotiation process weighs in favor of a finding of fairness[.]"); *Ying*, 2025 WL 968586, at *7 (finding settlement product of arms-length negotiations where parties negotiated for nearly a year).

**C. The Proposal Provides Adequate Relief to the Settlement Class – Rule 23(e)(2)(C) and Grinnell Factors 1, 4-9.**

**1. The Settlement Represents a Fair Compromise that Provides Significant Monetary and Non-Monetary Benefits to the Settlement Class.**

Courts have recognized that settlements are inherently compromises and that even a fraction of the maximum damages can be adequate for approval purposes. *See, e.g., Mautner v. Hirsch,* 1992 WL 106318, at *8 n.2 (S.D.N.Y. May 4, 1992) ("[T]he Court is mindful of the fact that a proposed settlement that only amounts to a fraction of the best possible recovery may be reasonable and adequate."); *Cagan v. Anchor Sav. Bank FSB*, 1990 WL 73423, at *13 (E.D.N.Y. May 22, 1990) ("A settlement can be approved even though the benefits amount to a small percentage of the maximum potential recovery."); *Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 2d 172, 177 (W.D.N.Y. 2011) ("The court's task, then, is simply to decide whether the settlement agreement as written is fair, reasonable, and adequate, not whether the parties or the court could conceivably have come up with a 'better' agreement."). Here, both the monetary and non-monetary benefits to the Settlement Class are significant and warrant approval, for the reasons explained below.

**a. Settlement Class Members Will Receive Significant Monetary Benefits.**

Based on Plaintiffs' Counsel's analysis of PPL's data, Plaintiffs anticipate that the per person amount for Settlement Class Members, prior to applicable tax withholding and after costs and fees, average approximately $680, with a high of approximately $1,885, and a median of approximately $656. Baran Decl. ¶ 29. The Guaranteed Total Recovery of $162,000,000 includes several component payments, all of which provide adequate relief to Settlement Class Members, for the following reasons.

### i. The General Damages Payment Adequately Compensates Settlement Class Members for Unpaid and Late Wages.

First, PPL has agreed to pay $40,500,000 to Settlement Class Members, representing settlement of their claims under the FLSA, NYLL, WPA, NYLL § 195, ESSTA, PSSLL, and all other Released Class Claims under the Settlement Agreement. This General Damages Payment will be distributed as follows: Class Members who Plaintiffs allege timely registered with PPL but were not paid a promised sign-up bonus will receive $50 each to compensate them for that alleged claim, which will constitute approximately $4.9 million of this General Damages Payment. The remainder of the General Damages Payment will be distributed to Settlement Class Members *pro rata* based on hours worked for PPL. Based on this payment, a significant percentage of the Settlement Class will recover a substantial portion of their unpaid wages.

### ii. Reserve Fund Structure Ensures that Settlement Class Members will Receive, at Minimum, an Additional $4.5 million.

Second, PPL has agreed to pay an additional $4,500,000 as a Reserve Fund in further settlement of Plaintiffs' claims, which will be distributed on a *pro rata* basis based on hours worked. The Reserve Fund, combined with the Additional MEC Fund, guarantees the Settlement Class will receive at least $4,500,000 after the Total Initial Monetary Payment. If there is any money in the Additional MEC Fund, every dollar of that relief will be exchanged for 50 cents of the Reserve Fund, up to $4,500,000. There will only be a full "exchange" of these funds if there is $9,000,000 or more in Additional MEC Fund. The Reserve Fund structure is a reasonable compromise given the uncertainty of how much money, if any, will be available in the Additional MEC Fund. Plaintiffs have thus successfully secured a Reserve Fund of at least $4,500,000 for the Settlement Class beyond the Total Initial Monetary Payment, resulting in a Total Guaranteed Recovery of at least $162,000,000.

Similar kinds of payment structures that provide for the recovery of additional funds if certain conditions are satisfied have been approved in class settlements, even where such reserve funds are not guaranteed. *See, e.g.*, *Fowler v. Union Pac. R.R. Co.*, 2019 WL 13038410, at \*2–3 (C.D. Cal. Jan. 7, 2019) (granting final approval of settlement with escalator clause, noting that it was preliminarily approved such that parties had authority to modify notice as to total recovery as impacted by the escalator clause); *Ramirez v. Merrill Gardens, LLC*, 2024 WL 3011142, at \*3 (E.D. Cal. June 11, 2024) (granting final approval of settlement with escalator clause that gave defendant option to increase settlement amount if condition satisfied, or to shorten class period). Here, this Reserve Fund provision will *guarantee* that the Settlement Class receives at least $4,500,000 in additional compensation. Accordingly, it is fair and reasonable.

### iii. The Guaranteed MEC Payment and the Additional MEC Fund Allow Settlement Class Members to Recover Compensation.

Third, PPL has agreed to pay Settlement Class Members all money allocated to the MEC plan not used for claims or the costs of administering the plan by the date the claim year closes (April 30, 2027), representing settlement of all claims related to the MEC plan and the PPL Flex Plan under the WPA, WTPA, ERISA claims related to any aspect of the MEC or the MEC-related payments set forth in the Settlement Agreement, NYLL, and all other Released Class Claims under the Settlement Agreement. As described above, PPL had allocated $0.40 of Wage Parity compensation, per hour worked, to the MEC Plan. As of May 1, 2026, approximately $36 million of these MEC allocations remains in PPL's Health Plan Account. Agmt. ¶ 78. More of these MEC funds may be used in claims by the end of April 2027. Agmt. ¶ 78; Baran Decl. ¶ 28.

The Guaranteed MEC Payment will return a large portion of this money—$25,000,000— to Settlement Class Members. And the Additional MEC Fund will likely add more. After negotiations as to the method of payment, the parties have agreed that all these MEC funds will be

paid as a cash payment, as opposed to alternate methods such as a retirement account or a flexible spending card. Accordingly, the Guaranteed MEC Payment and Additional MEC Fund allow Settlement Class Members to receive significant amounts of money that Plaintiffs contend represent earned wages that they <u>never</u> would have been able to access absent this Agreement. For example, absent this Settlement, PPL would not have reimbursed former PA Settlement Class Members for the money allocated from their WPA compensation to the MEC plan. This settlement term is a major achievement and benefit to the Class.

