

42nd Floor
1251 Avenue of the Americas
New York, NY 10020-1104

**Roy P. Salins**
212-603-6435 tel
212-379-5213 fax

roysalins@dwt.com

July 20, 2026

**By ECF Filing**
Honorable Lara K. Eshkenazi
United States District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     Philip Calderon, et al. v. Public Partnerships, LLC, No. 25 Civ. 2320 (FB)(LKE)

Dear Judge Eshkenazi:

This firm represents defendant Public Partnerships, LLC ("PPL") in the above-referenced matter. As set forth in the parties' status report, dated July 8, 2026 (which was "so ordered" by the Court on July 10, 2026), we write to address PPL's introduction of a voluntary dispute resolution agreement ("DRA") with personal assistants ("PAs") who receive payment from PPL through New York State's Consumer Directed Personal Assistant Program ("CDPAP").

As the Court is aware, the New York State Department of Health ("NYSDOH") identified PPL as the single CDPAP statewide fiscal intermediary, effective April 1, 2025. As of that date, PPL replaced approximately 650 fiscal intermediaries that had previously provided payroll services in CDPAP to approximately 300,000 PAs throughout New York. Because CDPAP is a Medicaid-funded program, those payments are subject to a specific and detailed regulatory regime – and, in fact, New York's transition from hundreds of fiscal intermediaries to a single statewide fiscal intermediary had the general goal of reducing the potential for waste, fraud and abuse in CDPAP.

By any reasonable measure, the transition to PPL as the statewide fiscal intermediary has been a success. PAs are being paid for the time they work in a timely manner. To the extent that payments are inaccurate or untimely, they are the vanishingly small exception to the rule – and PPL stands ready to address those issues as they are presented to it. It is in this context that PPL plans to introduce the DRA that will promptly address concerns presented by PAs, while simultaneously addressing the risk that PPL will remain in a never-ending loop of class and collective actions related to payroll issues stemming from its role as the statewide fiscal intermediary. Specifically, PPL's voluntary DRA ensures that PAs' complaints will be addressed in real time, in a manner tailored to the specific concerns of each complaint – to the mutual benefit of PPL, the PAs and the consumers they serve.

**DWT.COM**

**THE DISPUTE RESOLUTION AGREEMENT**

Enclosed as Exhibit A is the DRA that PPL proposes introducing to current PAs. This DRA would be distributed to: (i) current downstate PAs who are members of the preliminarily certified class in *Calderon*; (ii) current downstate PAs who are not members of the preliminarily certified class in *Calderon* (i.e., downstate PAs who have started since May 1, 2026); and (iii) current upstate PAs in the putative class in the pending lawsuit, *Flanagan v. Public Partnerships, LLC*, No. 25 Civ. 6225 (W.D.N.Y.) (the "*Flanagan* case").[1] The DRA is similar in material respects and contains language that has previously been approved in the context of pending wage-and-hour litigation. *See, e.g.*, *Carusillo v. FanSided, Inc.*, No. 20 Civ. 4766, 2021 WL 4311167, at *6-7 (S.D.N.Y. Sept. 21, 2021).

*The DRA Is Voluntary And Clearly Excludes Pending Wage/Hour Litigation*

The DRA advises PAs, in bolded plain language on the first page, that "this Agreement is not required for you to be a personal assistant in CDPAP." It also makes clear that PAs have the right to consult counsel of their choosing and to decline participation in the DRA by providing written notice to PPL within 30 days of receipt.

Most significantly, to avoid confusion among current PAs, the DRA expressly preserves the rights of PAs to participate as class members in this matter and the *Flanagan* case regardless of whether they participate in the DRA. Specifically, the DRA to current PAs states:

<u>**NOTICE REGARDING EXISTING CLASS ACTION**</u>
<u>**LAWSUITS**</u>

**1.      Pending *Calderon* Lawsuit – (This section applies to personal assistants involved in the <u>*Calderon vs. PPL*</u> class action lawsuit).**

**➤      Please note that this Agreement does not affect your ability to pursue or recover payment related to any claims asserted or released in *Calderon*. If the proposed settlement in *Calderon* is approved, and you are entitled to payment under that settlement, you can receive that payment regardless of this Agreement (unless you choose to opt out of the settlement). This Agreement applies only to claims that are not already part of an existing class action lawsuit such as *Calderon*.**

---

[1] Enclosed as Exhibit B is the DRA that PPL proposes introducing to new PAs. Those new PAs would generally not be members of the *Calderon* class, but could be members of the putative class in the *Flanagan* case.

