# KATZ BANKS KUMIN

**Hugh Baran, Partner**
**Emma Walters, Senior Associate**
**Phone:** 646-759-4501
**Email:** baran@katzbanks.com
       walters@katzbanks.com

August 7, 2026

<u>**Via ECF**</u>

The Hon. Lara K. Eshkenazi, United States Magistrate Judge
United States District Court, Eastern District of New York
225 Cadman Plaza East, Brooklyn, NY 11201

      Re: *Philip Calderon, et al. v. Public Partnerships, LLC*, No. 25-cv-02320 (FB)(LKE)

Dear Judge Eshkenazi:

Katz Banks Kumin LLP and The Legal Aid Society represent Plaintiffs and Class Representatives Philip Calderon, Farshad Pinchasi, Allison Fields, and Dana Folgar, and the preliminarily certified Settlement Class of downstate personal assistants in the above-referenced matter. We write to respond to the letter submitted on July 20, 2026, by Public Partnerships, LLC ("PPL"), and to request this Court enter an order under Federal Rule of Civil Procedure 23(d) barring PPL from distributing the proposed arbitration provision—or any other arbitration provision—to Settlement Class Members before the Court has entered an order on final approval of the $162 million settlement. *See* ECF No. 67.

As Class Counsel discussed with the Court at the preliminary approval hearing on July 1, 2026, the rollout of an arbitration provision before final approval of the Settlement is likely to interfere with the Court-approved notice process and cause significant confusion among Settlement Class Members. A simultaneous distribution of both Court-approved Class Notice *and* an arbitration provision—both of which allow for opt-out procedures—unnecessarily introduces confusion into the ongoing settlement notice process and potentially jeopardizes personal assistants from accessing the benefits of the Settlement.

Specifically, distribution of the arbitration provision to Settlement Class Members may: (1) lead Settlement Class Members to opt out of the settlement, confusing it with the opt-out procedure of the arbitration provision; or (2) cause Settlement Class Members to believe the arbitration provision is a term of the settlement itself, and lead them to opt-out or object to the Settlement on that basis.

PPL's second attempt at an arbitration provision cannot be separated from the confusion its initial forced arbitration rollout has already created among personal assistants. As the Court is aware, PPL first introduced a forced arbitration provision on June 23, 2026—after it had signed the Settlement Agreement and hours before Plaintiffs filed their unopposed motion for preliminary approval—via a pop-up notification in the PPL mobile time entry application. Personal assistants were unable to clock in or out of their shifts unless they "acknowledge[d]" the provision. On its face, the provision appeared to apply to the claims in this case. Although PPL ultimately rescinded that provision, Class Counsel is aware from conversations with Class Representatives, review of personal assistant message boards and Facebook forums, and from other legal service providers in the CDPAP program that the original provision caused significant confusion.

# KATZ BANKS KUMIN

The Hon. Lara K. Eshkenazi
August 7, 2026
Page 2

No matter the specific wording that PPL may use in a new arbitration provision, it cannot un-ring the bell of its initial botched rollout; confusion persists and will necessarily color Settlement Class Members' perspectives on this new provision and their eligibility for relief. In this context, implementing an arbitration provision will thwart the Parties' shared goal of facilitating participation in the preliminarily approved Settlement, as well as the Court's interest in the efficient and just resolution of this action. Fed. R. Civ. P. 1. Therefore, Plaintiffs urge the Court to exercise its authority under Federal Rule of Civil Procedure 23(d) to bar PPL from distributing its proffered arbitration provision to members of the Settlement Class until after the Court's decision on Final Approval. *See* Proposed Order.