Plaintiffs' Counsel anticipates that the per person amount for Settlement Class Members from the Guaranteed MEC Payment, prior to applicable tax withholding and after costs and fees, average approximately $105, with a high of approximately $224, with a median of approximately $106. Baran Decl. ¶ 30.

The Parties have agreed that PAs will receive any remaining funds allocated to the MEC plan, less claims and administrative costs, through the Additional MEC Fund. While the MEC plan ended as of April 30, 2026, PAs have the right to submit benefits claims until April 30, 2027. Consequently, the exact amount of funds to be distributed as Additional MEC Fund cannot currently be determined. The Parties have completed an initial forensic accounting of amounts paid into and out of the MEC Plan and will complete a further accounting at the end of the claims period. The latter accounting will determine the amount of Additional MEC Fund. Supported by the rigorous accounting process, the Additional MEC Fund ensures that Settlement Class Members will receive all funds allocated to the MEC plan not spent on valid claims or other expenses.

### iv. The PTO Payment & Reconciliation are Fair and Reasonable.

Finally, PPL has agreed to pay $92,000,000 to Settlement Class Members on a *pro rata* basis, representing settlement of claims related to PTO, and any other claims for paid time off

under the WPA, WTPA, NYLL, ESSTA, PSSL, and all other Released Class Claims under the Settlement Agreement. PPL shall then reconcile Settlement Class Members' PTO balances commensurate with each individual's *pro rata* payment. *See* Agmt. ¶¶ 63(c) & 63(d) & Ex. 1 (Allocation & PTO Reconciliation Plan). To this end, Plaintiffs' counsel anticipates that the per person amount for Settlement Class Members from the PTO Payment, prior to applicable tax withholding and after costs and fees, average approximately $388, with a high of approximately $943, with a median of approximately $365. Baran Decl. ¶ 31.

The $92,000,000 PTO Payment represents a significant achievement that will confer substantial monetary benefit on the Settlement Class. The PSSL and the ESSTA do not require employers to allow workers to use more than 56 hours of paid leave in a "use" year, even if they have accrued more. And, consistent with those laws, PAs are not allowed to use more than 56 hours of paid leave per year—even if they have accrued more PTO, either through working additional hours or through roll-overs from the previous year. The reality of PAs is that the majority of workers take time off—they are predominantly caring for loved ones and community members who require significant assistance. Indeed, based on PPL's data, Plaintiffs' counsel's expert has calculated that downstate PAs had only used approximately 16.5% of their accrued PTO between April 2025 and May 2026. The remainder of accrued PTO remains in PPL's accounts— unused (and often inaccessible because of the 56-hour cap) by PAs. Through the PTO Payment, the Agreement allows Settlement Class Members to receive cash in lieu of continuing to carry PTO balances that, as a practical matter, may never be available to them.

In addition, the PTO Payment confers significant benefits to the Class by providing payment immediately and in cash. As the time of settlement negotiations, Plaintiffs allege that PPL's website stated that accrued but unused PTO would not be paid out if the PA stopped providing services. Baran Decl. ¶ 45 & Ex. D. Since Plaintiffs commenced this action and starting

on May 1, 2026, PPL has since represented that it will pay out accrued PTO upon exit from CDPAP into a 401(a) retirement account. *See* Baran Decl. ¶ 46 & Ex. E. Moreover, according to PPL's new stated policy, at the end of each "use" year, PPL would pay out accrued PTO above 56 hours into a 401(a) retirement account. *Id.* Even so, PAs would not receive any such payout for a significant time, potentially years, as it is contingent on exit from CDPAP. Baran Decl. ¶ 47. Further, all PAs would have to take affirmative steps to withdraw any such funds from the 401(a) account, and PAs who are under 60—which is believed to be approximately half the Settlement Class—would not be able to access such 401(a) funds right away without incurring a tax penalty. *Id.* ¶ 48. The 401(a) funds may also potentially be subject to further administrative fees by third-party administrators of the 401(a) plan. *Id.* ¶ 49. The PTO Payment made under the Settlement Agreement, by contrast, will allow Settlement Class Members immediate access to those funds without needing to take any affirmative action.[11] *Id.*

The corresponding reconciliation of Settlement Class Members' accrued but unused PTO balances by the full $92,000,000 PTO Payment is a fair and necessary component of the settlement structure. The PTO Payment represents a monetization of accrued balances that would otherwise remain unused for many PAs due to the Program's structure and usage limits. The Parties have agreed that the Settlement Class Members' accrued but unused PTO is paid as cash, with a commensurate reduction in their PTO banks. While this approach is not expressly contemplated

---

[11] The PTO, when put in the bank, was not taxed because it was not paid. Because it is being paid out, taxes are due, but because that payout represents settlement of both alleged wage and non-wage liquidated damages, counsel estimated that 50% of a PA's PTO payment would be reported on a W-2 and 50% on a 1099-MISC. Agmt. ¶ 63(c). The allocation of the PTO Payment between W-2 wage payments and Form 1099 payments is a reasonable and appropriate approach under the circumstances—regardless of the fact that the entire PTO Payment agreed to by the Parties relates to the return of money that was previously allocated by PPL to PTO and the reconciliation of the PTO banks of the Settlement Class by the full PTO Payment. The Settlement resolves multiple categories of disputed claims, some of which concern unpaid wages while others concern disputed benefit allocations that were not previously treated as taxable wages. The same rationale applies to 50/50 allocation of the MEC payments. *See* Agmt. ¶ 63(b).

in the applicable NYC Department of Consumer and Worker Protection guidance,[12] the reduction simply reflects that Settlement Class Members are receiving the cash value of those balances now, rather than retaining both the funds and the underlying PTO entitlement. Authorizing the PTO Reconciliation therefore ensures that the settlement operates as intended—providing prompt and meaningful monetary relief to the Settlement Class while fairly resolving the Parties' dispute concerning the treatment of PTO under the WPA.

### b. Settlement Class Members Will Receive Significant Non-Monetary Relief.

In addition to monetary relief, the non-monetary relief provided by the Settlement Agreement—namely, the end of the mandatory MEC plan—has material value to current employee PAs. Plaintiffs allege that they were previously forced to have compensation allocated to a health plan that, from their perspective, provided little to no benefits. Under the negotiated structure, PPL will no longer make those mandatory allocations—regardless of their legality. For example, without automatic and mandatory enrollment into the MEC, Ms. Fields will receive additional wages of approximately $43 a month or $516 annually, and Mr. Calderon will receive additional wages of approximately $69 a month or $828 annually.