**2.     Pending Flanagan *Lawsuit* – (This section applies to personal assistants involved in the *Flanagan vs. PPL* class action lawsuit).**

**Please note that this Agreement does not affect your ability to pursue any claims asserted and certified for class treatment in *Flanagan*. If you are eligible to participate as a class member in the *Flanagan* lawsuit, you may do so regardless of this Agreement. This Agreement applies only to claims that are not already part of an existing class action lawsuit such as *Flanagan*.**

(*See* Ex. A.)  Furthermore, the DRA clearly advises PAs on their rights to decline the DRA:

## NOTICE REGARDING YOUR ABILITY TO DECLINE THIS AGREEMENT

**This Agreement is not required for you to be a personal assistant in CDPAP. You may decline this Agreement by sending an email or letter to PPL at [EMAIL ADDRESS] or by U.S. Mail to: [ADDRESS] and telling PPL that you wish to decline participation in this Agreement.**

➢     If you want to decline this Agreement, you must send the email or letter within 30 days of the date you receive this Agreement.

➢     You may decline only for yourself, not for any other person.

➢     You have the right to speak to your own lawyer about whether to decline this Agreement.

➢     You will not be subject to retaliation if you decline this Agreement.

(*Id.*)  The DRA, therefore, makes it abundantly clear that it does not apply to claims preliminarily certified in this lawsuit and that PAs my decline the DRA for purposes of other claims they may have against PPL.

*The DRA Includes A Class Action Waiver And Explains What Is Not Subject To Arbitration*

The DRA prominently discloses the existence and effect of the class and collective action waiver. It explains in plain language that covered disputes will be resolved individually in arbitration rather than through court proceedings. Specifically, paragraph 4 of the DRA (on page 2), states in plain language:

> You agree that any problem that you or PPL have will be arbitrated individually. Except as provided in the NOTICE above, this means that PPL and you both agree not to participate in any class, collective, or representative lawsuit against the other, and that you or PPL's problems cannot be joined with others except as allowed by the American Arbitration Association Employment Mass Arbitration Rules.

Importantly, the DRA also advises PAs of the categories of claims that are not arbitrable. Paragraph 5 states, "[c]laims not legally allowed to be arbitrated include claims relating to workers' compensation benefits, unemployment compensation benefits, sexual harassment claims, sexual assault claims, and requests for injunctive relief."[2]

*The DRA's Processes Are Set Forth In Plain Language To Avoid Confusion*

The DRA establishes a multi-step dispute resolution process intended to facilitate prompt and efficient resolution of PA concerns before arbitration becomes necessary. Specifically, PAs are instructed to report concerns directly to PPL through a dedicated telephone number or e-mail address. Payroll-related concerns are escalated to a designated escalation team that will contact the PA within three business days to discuss the issue. If PPL determines that additional compensation is owed, payment will be issued in the next payroll cycle.

Only if a dispute cannot be resolved through this internal process does the DRA call for arbitration. The DRA provides that arbitration will proceed under the Federal Arbitration Act ("FAA") and pursuant to the American Arbitration Association ("AAA") Employment Arbitration Rules and, where applicable, the AAA Employment Mass Arbitration Rules. The DRAs further provide that PPL will bear all arbitration-related costs (including the entire filing fee), while preserving any statutory fee-shifting to which the PA may be entitled.

---

[2] From a procedural perspective, the DRA informs PAs that issues relating to jurisdiction, enforceability, validity, and scope are delegated to the arbitrator, and it contains severability provisions ensuring that any invalid provision may be severed without affecting the enforceability of the remaining terms

The roll-out process for current PAs is as follows:[3] PPL will provide notice through Time4Care and Telephony directing the PA to review the DRA through the PPL@home online portal. The notification will continue appearing until the PA accesses the DRA. Once the PA opens the DRA, the PA likewise must scroll through the DRA and click a confirmation button indicating that the PA has "read and understand[s]" the DRA. Current PAs may decline participation by sending written notice to PPL within 30 days by e-mail.

## LEGAL ANALYSIS

*Absent Confusion, Businesses Are Generally Permitted To Communicate With Class Members In Accordance With Strong Federal Policy In Favor Of Arbitration*

The DRA is a lawful and appropriate communication with class members – whether a putative class or a class preliminarily certified for settlement purposes. Courts evaluating arbitration agreements introduced during the pendency of collective or class litigation focus principally on whether the communications are misleading, coercive, confusing, or are improperly designed to undermine participation in the litigation. *See O'Conner v. Agilant Sols., Inc.*, 444 F. Supp. 3d 593, 600-01 (S.D.N.Y. 2020) (citing *Gulf Oil Co. v. Bernard*, 452 U.S. 89 (1981)). At the same time, courts recognize that businesses retain the right to communicate with workers in the ordinary course of business, including regarding arbitration agreements. *See Gulf Oil*, 452 U.S. at 104; *Carusillo v. FanSided, Inc.*, No. 20 Civ. 4766, 2021 WL 4311167, at *6-8 (S.D.N.Y. Sept. 21, 2021). Restrictions on communications require "a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Gulf Oil*, 452 U.S. at 101-02.