## I.  BACKGROUND[1]

### A.  *After Executing the Settlement Agreement, PPL Caused Widespread Confusion by Distributing a Forced Arbitration Provision on its Mobile Application.*

At or around 6:30pm on June 23, 2026, PPL executed the now-preliminarily approved Settlement Agreement.[2] ECF No. 55-3. That same day, after signing the Settlement Agreement, and as Plaintiffs were preparing to meet the June 23 filing deadline set by the Court and file the Unopposed Motion for Preliminary Approval, ECF No. 55, PPL launched a click-wrap, pop-up forced arbitration provision on its mobile application Time4Care. *See* Exhibit 1 (June 23, 2026 forced arbitration provision).[3] The provision stated, among other things:

> This Agreement is required to be an employee of PPL. I understand that this Agreement requires me to bring any unresolved problem that I have with my pay to mandatory arbitration, not to a court or jury trial.
>
> . . . .
>
> I agree that any problem that I have will be arbitrated individually. This means that I agree not to participate in any class, collective, or representative lawsuit, and that my problems cannot be joined with

---

[1] For the purposes of this motion, Plaintiffs presume the Court's familiarity with this matter's procedural history, and herein incorporate the detailed procedural history recounted in Plaintiffs' Memorandum of Law in Support of Plaintiffs' Unopposed Motion for Preliminary Approval, ECF No. 55-1, at 7–8.

[2] As this Court is aware, in exchange for a release of Settlement Class Members' claims through the Settlement Execution Date—which included claims that (1) PPL allegedly failed to pay personal assistants at the correct rate for all hours worked in violation of the Fair Labor Standards Act and the New York Labor Law ("NYLL"), and (2) that PPL's mandated benefits program violated the New York Home Care Worker Wage Parity Act, the NYLL, and the New York State Paid Sick and Safe Leave Law—PPL agreed to pay a minimum of $162,000,000 and end the mandatory MEC Health Plan, among other relief. *See* Mem. ISO Preliminary Approval, ECF No. 55-1, at 8–12.

[3] In light of the Court allowing briefing by letter, Class Counsel has not introduced exhibits by declaration. However, we are happy to supplement this letter with a declaration should the Court require.

others except as allowed by the American Arbitration Association
Employment Mass Arbitration Rules.

Ex. 1. Nowhere did the first mandatory arbitration provision make any reference to the instant action against PPL, even though PPL had just that evening signed the Settlement Agreement.

PPL's decision to implement a forced arbitration provision via its timekeeping system—calling it a condition of continued employment while offering no way to bypass the pop-up notification—meant that personal assistants were unable to clock in or out of their shifts unless they clicked that they "understood" and "acknowledge[d]" the provision. Ex. 1. PPL launched the forced arbitration provision without notice to Class Counsel.

Almost immediately, potential Settlement Class Members expressed widespread confusion about PPL's roll-out of the mandatory arbitration provision. *See, e.g.*, Ex. 2. After filing the motion for preliminary approval, Plaintiffs contacted PPL's counsel to oppose the forced arbitration provision, noting that the sudden pop-up requirement was causing documented confusion among personal assistants, and demanded its rescission. Ex. 3 (email from H. Baran to R. Salins). The following morning, Plaintiffs conferred with PPL counsel about the need for immediate rescission and clear communication thereof to personal assistants. Accordingly, by 9:25am on the morning of June 24, 2026, PPL counsel advised that PPL had removed the pop-up and arbitration provision from its timekeeping application. By 9:45a.m., after further discussion with Plaintiffs' counsel about providing clarifying notice to personal assistants, PPL posted an online notice on its website that "Personal assistants may have received a pop-up message when logging in or out of PPL's systems starting June 23, 2026. That pop-up should be disregarded and has been removed. The policy that it stated is rescinded." *See* Ex. 4 (screenshot of website notice). However, as of the date of this filing, that notice is no longer present on PPL's website. *See* Ex. 5 (screenshot showing only the settlement notice).

### B. PPL Stated Its Intent to Move Forward with A New Arbitration Provision.

Settlement Class Members have continued to express confusion about whether the first mandatory arbitration provision remains in effect. Particularly for those who had no choice but to "acknowledge" the provision to bypass the pop-up in order to clock in or out, Class Counsel has heard and read many reports from personal assistants who are worried the arbitration provision is still in effect and may impact their ability to participate in the Settlement.