Under PPL's current policy, these wages will be paid into a 401(a) retirement account. On a Class-wide basis, Plaintiffs estimate that based on the average hours worked in a workweek by Class members (29 hours), Class members will receive additional wages of approximately $50 a month or $600 annually, for a total benefit to the Class of approximately $120 million over the next year, and more over the remainder of PPL's contract. In addition, Settlement Class Members will not experience coordination of benefits problems due to multiple sources of insurance

---

[12] *Rules for Protected Time Off Policies,* NYC Consumer and Worker Protection (April 20, 2026), https://www.nyc.gov/assets/dca/downloads/pdf/businesses/Paid-Safe-And-Sick-Leave-Policies.pdf.

coverage. *See* FAC ¶ 134.

"Courts have now widely accepted the principle that settlements involving nonpecuniary benefits can be 'fair and adequate'—and thus suitable for approval." *Polar Int'l Brokerage Corp. v. Reeve*, 187 F.R.D. 108, 116 (S.D.N.Y. 1999); *see Patti's Pitas, LLC v. Wells Fargo Merch. Servs., LLC,* 2021 WL 5879167, at *3 (E.D.N.Y. July 22, 2021) (approving settlement that included non-monetary relief, including practice changes). Accordingly, the Agreement allows for significant non-monetary relief that benefits current and future PAs.

### c. The Release of FLSA Claims by Class Members is Permissible.

As a material term of the Settlement Agreement, the Parties agreed upon the release of FLSA claims as part of the Rule 23 releases. This procedure was recently approved by the Third Circuit in *Lundeen v. 10 West Ferry Street Operations LLC*, 156 F.4th 332 (3d Cir. 2025). In *Lundeen*, the Third Circuit adopted a developing line of caselaw and squarely held—in an issue of first impression at the circuit level—that class members can release FLSA claims in a court-approved Rule 23 settlement, so long as the notice clearly advises class members of the FLSA release, there is a meaningful opportunity to opt out, and the release term is determined by the court to be fair and reasonable.[13] 156 F.4th at 341–42.

Here, the release of FLSA claims by all Settlement Class Members is fair and equitable because (1) nothing in the statutory text or legislative intent of the FLSA mandates a separate opt-in process for release of FLSA claims; (2) other courts in this Circuit and beyond have allowed release of FLSA claims by a settlement class; (3) an opt-out procedure will facilitate maximum participation in the settlement—a goal shared by all parties; and (4) all of the NYLL claims encompass the FLSA wage-and-hour claims entirely.

---

[13] Notably, the U.S. Department of Labor was given an opportunity to state its opinion on the release procedure in *Lundeen* and declined to do so. *See* Brief of Plaintiff-Appellee at 1, *Lundeen v. 10 West Ferry Street Operations LLC*, 156 F.4th 332 (3d Cir. 2025) (No. 23-3375).

First, a waiver of FLSA claims is consistent with both the statutory language and its legislative history. Neither the text of 29 U.S.C. § 216(b) nor its legislative history mandates an opt in or other specific procedure for the release of FLSA claims. *See id.*, 156 F.4th at 338–40; *accord Richardson v. Wells Fargo Bank, N.A.*, 839 F.3d 442 (5th Cir. 2016) and *Rangel v. PLS Check Cashers of California, Inc.*, 899 F.3d 1106 (9th Cir. 2018). Instead, the statutory text of § 216(b) only requires written consent to *litigate* a claim. Requiring written consent to release claims as part of a Rule 23 settlement would be an "enlargement of [the text] by the court…beyond [the court's] authority." *Lundeen*, 156 F.4th at 339. Further, as the Third Circuit clarified, "Congress did not have worker protection in mind when it later adopted the opt-in mechanism" as part of the Portal-to-Portal Act of 1947, but rather created the opt-in process "'primarily as a check against the power of unions' and a bar to 'one-way intervention' whereby plaintiffs could wait for a favorable outcome before choosing to opt in and be bound by judgment." *Id.* at 340–41 (quoting *Knepper v. Rite Aid Corp.*, 675 F.3d 249, 255, 260 (3d Cir. 2012)). To the contrary, "[h]istorically, the FLSA's opt-in mechanism has limited the size of the FLSA action, with estimates indicating that typically only between fifteen and thirty percent of potential plaintiff-employees opt-in." Rachel K. Alexander, *Federal Tails and State Puppy Dogs: Preempting Parallel State Wage Claims to Preserve the Integrity of Federal Group Wage Actions*, 58 AM. U. L. REV. 515, 518 (Feb. 2009). Accordingly, a separate opt-in procedure is neither required by the statute, nor does it serve to protect workers under these circumstances.

Second, many courts apart from the Third Circuit have approved settlements that allow for release of FLSA claims without an opt-in procedure, both pre-dating and post-dating *Lundeen*. For example, in *Flores v. Mamma Lombardi's of Holbrook, Inc.*, 104 F. Supp. 3d 290, 300 n.4 (E.D.N.Y. 2015), a court in this District approved a proposed settlement agreement that included a general release of any and all wage and hour claims, including FLSA claims, for the entire class.

Similarly, the court in *Pliego v. Los Arcos Mexican Restaurants, Inc.*, 313 F.R.D. 117, 122, 125 (D. Colo. 2016), allowed for the release of FLSA claims in an opt-out only class settlement, citing the recent move toward allowing this type of general release. Following that trend, several other courts throughout the country have allowed for the type of release the Parties request here. *See, e.g., Lunemann v. Kooma III LLC*, 2024 WL 2133803, at *2 (E.D. Pa. May 13, 2024) (holding that "the opt-in FLSA claims may be properly released through the opt-out class settlement."); *Stephens v. Farmers Rest. Grp.*, 329 F.R.D. 476, 489 (D.D.C. 2019) ("The Court finds little support for the proposition that parties are categorically precluded from including such a release in a binding Rule 23 class-action settlement."); *Davis,* 827 F. Supp. 2d at 180 (allowing for certification of a state class with a release of FLSA claims); *Rangel,* 899 F.3d at 1110 (holding that res judicata barred additional FLSA claims released in a Rule 23 settlement, even though the underlying settlement did not contain an opt-out procedure); *Then v. Great Arrow Builders, LLC*, 2022 WL 562807, at *4 (W.D. Pa. Feb. 23, 2022) (approving a similar settlement structure).