The FAA strongly favors enforcement of arbitration agreements in accordance with their terms. *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991); *Perry v. Thomas*, 482 U.S. 483, 489 (1987). Courts, therefore, have permitted businesses to implement arbitration agreements during pending class litigation so long as the rollout procedures are not misleading or coercive and workers receive meaningful notice and an opportunity to decline participation. *See Carusillo*, 2021 WL 4311167, at *6-7; *Lawrence v. NYC Med. Practice, P.C.*, No. 18 Civ. 8649, 2023 U.S. Dist. LEXIS 126558, at *31-32 (S.D.N.Y. July 21, 2023) (rejecting the argument that the introduction of arbitration agreements during the pendency of class or collective litigation is unconscionable as a "hard and fast rule" – rather, courts "should [examine] the entirety of defendant's conduct and communications [and there is no] statutory rule or case law that requires defense counsel to give

---

[3] The rollout process is different for new PAs. For new PAs, the DRA will be presented electronically along with other enrollment materials during the onboarding process. The PA will scroll through the DRA and click a confirmation button indicating that the PA has "read and understand[s]" the DRA. Any PA who wishes to decline participation may do so by following the opt-out procedure set forth in the DRA itself – specifically, by sending written notice to PPL via e-mail within 30 days.

specific information and instructions to putative class members, nor [are there] any 'magic words' that must be disclosed [in communications]") (quoting *Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 269 (S.D.N.Y. 2020)).

*The Southern District Of New York Recently Approved A Similar Arbitration Agreement*

Judge Oetken's decision in *Carusillo* is particularly instructive. There, the Southern District of New York approved a business's rollout of updated arbitration agreements to putative collective members during the pendency of an FLSA collective action. The court emphasized several features demonstrating that the communications were not coercive or misleading, including: (1) "prominent, clear, and unambiguous class and collective action waivers"; and (2) clear notice of the employee's right to decline participation in the arbitration agreement. 2021 WL 4311167, at *6. The court further explained that there was "nothing misleading, coercive, or confusing" about agreements where employees had a meaningful opportunity to decline and were adequately informed of the litigation and the effect of the arbitration provision. *Id.*, at *6.

Indeed, the DRA contains stronger protections than the agreements approved in *Carusillo*. In *Carusillo*, the court approved agreements that carved out participation in the pending litigation for current workers. *Id.* Here, the DRAs for both current and future PAs expressly preserve participation rights relating to pending litigation and repeatedly clarify that the DRAs apply only to claims not already asserted or certified.

*The DRA Contains The Necessary Disclosures To Avoid Confusion*

Significantly, a dispute resolution agreement like the DRA that is issued during the pendency of class litigation is not presumed to be an impermissible intrusion on the court's managerial duty. For example, in *Stevenson v. Great Am. Dream, Inc.*, the court upheld an arbitration agreement, holding:

> Edwards argues that an otherwise permissible arbitration agreement is unconscionable if it was executed during the pendency of a collective action for which the signatory may potentially have been a participant. This argument fails. Regardless of whether there is a pre-existing collective action, the effect of the arbitration agreement is the same: it prevents the signatory from litigating her FLSA claim in a judicial forum.
>
> . . .
>
> Here, as Edwards herself acknowledges, the Defendant did not communicate with her about this case. The Defendant simply did what it was allowed to do: it "require[d] [its] employee[s] to

arbitrate, rather than litigate, rights under various federal statutes."
[citations in footnote omitted] Although this may incidentally affect
the litigation by reducing the total number of participants, that alone
does not compel the Court to disregard an otherwise valid arbitration
agreement.

No. 12 Civ. 3359, 2014 WL 3519184, at *1-2 (N.D. Ga. July 15, 2014). Furthermore, in *Lillehagen v. Alorica, Inc.*, the business issued an arbitration agreement without disclosing the pending class litigation. No. 13 Civ. 92, 2014 WL 12768156 at *7 (C.D. Cal. Dec. 18, 2014). Although this could appear to create confusion, the court held that there was "nothing in the records potentially showing that the Opt-In Plaintiffs did not understand that they were agreeing to arbitrate their disputes with [defendant] or that the Agreements were otherwise invalid." *Id.* Here, of course, PPL advises PAs that the DRA does not affect their membership in the *Calderon* or *Flanagan* classes.