Despite PPL's awareness of this ongoing uncertainty, and notwithstanding Class Counsel's objections, on June 26, 2026, PPL's counsel informed the undersigned of PPL's plan to impose a substitute arbitration provision prior to final approval of the proposed Settlement. After the Court granted preliminary approval from the bench on July 1, 2026, counsel for PPL raised its intention and sought court approval to roll out a second arbitration provision and class action waiver, over Plaintiffs' counsel's objection. Tr., ECF No. 59, at 20:6-11.

In response to the Court's query as to why PPL sought to institute an arbitration provision during the brief period between preliminary and final approval rather than continue to operate without for a few additional months (as it has done for the last year and a half), PPL responded

# KATZ BANKS KUMIN

with the generalized concern that it was an "operational priority" to reduce risk.[4] Tr., ECF No. 59, at 20:6-11; 22:2-17.

### C. PPL Proposed a New (Similarly Deficient) Arbitration Provision.

On July 20, 2026, PPL submitted its proposed new arbitration provision to this Court. The new proposed arbitration provisions (one for all current statewide employees including Settlement Class Members, and one for new employees) are attached as Exhibits A and B to PPL's July 20, 2026 letter.[5] ECF Nos. 67-1 & 2. Among the arbitration provision's facially confusing provisions are the following:

(1) The "Notice Regarding Existing Class Action Lawsuits": While the proposed arbitration provision states that the provision "does not affect your ability to pursue or recover payment related to any claims asserted or released in *Calderon*," it does not describe what those claims are, and also references the Settlement opt-out procedure. It then says, "If the proposed settlement in *Calderon* is approved, and you are entitled to payment under that settlement, you can receive that payment regardless of this Agreement (unless you choose to opt out of the settlement). This Agreement applies only to claims that are not already part of an existing class action lawsuit such as *Calderon*." The same notice also references the upstate *Flanagan* case.

(2) The "Notice Regarding Your Ability to Decline this Agreemen": Upon reviewing the agreement, Settlement Class Members will be bound unless they send a letter or email opting out within thirty days "of the date [they] receive this Agreement." The proposed arbitration provision does not indicate that Settlement Class Members will be bound by default unless they opt out.

Ex. A to PPL Letter, ECF No. 67-1.

PPL has stated no plan to assist personal assistants who are not proficient in English, despite PPL's own knowledge that 20% or more of personal assistants (i.e., approximately 40,000 Settlement Class Members) speak a first language other than English.

Finally, PPL has proposed the following as to the distribution of the notice: According to PPL, notice would be provided through the Time4Care application and Telephony "directing the

---

[4] In its letter, PPL states that inaccurate and/or untimely payments "are the vanishingly small exception to the rule" of PPL's alleged wage compliance. But it also says that "PPL will remain in a never-ending loop of class and collective actions related to payroll issues stemming from its role as the statewide fiscal intermediary." *See* PPL Letter, ECF No. 67, at 1. Both things cannot be true.

[5] PPL seems also to be seeking approval of the arbitration provision as to potential *Flanagan* class members. However, as we observed in a prior letter to Your Honor, while a statewide arbitration provision by PPL would likely impact all personal assistants in New York State, those concerns are not before the Court here. ECF No. 64. Any concerns about the impact on potential *Flanagan* class members (who are not otherwise Calderon Settlement Class Members, as there may be personal assistants who work both upstate and downstate) can and should be raised with the *Flanagan* court. *See OConner v. Agilant Sols., Inc.,* 444 F. Supp. 3d 593, 606 (S.D.N.Y. 2020) (declining to rule on an arbitration agreement's viability as to non-putative class member employees).

PA to review the DRA [dispute resolution agreement] through the PPL@home online portal." ECF No. 67, at 5. That notification to review and acknowledge the forced arbitration provision would "continue appearing until the PA accesses the DRA." *Id.* PPL says that Settlement Class Members would then have to "scroll through the DRA and click a confirmation button indicating that the PA has 'read and understand[s]' the DRA." *Id*. Settlement Class Members are then bound by the arbitration provision unless they opt-out by email or letter within 30 days "of the date you receive this Agreement." ECF No. 67-1. PPL has not described when this 30-day period is triggered—i.e., if it is the date the pop-up was first received, or the date the Settlement Class Member first opens the full arbitration provision.