Since *Lundeen*, other district courts have approved FLSA releases as part of a Rule 23 settlement—including the district court in *Lundeen* itself, following remand.[14] *See Lundeen*, No. 2:24-cv-109-JDW, ECF No. 45 (E.D. Pa Dec. 12, 2025), Ex. G to Baran Decl. (district court preliminary approval order); *see also, e.g., Lawson v. Grubhub, Inc.*, 2026 WL 710228, at *9 (N.D. Cal. Mar. 13, 2026); *Duggan v Buckley Cable Constr. Co.*, No. 24-3296, ECF No. 54 (E.D. Pa. Apr. 10, 2026) (district court preliminary approval order) & *Peterson v. Flixbux, Inc.*, No. 23STCV06069 (Cal. Super. Ct. Dec. 6, 2024) (superior court preliminary approval order), Ex. G

---

[14] The recent Pennsylvania district court decision, *Steahle v. Cargroup Holdings, LLC*, 2025 WL 3284466, at *5 (E.D. Pa. Nov. 25, 2025), is not to the contrary because there, the district court held that the notice was "confusing and unclear as to whether certain employees have released FLSA claims." The notice therefore was not compliant with the holding of *Lundeen*, which requires clear notice of the FLSA release. Similarly, *Walencik v. Kostal Kontakt Systeme, Inc.*, 809 F. Supp. 3d 731, 733 (E.D. Mich. 2025), is not to the contrary because the employer there sought approval of a full general release of claims by class members, which is not sought here.

to Baran Decl. Accordingly, approval of the Settlement Agreement here aligns with these other settlement approvals.[15]

Third, it is undisputed that release of FLSA claims through a *Lundeen* procedure benefits PAs by allowing Settlement Class Members to recover all available funds automatically without taking affirmative steps to do so, while also providing certainty of settlement to PPL as a material benefit of its bargain. *See generally* Craig Becker & Paul Strauss, *Representing Low-Wage Workers in the Absence of a Class: The Peculiar Case of Section 16 of the Fair Labor Standards Act and the Underenforcement of Minimum Labor Standards*, 92 MINN. L. REV. 1317, 1328 (2008) (explaining why opt-ins "reasonably fear" that opting into an FLSA collective action would result in retaliation); *Exposing Wage Theft Without Fear*, NAT'L EMP'T L. PROJECT, at 11 (June 2019), https://s27147.pcdn.co/wp-content/uploads/Retal-Report-6-26-19.pdf (explaining why the FLSA's anti-retaliation provision is generally insufficient, on its own, to encourage workers to overcome the fear of retaliation, including in light of the opt-in mechanism).

Fourth, the limited universe of claims under the FLSA here, the fact that the First Amended Complaint already alleged all possible FLSA claims, and the fact that all of the FLSA claims released are also encompassed within NYLL claims that can be released through the Rule 23 release—and will thus be compensated through the General Damages Payment and Reserve Fund—makes the release of the FLSA claims a fair and reasonable term. *See generally Rana v. Islam*, 887 F.3d 118, 123 (2d Cir. 2018) (finding NYLL and FLSA do not allow duplicative liquidated damages for same course of conduct); *Gamero v. Koodo Sushi Corp.*, 272 F. Supp. 3d 481, 498 (S.D.N.Y. 2017) ("An employee may not receive a 'double recovery' of back wages

---

[15] The Court need not engage in an analysis of the waiver of FLSA claims under *Cheeks v. Freeport Pancake House*, 796 F.3d 199, 200 (2d Cir. 2015), which only dealt with private settlements of FLSA claims through a private stipulated dismissal with prejudice pursuant to FRCP 41(a)(1)(A)(ii). Because the Parties seek court approval here, *Cheeks* is not relevant to the inquiry currently before the Court. Further, courts do not typically examine the factors set out in *Cheeks* until final approval. *See Campbell*, 2025 WL 1874485, at *4–5 (citing *Cheeks*).

under both the FLSA and the NYLL.") (cleaned up, and collecting cases). To be clear: all FLSA damages here are also available under the NYLL. Accordingly, all Settlement Class Members will be receiving *pro rata* relief based on hours worked to compensate them for, among other claims, their overlapping FLSA and NYLL wage and hour claims asserted in the First Amended Complaint.

To ensure all downstate PAs are fully informed that the Rule 23 release includes a release of FLSA claims, Plaintiffs' proposed settlement notice process also provides "clear notice [] of the release and a meaningful opportunity to opt out." *Lundeen*, 156 F.3d at 342; *see Then,* 2022 WL 562807, at *4 ("Here, the Court concludes that the parties' release is acceptable, particularly because the proposed notice appears to fully inform settlement class members of what they must do to opt-out of the settlement and preserve any FLSA claim they might have[.]"). Accordingly, Class members who feel they have different or exceptionally high damages for wage-and-hour claims, including FLSA claims, will be able to understand their options, and if they so choose, to opt out and pursue separate actions. The ability to proceed without an opt-in procedure also reduces settlement administration costs associated with processing opt-in forms, thereby increasing monetary relief for the Settlement Class as a whole.

### 2. Costs, Risks, & Likely Duration of Litigation Support Approval.

"Litigating this case to a final judgment would likely take years and require several rounds of motion practice and extensive discovery, including fact discovery and expert discovery." *Mikhlin v. Oasmia Pharm. AB*, 2021 WL 1259559, at *5 (E.D.N.Y. Jan. 6, 2021). Shortly after Plaintiffs filed their notice of motion for conditional certification, and PPL filed its notice of motion to dismiss, the Parties began negotiating this Agreement, holding off on formal discovery and motion practice, including the Parties' contemplated motions. *See supra*, BACKGROUND Part II & Baran Decl. ¶ 3. "Unquestionably, continued litigation would be complex and result in

the significant expenditure of time, money, and other resources." *Caccavale*, 2025 WL 882220, at *7. Among other litigation demands, depositions of all parties and key witnesses, document productions, and expert fees would significantly contribute to costs and delay resolution of the action. *Id*. In other words, years of substantial litigation would remain absent a settlement at this juncture, with uncertain results that may not exceed the Settlement. This supports approval.