The clear protections contained in the DRA readily distinguish it from those in which courts have invalidated an arbitration agreement signed during pending litigation. *See, e.g.,* *O'Connor v. Uber Techs., Inc.*, 2013 WL 6407583, at *7 (N.D. Cal. Dec. 6, 2013) (ordering that, for an arbitration agreement to be binding, "Uber drivers must be given clear notice of the arbitration provision, the effect of assenting to arbitration on their participation in this lawsuit, and reasonable means of opting out of the arbitration provision within 30 days of the notice"); *Griffin v. Aldi, Inc.*, No. 16 Civ. 354, 2017 WL 1957021 (N.D.N.Y. May 11, 2017) (quoting *O'Conner* for the proposition that "Courts have . . . found procuring . . . arbitration agreements without providing adequate information about the pending class action [constitutes] misleading communications which the court may limit.") The same considerations weigh in *support* of enforceability here:

- The DRA prominently discloses the existence of pending litigation and expressly preserves class members' ability to participate regardless of the DRA.

- The DRA expressly states, in plain language, that participation is voluntary and not required for a PA to continue providing services through CDPAP.

- The DRA provides a straightforward 30-day declination procedure and expressly prohibits retaliation against any PA who declines participation.

Moreover, we anticipate that plaintiffs will cite to *Avery v. TEKSystems*, 165 F.4th 1219 (9th Cir. 2026). That case, however, is inapposite. There, the Ninth Circuit Court of Appeals affirmed the District Court's decision that the employer's communications accompanying arbitration agreement were "misleading and omitted key information." *Id.* at 1221-1222. Those communications "repeatedly disparaged the efficacy of class actions and misleadingly claimed

that class actions are 'wasteful, inefficient means for resolving disputes.'" *Id.* at 1231. There is no such language in the DRA, and PPL will use no such language in the rollout process.

Furthermore, the rollout procedures reduce the possibility of confusion or coercion. Unlike the agreement criticized in *Williams v. Securitas Security Servs. USA, Inc.*, No. 10 Civ. 7181, 2011 WL 2713741, at *2-3 (E.D. Pa. July 13, 2011), where employees were deemed to have accepted arbitration automatically unless they declined, the DRA requires PAs to access the DRA directly, scroll through the document, and affirmatively acknowledge that they have read and understood it. *See Carusillo*, 2021 WL 4311167, at *7. The DRA repeatedly discloses the declination procedure and provide PAs a full 30 days to decline participation.[4] Court applying *Williams* have found these distinguishing factors material when finding no impropriety in introducing arbitration agreements while litigation is pending. *See, e.g., Goodman v. Burlington Coat Factory Warehouse Corp.*, No. 11 Civ. 4395, 2014 U.S. Dist. LEXIS 194492, at *6-7 (D.N.J. Aug. 20, 2014) ("In contrast to the *Williams* case, plaintiffs have failed to show that the [DRA] is misleading or coercive. It is neither long nor complex and is not misleading"); *Jones v. Judge Tech. Servs.*, No. 11 Civ. 6910, 2014 U.S. Dist. LEXIS 109551, at *19-22 (E.D. Pa. Aug. 6, 2014) (applying *Williams* to conclude that the agreements in question "simply do not contain the sort of confusing, misleading or unfair communication that warrants our intervention").

Finally, the DRA serves substantial and legitimate business purposes independent of this litigation. PPL operates the statewide fiscal intermediary system serving approximately 300,000 PAs throughout New York. The DRA is specifically designed to facilitate prompt identification and resolution of payroll and administrative concerns, including by requiring escalation-team review of payroll complaints within three business days and prompt correction of any identified underpayments. Courts consistently recognize that businesses may implement arbitration agreements as part of ordinary business operations during pending litigation where, as here, the rollout is transparent, non-coercive, and accompanied by meaningful opt-out rights and clear notice concerning pending litigation. *See Carusillo*, 2021 WL 4311167, at *6-7; *Stevenson*, 2014 WL 3519184, at *1-2.

For these reasons, PPL respectfully requests that the Court approve both the forms of the DRA enclosed as Exhibits A (current PAs) and B (new PAs) and the manner in which PPL has proposed to roll out the DRAs. To the extent the Court has concerns regarding confusion, PPL will amend the DRA accordingly pursuant to the Court's instructions.

---

[4] The DRA also contains additional procedural safeguards supporting their enforceability and fairness. For instance, PPL bears all arbitration-related costs (including the entire filing fee); statutory remedies and fee-shifting provisions remain available; claims that are not legally arbitrable are expressly excluded; and any disputes regarding enforceability or scope are delegated to the arbitrator pursuant to the FAA and AAA rules.

We thank the Court for its consideration of this matter.

Respectfully submitted,

Roy P. Salins