## II.    LEGAL STANDARD

To "protect class members and fairly conduct the action," Rule 23(d) allows a court to limit communications to class members by issuing orders that "require. . . giving appropriate notice to some or all class members" and/or "impose conditions on the representative parties." Fed. R. Civ. P. 23(d)(1). The Supreme Court has long established that to guard against the "potential for abuse," a "district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99–100 (1981). And as another court in this district recognized, "the Court bears the responsibility to protect the class and preserve the integrity of the process, and Rule 23(d) gives the Court the discretion to meet that responsibility." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,* 2014 WL 4966072, at *31 (E.D.N.Y. Oct. 3, 2014).

Accordingly, Rule 23 authorizes courts to limit communications in class actions and gives the court a "responsibility to restrict communications that are potentially coercive or misleading."[6] *Zamboni v. Pepe West 48th Street LLC*, 2013 WL 978935, at *2–3 (S.D.N.Y. Mar. 12, 2013) (citing *Gulf Oil*, 42 U.S. at 104). *Gulf Oil* does not require a finding of actual or willful misconduct "so long as the effect is to interfere with class members' rights." *O'Connor v. Uber Techs., Inc.*, 2013 WL 6407583, at *6 (N.D. Cal. Dec. 6, 2013) (finding arbitration communication was "likely to mislead potential class members."). Such limitations "should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties," and "should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances." *Gulf Oil,* 42

---

[6] To determine whether there has been actual (or potential) coercion or deception, courts may consider: (i) class members' relative vulnerability; (ii) evidence of actual or contextual risk of coercion; (iii) evidence of defendant's intention to narrow the class; (iv) whether the provision was imposed unilaterally; and (v) evidence "of misleading conduct, language, or omissions." *Chen-Oster v. Goldman, Sachs & Co.*, 449 F.Supp.3d 216, 255 (S.D.N.Y. 2020), report and recommendation adopted, 2021 WL 4199912 (S.D.N.Y. Sept. 15, 2021*) (collecting cases and listing relevant factors); *see, e.g., Pospisil v. ATP Tour, Inc.*, 349 F.R.D. 475, 481–82 (S.D.N.Y. 2025) (granting Rule 23(d) relief under the *Chen-Oster* factors); *Tomkins v. Amedisys, Inc.*, 2014 WL 129401, at *1-2 (D. Conn. Jan. 13, 2014) (granting protective order against defendant-employer's attempt to impose a "confusing, misleading, and one-sided," purportedly "self-executing" arbitration agreement that identified the ongoing litigation by name, but did "not contain any other information about the case" or the agreement's effect on employees' participation in the action).

U.S. at 101–02; *see Chime v. Peak Security Plus, Inc.*, 2016 WL 3440593, at \*3 (E.D.N.Y. June 20, 2016) (same).

Notably, courts have found a heightened risk of coercion where an ongoing employment relationship exists between parties. *See Zamboni*, 2013 WL 978935, at \*3 ("communications may be deemed inherently coercive" where "there is an ongoing and unequal business or employment relationship between the parties").

## III. ARGUMENT

### A. The Court Should Deny PPL's Request to Approve the Second Proposed Arbitration Provision to Settlement Class Members, and Bar PPL From Doing So Until After Final Approval Under Rule 23(d).

This Court has discretion to prevent PPL from promulgating the arbitration provision to Settlement Class Members during the notice period and until final approval. Under Rule 23(d), Class Representatives request that the Court decline to approve PPL's proposed specific communication, and bar PPL from issuing any other proposed arbitration provision to Settlement Class Members until final approval, to avoid confusion about any potential impact of the provision on the Settlement, to avoid unintended opt-outs, and—most importantly—to ensure the efficacy and clarity of the Settlement Notice meets due process requirements. Distribution and implementation of PPL's proposed arbitration provision to Settlement Class Members during the ongoing notice and settlement period will cause confusion, and risks actual or potential coercion or deception, for the reasons outlined below.