Each party faces substantial risk if litigation continues. Plaintiffs' claims under the WPA are novel, and there is little case law interpreting the WPA's requirements. PPL asserts that its practice of counting PTO towards WPA compensation is permitted and consistent with guidance from the New York State Department of Labor. There is also some risk that Plaintiffs' claims for liquidated damages based on wages that were paid weeks late would not be cognizable under recent amendments to the Labor Law. *See* NYLL § 198(1-a) (as amended); *but see Beh v. Community Care Companions, Inc.*, 2026 WL 1289873, at *7 (W.D.N.Y. Mar. 11, 2026), *report and recommendation adopted sub nom. Beh v. Cmty. Care Companions Inc.*, 2026 WL 1286570 (W.D.N.Y. May 8, 2026) (finding the amendment does not limit recovery of liquidated damages for late-paid wages except for the "simple pay frequency cases for which the New York Legislature has recently provided relief to employers.").

PPL has also made several other arguments and asserted other defenses that create additional litigation risks, including, but not limited to: (1) PPL's stated good faith attempts to pay PAs timely and in full; (2) PPL's argument that the WPA permits employers to satisfy their WPA obligations through a combination of wages and cash, which allegedly permits PPL to maintain a policy of both mandatory enrollment in the MEC/Flex program and PTO allocation;[16] (3) PPL's argument that some instances of non-payment of PA wages was the result of Consumers' actions;

---

[16] *See* N.Y. Pub. Health L. § 3614-C(1)(b).

and (4) PPL's argument that PPL is not a joint employer of PAs, *see e.g.*, *Talarico v. Public Partnerships, LLC*, Case No. 25-1369 (3d Cir. May 19, 2026). Plaintiffs do not admit the validity of these defenses, Agmt. ¶ 123, but acknowledge that there are risks should the Settlement not be approved and the Parties continue with litigation.

Moreover, absent settlement, PPL would contest the propriety of class certification, and "[c]ourts generally acknowledge that a contested motion to certify a class would pose at least some increased risk that class certification might be denied." *Mikhlin*, 2021 WL 1259559, at *6. In sum, the costs, risk, and delay—including the complexity, expense and likely duration of the litigation and risks of establishing liability and damages, as well as maintaining a class—support approval.

### 3. The Proposed Method of Distributing Relief is Effective and Equitable – Rule 23(e)(2)(C)(ii), (D).

Here, the Net Initial Settlement Payment will be distributed largely on a *pro rata* basis based on hours worked using updated data analyzed by Plaintiffs' expert as follows, *see* Agmt. Ex. 1 (Allocation Plan); *see also Ying v. All-Ways Forwarding of N.Y. Inc.*, 2025 WL 968586, at *8 (E.D.N.Y. Mar. 31, 2025) (discussing *pro rata* allocation); *Fusion Elite All Stars v. Varsity Brands, LLC*, 2023 WL 6466398, at *5 (W.D. Tenn. Oct. 4, 2023) ("Courts generally find that distributing settlement funds on a *pro rata* basis… is fair and reasonable."):

*First*, each Settlement Class Member with an unpaid bonus claim shall receive $50 from the Net General Damages Payment (i.e., the General Damages Payment minus reasonable and approved Fees and Costs; each "Net" Payment below reflects such reductions for approved Fees and Costs, per the Allocation Plan).

*Second*, the remainder of the Net General Damages Payment shall be allocated amongst Settlement Class Members proportionally on a *pro rata* basis, based on hours worked from March 1, 2025, to April 30, 2026. This is a fair and reasonable method of allocating these damages

because it would be difficult to go claim-by-claim as there are many different wage claims, each of which is hotly contested by PPL and subject to a variety of different litigation risks.[17] *Baran Decl.* ¶ 50; *see Gonzales v. 27 W.H. Bake, LLC*, 2018 WL 1918623, at *3 (S.D.N.Y. Apr. 20, 2018) ("The settlement fund will be distributed to plaintiffs on a *pro rata* basis. In light of number of hours worked by and the hourly rates paid to each plaintiff, the allocation of the settlement fund is fair and reasonable."). Further, a claim-by-claim analysis would be timely and costly given the class size, and that PPL will likely contest the risk associated with each individual claim.

*Third*, the Net Guaranteed MEC Payment shall be allocated amongst Settlement Class Members proportionally on a *pro rata* basis, based on the amounts allocated from each PA's WPA compensation towards the MEC Plan.

*Fourth*, the Net PTO Payment shall be allocated amongst Settlement Class Members proportionally based on the available PTO balance of the Settlement Class Member as of the date PPL makes the PTO Payment and conducts the PTO Reconciliation.

Thereafter, the Second Settlement Payment shall be allocated proportionally on a *pro rata* basis, based on hours worked (for the Reserve Fund portion) and the amount of health premiums allocated from WPA compensation (for the Additional MEC Fund portion).

Relatedly, the proposed Class Representatives intend to seek no more than $15,000 each as service payments for their work in this Action. This is reasonable in light of the risk each of the Plaintiffs undertook in bringing this action against their then-current employer, as well as their dedicated services rendered throughout the litigation, including their assistance with proposed Class Counsel's factual investigations, preparation of the Complaints in the actions, and participation in nearly six months of lengthy, complex settlement negotiations including three day-

---

[17] Further, requiring further analysis of payroll data at this time would cost tens of thousands of dollars in money that would otherwise be distributed to the Class.

long mediation sessions and numerous evening meetings with counsel to obtain the relief here. *See* Baran Decl. ¶¶ 80 & 83.; *see also Zhu v. Wanrong Trading Corp.*, 2024 WL 4351357, at *13 (E.D.N.Y. Sept. 30, 2024) (approving awards of $20,000 and $10,000, and noting that the class representatives in that employment class action had to weigh "significant potential risk of retaliation" in pursuing class action, and had "put their ability to secure future employment at risk" by participating in class action litigation); *see also Sand v. Greenberg*, 2011 WL 7842602, at *3 (S.D.N.Y. Oct. 6, 2011) (approving award in FLSA case because plaintiffs "took risks by putting their names on this lawsuit," including that of "blacklisting").

The method of distributing funds is automatic and also weighs in favor of approval. After final approval, payments will be issued by the Settlement Administrator, without the need for Settlement Class Members to send in claim forms. The default method of distribution through last known direct deposit information provided by PPL is effective and supports approval, as most Settlement Class Members are current or former PPL employees who are paid through direct deposit. Baran Decl. ¶ 60 (PPL represented that approximately 88% of PAs are paid through direct deposit); *see Abarza*, 2025 WL 1519147, at *10 (approving method where there is a "reasonable, rational basis, especially when recommended by experienced counsel"); *see also Caccavale*, 2025 WL 882221, at *3.