First, Settlement Class Members already have received a detailed notice in this action, and putting a separate arbitration policy in front of them adds confusion.[7] The Settlement involves a multi-part relief structure, a wide range of claims, and a broad release. It occurs against a backdrop of distrust of PPL by Settlement Class Members.[8] PPL's proposed "Notice Regarding Existing Class Action Lawsuits" section of the arbitration provision is likely to cause further confusion and mistrust. Settlement Class Members are still learning about the existence of this action. The proposed arbitration notice complicates matters further by adding the upstate *Flanagan* lawsuit, which does not apply to them (unless a personal assistant worked both downstate and upstate), to the mix. The 60-day notice period is designed to give Settlement Class Members the time to weigh the Settlement and its terms without interference. PPL should not be permitted to disturb this ongoing process with a confusing arbitration provision.[9]

---

[7] Settlement Administrator Atticus Administration ("Atticus") distributed email and text notices on July 21, 2026, and sent postcards on July 30, 2026, as provided in the Court-approved notice plan.

[8] *See, e.g.*, *Workers Say PPL Paycheck Problems Persist Months Into Transition*, NEWS10 (Aug. 5, 2025), https://www.news10.com/news/workers-say-ppl-paycheck-problems-persist-months-into-transition/; *CDPAP Advocates say PPL Payment Issues Continue*, NEWS10 (Dec. 10, 2025), https://www.news10.com/news/cdpap-advocates-say-ppl-payment-issues-continue/.

[9] Academic and sociological data have clearly established that the vast majority of recipients do not read clickwrap provisions, and that users simply click through whatever is required to bypass the notifications. The New York Court of Appeals recognized this, even as it permitted enforcement of such clickwrap arbitration provisions. *See Wu v. Uber*

Second, Settlement Class Members are particularly vulnerable to confusion given their diverse language needs and job demands caring for some of New York's most at-risk residents. As described above, PPL has not proffered a translation plan for non-English speaking personal assistants, although a substantial percentage of personal assistants speak a first language other than English. The language needs, education, access to information, and geography of the Settlement Class are highly relevant under Rule 23(d). *See Chen-Oster*, 449 F. Supp. 3d at 255 (considering the "relative vulnerability of the putative class members"); *see also Uber Techs,* 2013 WL 6407583, at *6 (discussing how an arbitration provision was particularly problematic where "many, if not the majority of, Uber drivers are smaller outfits run by immigrants for whom English is not their native language.").

Third, implementation of an arbitration provision that contains an opt-out process (named a declination procedure) during the pendency of the instant matter may lead Settlement Class Members to inadvertently opt-out of the Settlement as a result of understandably confusing the two procedures. Courts have held that "[c]ommunications that threaten the choice of remedies available to class members are subject to a district court's supervision[.]" *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 252 (S.D.N.Y 2005). Pursuant to the Court-approved opt-out procedure, Settlement Class Members may opt out of the Settlement by sending the approved Opt-Out Form to Atticus by either U.S. mail or email. *See* Opt-Out Form, available at https://www.publicpartnershipssettlement.com/wp-content/uploads/2026/07/Calderon-Opt-Out-Form.pdf. Similarly, Settlement Class Members may opt out of PPL's proposed arbitration provision by sending written notice to PPL by either U.S. mail or email. *See* ECF No. 67-1. The parallel processes operating simultaneously would no doubt "seek or threaten to influence the choice of remedies" available to Settlement Class members by increasing the risk of inadvertent opt-out, thus depriving Settlement Class Members of the benefits of the Settlement. *See In re Sch. Asbestos Litig.*, 842 F.2d 671, 683 (3d Cir.1988).