### 4. The Settlement is Within the Range of Reasonableness in Light of the Best Possible Recovery & All Attendant Litigation Risks.

The $162,000,000 Total Guaranteed Recovery and non-monetary relief are well within the range of reasonableness. *See Davis*, 827 F. Supp. 2d at 178 (in considering the range of reasonableness, "it is important to bear in mind that it will often be difficult if not impossible to calculate with any precision or accuracy what the best possible, or likely, recovery would be at trial. Numerous factors and contingencies may enter into that equation, preventing it from being

reduced to a simple formula."). Plaintiffs' counsel believes that the likely recovery if the case was litigated after accounting for all risks was uncertain, depending on a variety of risk factors including but not limited to: the very limited WPA caselaw and novel theories advanced by Plaintiffs; whether it is permissible to allocate for mandated leave from the total compensation under the WPA, including under recent New York Department of Labor guidance; whether recent amendments to NYLL § 198 that limit liquidated damages in limited circumstances and have not yet been definitively interpreted by the courts would limit late-pay damages in this case; whether PAs are employees of PPL for purposes of FLSA and NYLL liability, an issue on which there have been split rulings in other courts, including a recent negative ruling in the Third Circuit; whether unpaid work was unauthorized by Medicaid, potentially creating a full defense to liability; whether allegedly unauthorized work for is compensable; whether registration bonuses were unpaid due to incomplete or untimely submissions by PAs, potentially sharply limiting the number of PAs who could recover for this claim; whether individualized differences might come to light and thwart class certification; and finally, Supreme Court doctrinal changes in the area of class actions that might limit recovery.

Here, Settlement Class Members will receive significant monetary relief. Based on Plaintiffs' counsel's expert's calculations using data provided by PPL, the average member of the Class provided services for approximately 29 hours per week. Baran Decl. ¶ 41. In New York City, their gross compensation was approximately $628 per week in 2025, and $644 in 2026. *Id.* at ¶ 52. On average, based on the calculations of Plaintiffs' counsel's data expert, Class Members are expected to receive approximately $680 through this Settlement. *Id.* at ¶ 29. The 75th percentile of the expected recoveries is approximately $1,006. *Id.* This means that approximately 50,000 Settlement Class Members will receive payments estimated to be between $680 and $1,006, and approximately 50,000 will receive payments estimated to be between $1,006 and $1,885. *Id.*

This is meaningful relief, and is particularly meaningful in light of the fact that courts routinely approve less generous settlements. *Mikhlin*, 2021 WL 1259559, at *9 ("Courts in this Circuit commonly find that settlements for less than half of potential damages are within the range of reasonableness."). It is made more meaningful given the fact that Class Members are low-wage workers, earning on average approximately $628 a week in 2025, and $644 in 2026, and the average Settlement Class Member will receive more than their weekly gross pay. Excluding administration expenses, service payments, and attorneys' fees and costs, the remaining settlement fund for distribution is well within the range of reasonableness. *See e.g., In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 49 (E.D.N.Y. 2019) ("There is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.") (quoting *Grinnell*, 495 F.2d at 455, n.2); *D'Angelo v. Hunter Bus. Sch., Inc.*, 2023 WL 4838156, at *7-8 (E.D.N.Y. July 28, 2023) (approving settlement where settlement fund was 5% of possible damages).

The Agreement also provides much of the non-monetary relief initially demanded, most importantly the termination of the mandatory MEC plan. *See supra*, ARGUMENT Part II.C.1.b; *see also* Baran Decl. ¶ 129. This supports approval.

### 5. The Terms of Any Proposed Award of Litigation Costs and Attorneys' Fees, Including Timing of Payment, Are Fair and Reasonable - Rule 23(e)(2)(C)(iii).

Plaintiffs anticipate requesting a reasonable amount of out-of-pocket litigation costs and expenses of no more than $250,000, and an award of reasonable attorneys' fees of no more than 15% of the Net Guaranteed Recovery (i.e., the Total Guaranteed Recovery minus reasonable and approved litigation costs). Baran Decl. ¶ 122.

The costs Plaintiffs expect to request are reasonable as proposed Class Counsel's current costs are more than $160,000 and include filing fees, fees for Plaintiffs' data expert, and mediation

costs. *Id.* ¶ 123. Data processing fees are expected to somewhat increase ahead of final approval. In the event further mediation is required for any issue under the Agreement's dispute resolution procedure, Plaintiffs' cost request may be larger than anticipated. Accordingly, the Agreement provides that Plaintiffs' may seek up to $400,000 in out-of-pocket litigation costs, in the unlikely event costs end up being that high.

The attorneys' fees Plaintiffs anticipate requesting represent less than half of the attorneys' fees typically approved as reasonable in class action settlements by courts in this Circuit, which "regularly hold requests for attorneys' fees totaling one-third of the settlement fund well within the range of reasonableness." *Hunter*, 2025 WL 1649323, at *17 (citations and internal quotation marks omitted); *see Rosenfeld v. Lenich*, 2021 WL 508339, at *6 (E.D.N.Y. Feb. 11, 2021) ("Courts in this Circuit routinely find that requests for attorney's fees totaling one-third of the settlement fund are 'well within the range of reasonableness.'") (collecting cases); *see also Carbone v. Ltd. Run Games, Inc.*, 2026 WL 686144, at *6 (E.D.N.Y. Mar. 11, 2026) (same). Proposed Class Counsel's anticipated request for fees is a reasonable reflection of "the risk an attorney assumes in undertaking a case, the quality of the attorney's work product, and the public benefit achieved." *Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir. 1993). Those risks were significant in this case, which involved an exceptionally large class, as well as novel and untested legal claims under the WPA, a statute which to counsel's knowledge has almost never been litigated. *Moore v. Rubin*, 766 F. Supp. 3d. 423, 427–32 (E.D.N.Y. 2025) (awarding fee enhancement in light of risks inherent in litigation under the Trafficking Victims Protection Act (TVPA), given the number of "untested legal and factual issues under the TVPA" and the "absence of a market for TVPA cases").