Fourth, the arbitration provision only speaks to whether Settlement Class Members may recover money under the Settlement—it does not, however, clearly state whether they may pursue claims covered under the Settlement (regardless of whether they opt-out of either the Settlement or the arbitration provision). *See* Ex. A ("Please note that this Agreement does not affect your ability to pursue or recover *payment* related to any claims asserted or released in *Calderon*.") (emphasis added). This may therefore appear to put a thumb on the scale as Settlement Class Members weigh their options, including whether to opt-out, by making them believe that they cannot pursue claims for the time period covered by this case outside the arbitration procedure if they opt out of the Settlement. *See id.* ("This Agreement applies only to claims *that are not already*

---

*Techs., Inc.*, 43 N.Y.3d 288, 313 (2024) ("If she did not read the terms [of a clickwrap arbitration provision], then plaintiff was like most people. The reality is that a majority of customers never read these terms.") (cited studies omitted.). Regardless of what the provision's language says, many personal assistants s will click through and make assumptions.

*part of an existing class action lawsuit* such as *Calderon*.") (emphasis added). That could raise potential due process concerns about the efficacy of the opt-out procedure.[10]

Fifth, and finally, the timing of PPL's arbitration policy may cause Settlement Class Members to believe that the arbitration provision is a condition of accepting the settlement, which is misleading and coercive. *See In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d at 253 ("If the class and the class opponent are involved in an ongoing business relationship, communications from the class opponent to the class may be coercive.") (quoting *Kleiner v. First Nat. Bank of Atlanta*, 751 F.2d 1193, 1202 (11th Cir. 1985)); *see also Camp v. Alexander*, 300 F.R.D. 617, 624 (N.D. Cal. 2014) ("The caselaw nearly universally observes that employer-employee contact is particularly prone to coercion[.]"). This may cause people who do not want to accept an arbitration clause to opt out of the Settlement—or to object (and possibly appeal) based on that misunderstanding. Such avoidable delays would further reduce the value of the Settlement monies to Settlement Class Members, as it is well established that money loses its "time value" the longer it goes unpaid. *See generally Levy v. Endeavor Air Inc.*, 638 F. Supp. 3d 324, 330 (E.D.N.Y. 2022) (discussing the "time value of money" as a matter of economics, noting that "the delay in payment . . . necessarily means that plaintiffs were forced to wait to receive money that, as compared with when they should have received it, was, when they did receive it, worth less.").

While the concerns outlined above are at their peak during the opt-out period of the Settlement, they do not abate until a final approval order is issued by the Court. Until the Court grants final approval of the Settlement, potential changes to the Settlement Agreement as could potentially be required by the Court may necessitate further notice to Settlement Class Members and the opportunity to opt out. Any arbitration provision implemented before the action is final runs the risk of confusing matters for Settlement Class Members. Accordingly, because both the substance and the timing of PPL's proposed arbitration provision to Settlement Class Members are misleading and will undoubtedly lead to serious risk of confusion and deception if issued before final approval, Plaintiffs request that this court exercise its authority under Rule 23(d) to deny PPL's request to approve the proposed arbitration policy and the associated roll-out process to Settlement Class Members, and to limit <u>any</u> arbitration policy from being distributed to Settlement Class Members prior to final approval.[11]

## B. PPL's Cited Cases—Which Do Not Cover Proposed Arbitration Agreements Distributed Between Preliminary and Final Approval—Are Inapposite.

PPL cites a variety of cases (both in and outside of the Second Circuit), that it claims supports the distribution of its proposed arbitration agreement provision. PPL's cited cases are easily distinguishable as they do not address the question at hand: whether the dissemination of an arbitration provision between preliminary and final approval risks coercion and confusion, and

---

[10] This concern, and others, might require further corrective notices to the Settlement Class to mitigate the impact of the arbitration provision, should the Court permit it to be distributed. This would potentially require a lengthier notice period and additional rounds of noticing, reducing the amount to be paid out to Settlement Class Members.

[11] The "Exhibit A" version of the arbitration policy would be sent to current employee Settlement Class Members. The "Exhibit B" version, however, could also end up being given to Settlement Class Members, to the extent a personal assistant has left the program but returns to care for another consumer and must register anew with PPL.