The benefits of the excellent Settlement reached here for a very large population of care workers are also very significant, and proposed Class Counsel should be fairly compensated for

achieving this result. *See Hall v. ProSource Techs.*, 2016 WL 1555128, at *16 (E.D.N.Y. Apr. 11, 2016) (class counsel "served the important function of protecting the wage and hour rights of hundreds of employees who might not otherwise have the means or incentive to pursue individual actions."); *see also Amador v. Morgan Stanley & Co., LLC*, No. 11-cv-4326, Hr'g Tr. 16 (S.D.N.Y. Dec. 19, 2014) ("It's important that lawyers have incentives to bring [wage and hour] cases like this."). Moreover, "it is appropriate to reward counsel and incentivize counsel to pursue the best possible result for the Class and not punish counsel for negotiating an advantageous settlement on behalf of the Class at the early stages of the litigation." *In re Valeant Pharmas. Int'l, Inc. Sec. Litig.*, 2020 WL 3166456, at *15 (D.N.J. June 15, 2020). And proposed Class Counsel have collectively spent significant amounts of time on this case that have not been compensated to date and anticipate spending significant additional time on this case through settlement administration and final approval. This has prevented them from taking on other potential litigation, including paid fee-generating matters. Baran Decl. ¶¶ 120–21.

In addition, the costs of settlement administration together are expected to be no more than $450,000, approximately one-quarter of a percent of the Total Guaranteed Recovery. Baran Decl. ¶ 71 & Ex. F (settlement administrator declaration & proposal). Plaintiffs' Counsel engaged in an extensive competitive bidding process with six different settlement administrators and extensively negotiated with bidders to ensure that an experienced, capable administrator would do all necessary work at a fair and reasonable cost to the Class. Baran Decl. ¶ 70–73. And the service awards to be sought for Plaintiffs, as discussed above, are reasonable and well within the range typically approved. *See supra,* ARGUMENT Part II.C.3.

Proposed Class Counsel will file a petition for attorneys' fees, litigation costs, and administration costs in advance of the Opt-Out/Objection Deadline, and in advance of the final

fairness hearing scheduled in this matter, which will provide further detail as to the reasonableness of the requested attorneys' fees.

### 6. There Are No Agreements Required to Be Identified Under Rule 23(e)(3) – Rule 23(e)(2)(C)(iv).

There are no side agreements to be disclosed, and the Settlement Agreement is the Parties' only agreement apart from the Term Sheet in this matter, which the Agreement superseded. Baran Decl. ¶ 76; Agmt. ¶ 150.

### 7. The Reaction of the Absent Class Members Will Be Known After Notice and the Public Interest Supports Settlement.

Settlement Class Members have not yet had the opportunity to weigh in on this Settlement because notices have not yet been distributed. The parties will inform the Court of Settlement Class Members' reaction to the Settlement with their Final Approval brief. *See Abarza*, 2025 WL 1519147, at *12 (the court does not consider the class's reaction until after preliminary approval is granted). That said, approval of this settlement is in the public interest. Public policy generally favors settlement of class action lawsuits. *Hunter*, 2025 WL 1649323, at *13.

## III. THE COURT SHOULD APPROVE THE PROPOSED NOTICE PLAN AND THE CLASS NOTICES.

Rule 23 requires that the Court "direct to class members the best notice that is practicable under the circumstances[.]" Fed. R. Civ. P. 23(c)(2)(B). Here, notice will be distributed via electronic mail, text message, and posted on the Settlement Website and PPL's employee online portals. *See supra,* BACKGROUND Part III.E; *see also Millin v. Brooklyn Born Chocolate, LLC*, 2020 WL 2198125, at *3 (E.D.N.Y. May 6, 2020) ("There is no credible reason why notice should not be provided by email or text message[.]"). Email, text message, and the portal posting notice are particularly effective with the proposed Settlement Class here because the PAs have communicated with PPL nearly exclusively by email and phone, and current PAs likely access the

portal at the beginning and end of each work shift. Postcard notice will also be sent to any Settlement Class Members whose email notices "bounce back" or are otherwise undeliverable.

The notices inform Settlement Class Members of the terms of the Settlement and their rights and deadlines in which to exercise them, contain details about the definition of the Settlement Class, proposed Class Counsel, the components of the Settlement fund, the procedure for opting out and objecting, the potential size of proposed Class Counsel's request for attorneys' fees and costs, and the date and location of the final approval hearing. Courts have found that email notices are an appropriate way to "inform[ ] the class about the allocation of attorneys' fees, and provides specific information regarding the date, time, and place of the final approval hearing[,]" and how to access the long form notices, which provides even greater detail than the email and text notices. *Mikhlin*, 2021 WL 1259559, at \*12.

Courts in this circuit, and around the country, increasingly approve notice by email and/or text message only, particularly in cases with large classes where mail costs would be significant. *See, e.g., Ortega v. Uber Tech., Inc.*, 2018 WL 4190799, at \*10–11 (E.D.N.Y. May 4, 2018) (approving notice solely by email, with mail only to undeliverable emails, because class members communicated with defendant corporation over email, demonstrating that they were "familiar and comfortable with email and the Internet"); *Williams v. Equitable Acceptance Corp.*, No. 18-CV-07537 (NRB), Order Granting Preliminary Approval ¶ 5(c) (S.D.N.Y. Apr. 27, 2021) (approving notice by email, with postcards only to undeliverable emails) (Ex. G. to Baran Decl.); *Peterson v. Flixbus, Inc.*, No. 23STCV06069, Order Granting Preliminary Approval ¶ 12 (Cal. Super. Ct. Dec. 6, 2024) (Ex. G to Baran Decl.) (approving notice by email and settlement website only to class of over 500,000 consumers); Baran Decl. Ex. F, Declaration of Christopher Longley ("Longley Decl.") ¶ 15 (listing cases proposed Administrator has provided email only notice); *Engesser v. McDonald*, No. 25-cv-01689, ECF No. 125, Preliminary Approval Order ¶ 4 (E.D.N.Y. July 7,

2025) (Block, J.) (approving notice to several hundred thousand CDPAP consumers of Rule 23(b)(2) settlement by, *inter alia*, email and text message). In addition, mailing today is generally far less reliable than electronic communication, especially in transient populations in New York City, because physical addresses change much more often than email addresses. *See, e.g.*, *Knight v. Concentrix Corp.*, 2019 WL 3503052, at \*5 (N.D. Cal. Aug. 1, 2019) ("Now, email are regularly utilized by the masses, and may, in fact, be more reliable than mailing addresses, particularly for former employees who may have moved residences."); *O'Quinn v. TransCanada USA Servs., Inc.*, 469 F. Supp. 3d 591, 610 (S.D.W. Va. 2020) ("Email is a more reliable form of communication than paper mailing, given that mailing addresses tend to change more often than email addresses."); *In re Deloitte & Touche, LLP Overtime Litig.*, 2012 WL 340114, at \*2 (S.D.N.Y. Jan. 17, 2012) ("In the present age, however, communication through email is the norm[.]").