The Hon. Lara K. Eshkenazi
August 7, 2026
Page 9

whether it is thus appropriate for Court intervention under Rule 23(d). Indeed, Class Counsel has not found *any* cases that support PPL's request to allow such a communication.

Several of the cases on which PPL relies only considered arbitration provisions applicable to non-class members. For example, not only did the arbitration clause at issue in *Jones v. Judge Tech. Servs. Inc.,* 2014 WL 3887733, at *6–7 (E.D. Pa. Aug. 7, 2014), occur *before* the court approved issuance of class notice, but it only applied to employees not included in the class. And in *Lillehagen v. Alorica, Inc.*, 2014 WL 12768156, at *1–5 (C.D. Cal. Dec. 18, 2014)*,* the court considered an employer's motion to compel arbitration agreements allegedly disseminated to non-collective members after the case was filed but six months before potential opt-in plaintiffs received notice.

PPL's remaining cases all relate to the ability to send arbitration provisions outside of the notice period, with the majority involving arbitration requirements issued before even conditional and/or class certification, and not in a settlement posture.[12] For example, in *Stevenson v. Great Am. Dream, Inc.*, 2014 WL 3519184, at *1 (N.D. Ga. July 15, 2014), the court did not even engage in an analysis discussion under Rule 23(d), rather discussing the unconscionability of an arbitration provision disseminated after employees had moved for conditional certification (but on which the court had not yet ruled on) but before potential opt-in plaintiffs had opted in to the litigation. Likewise, the court in *Lawrence v. NYC Med. Prac., P.C.*, 2023 WL 4706126, at *2, 9 (S.D.N.Y. July 21, 2023), only discussed the unconscionability of an arbitration provision distributed *more than two years* prior to class certification. In *Goodman v. Burlington Coat Factory Warehouse Corp.*, 2014 WL 12607854, at *1 (D.N.J. Aug. 20, 2014), defendant sent the arbitration provision (which included an attached opt-out form) nearly two years after conditional certification—not mere weeks to months after the distribution of class notice. Finally, the employer in *Griffin v. Aldi, Inc.,* 2017 WL 1957021, at *4 (N.D.N.Y. May 11, 2017), conceded "the impropriety of seeking releases from departing store managers after conditional certification without mentioning this lawsuit," and the court only considered releases sent after the initiation of the lawsuit but before notice. PPL's closest case, *Carusillo v. Fansided,* 2021 WL 4311167, at *1 (S.D.N.Y Sept. 21, 2021), only considered the rollout of an arbitration provision to potential opt-in plaintiffs at the same time as it was ruling on conditional FLSA certification. Moreover, the defendant had already been distributing updated contractor agreements with arbitration provisions prior to the filing of the case. *Id.* at *6. And again, *Carusillo* was not in a settlement posture whatsoever.

Even during the arguably less fraught time in which members were not actively receiving class notice, courts across the country have exercised their discretion to disallow defendants from communicating with potential class members about arbitration provisions. For example, in *Williams v. Securitas Sec. Servs. USA, Inc.,* 2011 WL 2713741, at *1-2 (E.D. Pa. July 13, 2011),

---

[12] Although it is undisputed that the "[t]he Court's power to restrict communications between parties and putative class members applies even before a class is certified," *In re Initial Pub. Offering Sec. Litig.*, 499 F. Supp. 2d 415, 418 n.13 (S.D.N.Y. 2007), none of the cases PPL cites to in support of its proposed arbitration provision specifically deal with the heightened likelihood of confusion when an arbitration provision is sent out *during the notice period* between preliminary and final settlement approval. Plaintiffs have found no such case either. That is likely because most settling defendants and their counsel already understand that such communications are likely to interfere with the settlement notice process—as Your Honor did when this issue came up at the Preliminary Approval hearing.