Here, notice by email and text is supplemented by providing postcard notice to undeliverable emails, and by ensuring the notice is also posted on PPL's website and app. Courts have recognized that posting in places frequented by class members—such as PPL's website and mobile app are—is an effective way to supplement direct notice. *See Martin v. Weiner*, 2007 WL 4232791, at \*3 (W.D.N.Y. Nov. 28, 2007) (finding web notice on defendants' website would be an effective way to provide notice to settlement class members and ordering defendants to post notice on their websites); *see also City Select Auto Sales Inc. v. BMW Bank of N.A. Inc.*, 867 F.3d 434, 445–46 n.15 (3rd Cir. 2017) (Fuentes, J., concurring) (collecting cases where courts permit notice by, *inter alia*, posting in places frequented by class members); *Engesser*, No. 25-cv-01689, ECF No. 125, Preliminary Approval Order ¶ 4 (approving notice to CDPAP consumers of Rule 23(b)(2) settlement by, *inter alia*, posting to defendants' website). The Notice plan, taken as a whole, provides multiple means of notice that are highly likely to inform downstate PAs about the Settlement and their rights with respect to it.

Finally, Plaintiffs' counsel have written the various notices in plain language, and designed them so that they comply with standards and templates developed by the Impact Fund— an organization that has invested considerable time and resources into studying ways to improve class action notices such that they provide more effective, understandable notice to class members. Baran Decl. ¶ 23. The notices will also be available on the Settlement Website—which will itself be easily translatable into multiple languages—in multiple languages spoken by PAs, and the Settlement Administrator will provide telephone- and email-based support in multiple languages. Agmt. ¶ 96; Longley Decl. ¶ 21 & Ex. 2.

Accordingly, for all these reasons, the proposed methods and form of notice satisfy the due process requirements of Rule 23(c), providing "the best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see Campbell*, 2025 WL 1874485, at *14.

## IV. THE COURT SHOULD APPOINT THE SETTLEMENT ADMINISTRATOR AND SCHEDULE A FINAL FAIRNESS HEARING.

Finally, the Court should appoint Atticus Administration as the Settlement Administrator to facilitate the notice procedure described above, and the Court should schedule a final fairness hearing in this matter to finally approve the Class Settlement and to finally certify a Settlement Class.

After a competitive bidding process, Atticus was selected as the appropriate and cost-effective among the six bids for administration. *See* Baran Decl., Ex. F (declaration of Atticus CEO setting forth Atticus Administration's credentials, and Atticus's proposal) (describing bid process). This procedure ensured that Settlement Class Members will receive high quality, detail-oriented settlement administration without overpaying for the service. *See, e.g.*, *In re Nano-X Sec. Litig.*, 2023 WL 12071594, at *3 (E.D.N.Y. Oct. 31, 2023) (appointing proposed settlement administrator selected through a bidding process).

In accordance with the parties' Settlement Agreement, Plaintiffs requests that the Final Fairness Hearing be held no earlier than 150 days following the grant of Preliminary Approval, or as soon thereafter as available on the Court's Calendar. *See* Agmt. Ex. 10, Proposed Order.

## CONCLUSION

For all of the reasons stated above, Plaintiffs respectfully request that the Court enter the proposed Order and: (1) grant Preliminary Approval; (2) certify the proposed Rule 23 Settlement Class; (3) appoint Plaintiffs' Counsel as Class Counsel and the Plaintiffs as Class Representatives; (4) authorize notice to similarly situated employees; (5) appoint Atticus Administration as Settlement Administrator and authorize it to send and post the proposed Notices to the proposed Settlement Classes; and (6) set a Final Fairness Hearing for no earlier than 150 days following the grant of Preliminary Approval.

Dated: New York, New York
June 23, 2026

**KATZ BANKS KUMIN LLP**
/s/ Hugh Baran
Hugh Baran (he/him)
Emma Walters (she/her)
Avi Kumin (he/him)[†]
111 Broadway, Suite 1403
New York, NY 10006
(646) 759-4501
baran@katzbanks.com
walters@katzbanks.com
kumin@katzbanks.com

**THE LEGAL AID SOCIETY**
Elizabeth Saylor (she/her)
B. Franco Olshansky (she/her)
Richard Blum (he/him)
Rebekah Cook-Mack (she/her)
Michael Diller (he/him)
Rebecca Antar (she/her)
Belkys Garcia (she/her)
49 Thomas Street, Fl 5
New York, NY 10013

(332) 227-7291
esaylor@legal-aid.org
bfrancoolshansky@legal-aid.org
rblum@legal-aid.org
rcook-mack@legal-aid.org
mdiller@legal-aid.org
rantar@legal-aid.org
brgarcia@legal-aid.org

*Counsel for Plaintiffs and the Proposed Settlement Class*

† *Pro hac vice motion to be filed*

<h1 style="text-align:center">CERTIFICATE OF COMPLAINCE</h1>

Pursuant to Local Civil Rule 7.1 and the Individual Practice Rules of Senior Judge Frederic Block and Magistrate Judge Lara K. Eshkenazi, I certify that the above Memorandum of Law in Support of Plaintiffs' Unopposed Motion for Preliminary Approval, Preliminary Class Certification, Appointment Of Class Counsel, And Other Relief  was prepared using a computer, and that it contains 15,563 words, and therefore complies with Local Civil Rule 7.1 and the Court's June 3, 2026 Order granting Plaintiffs' motion for leave to file up to 50 pages.

This word count excludes the parts of the document exempted by the Local Rules (specifically: the caption, table of contents, table of authorities, signature block, and any required certificates of service). In preparing this certification, I have relied on the word-count function of the word-processing system (Microsoft Word) used to prepare this document.

Dated: New York, NY
June 23, 2026

/s/ Hugh Baran
Hugh Baran (he/him)
Katz Banks Kumin LLP
111 Broadway, Suite 1403
New York, NY 10006
(646) 759-4501
baran@katzbanks.com

*Counsel for Plaintiffs and the Proposed Settlement Class*