# KATZ BANKS KUMIN

the court granted plaintiffs' motion for a protective order and corrective notice before conditional certification because the proposed arbitration provision "stands the concept of fair dealing on its head and is designed to thwart employees of Securitas from participating in this lawsuit." Even prior to preliminary certification, and even with some of the "protections" PPL now relies on (including identifying the pending lawsuit by name in the agreement and allowing for a declination provision), the court found that the agreement "is likely to cause confusion to potential class members." *Id.* at *2-4. Similarly, in *Agilant Solutions,* the court held that a rollout of an arbitration provision to putative class members after plaintiffs filed their motion for conditional certification but before the court granted it was "improper and misleading," at least in part because, as it is believed to be here, defense counsel in the ongoing class litigation was "intimately involved in the rollout of the Arbitration Agreement." 444 F. Supp. 3d at 603, 606. Finally, in *Uber Techs.,* the court exercised its discretion under Rule 23(d) to control dissemination of an arbitration agreement first circulated prior to the filing of the class complaint. 2013 WL 6407583, at *1–2, 7.

PPL's attempt to wave away the Ninth Circuit's holding in *Avery v. TEKsystems, Inc.,* 165 F.4th 1219 (9th Cir. 2026), is misleading at best.[13] Although the arbitration language at issue in that case was arguably more disparaging towards litigation and class actions than PPL's proposed language, the same arguments for denying PPL's motion persist. As in *Avery,* PPL's "arbitration roll out [will be] internally inconsistent and thus confusing." *Id.* at 1231. Most importantly (and relevantly to this motion), the "timing of [defendant's] roll out [will add[]to the confusion." *Id.* at 1232. Here, PPL intends to disseminate the second arbitration provision *during the pendency of the settlement notice period* and prior to final approval. PPL intends to do so on the heels of a misleading forced arbitration provision that was sprung on personal assistants late at night—while many were in the middle of their shifts—as the Settlement was about to be announced, and which was then rescinded a day later. Nothing about the language of PPL's arbitration provision cures the serious potential for confusion that would result from its rollout now, in the middle of the settlement notice process.

## IV.    CONCLUSION

Plaintiffs respectfully request that the Court: (1) deny approval of PPL's proposed arbitration provisions and (2) issue an order under Rule 23(d) preventing PPL from sending the provisions to Settlement Class Members until the Court's order on Final Approval of the Settlement. *See* Plaintiffs' Proposed Order (attached).

We thank the Court for its continued attention to this matter.

Respectfully submitted,

---

[13] *Avery* is not a standalone case. The Fourth and Eleventh Circuits have reached similar results. *See Degidio v. Crazy Horse Saloon and Restaurant, Inc.*, 880 F.3d 135, (4th Cir. 2018) (affirming denial of motion to compel as to "sham" agreements distributed to class members during discovery period of FLSA litigation), *cert. denied*, 585 U.S. 1005; *Billingsley v. Citi Trends, Inc.*, 560 F. App'x 914, 918, 922 (11th Cir. 2014) (affirming voiding of arbitration provisions where employer's "rushed and atypical rollout" was "confusing, misleading, coercive, and clearly designed to thwart unfairly" employee rights to make an informed choice).

# KATZ BANKS KUMIN

The Hon. Lara K. Eshkenazi
August 7, 2026
Page 11

**KATZ BANKS KUMIN LLP**
/s/ Hugh Baran
Hugh Baran (he/him)
Emma Walters (she/her)
Avi Kumin (he/him)*
111 Broadway, Suite 1403
New York, NY 10006
(646) 759-4501
Baran@katzbanks.com
Walters@katzbanks.com
Kumin@katzbanks.com


**THE LEGAL AID SOCIETY**
B. Franco Olshansky
Richard Blum
Rebekah Cook-Mack
Michael Diller
Belkys Garcia
Elizabeth Saylor
Rebecca Antar
49 Thomas Street, Fl 5
New York, NY 10013
(332) 227-7291
bfrancoolshansky@legal-aid.org
rblum@legal-aid.org
rcook-mack@legal-aid.org
mdiller@legal-aid.org
brgarcia@legal-aid.org
esaylor@legal-aid.org
rantar@legal-aid.org

*Counsel for Plaintiffs & the Settlement Class*


*\*Pro hac vice motion to be filed*


cc:      All counsel (via ECF)